**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO**

JEFFERY A. WOGENSTAHL )

      Petitioner, ) Case No. 1:17-cv-298

vs. ) JUDGE THOMAS M. ROSE

WARDEN, CHILLICOTHE )
CORRECTIONAL
                   )
      Respondent.            MAGISTRATE MICHAEL R. MERZ

---

## JEFFERY A. WOGENSTAHL'S PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C § 2254

---

Office of the Ohio Public Defender

KIMBERLY S. RIGBY (0078245)
Supervising Attorney, Death Penalty Dept.
Kimberly.Rigby@opd.ohio.gov
Trial Counsel

ELIZABETH ARRICK (0085151)
Elizabeth.Arrick@opd.ohio.gov
Assistant State Public Defender

250 East Broad St., Suite 1400
Columbus, Ohio 43215
614-466-5394; 614-644-0708 (Fax)

And

ANDREW P. AVELLANO - 0062907
Attorney At Law
4181 East Main Street
Columbus, Ohio 43213
(614) 237-8050; (614) 237-3505 - Fax
Email: drewavo@wowway.com

COUNSEL FOR JEFFREY A. WOGENSTAHL

# TABLE OF CONTENTS

TABLE OF CONTENTS ......................................................................... i

PETITION FOR WRIT OF HABEAS CORPUS, 28 U.S.C. 2254 .......................... 1

JURISDICTION .................................................................................... 1

PROCEDURAL BACKGROUND ............................................................... 2

    A.   Trial Proceedings .......................................................... 2

    B.   Direct Appeal ............................................................... 3

    C.   First Application For Reopening....................................... 26

    D.   Post-Conviction ............................................................ 34

    E.   First New Trial Motion .................................................. 39

    F.   Second Application For Reopening..................................... 41

    G.   Initial Federal Habeas Proceedings ................................... 44

    H.   Second New Trial Motion ............................................... 51

    I.   Resumed Federal Habeas Proceeding................................. 52

    J.   Third New Trial Motion ................................................. 55

    K.   Reopening Of Direct Appeal ........................................... 58

    L.   Second Post-Conviction Proceedings................................. 59

CONSTITUTIONAL VIOLATIONS............................................................ 71

First Claim For Relief: The Prosecution Suppressed Material,
Exculpatory Evidence. United States Constitution, Sixth and
Fourteenth Amendments...................................................................... 71

    A.   The Hamilton County Prosecutor's Office Did Not Have
        Adequate Controls in Place at the Time of Wogenstahl's
        Trial to Identify and Provide Counsel with Exculpatory
        Evidence ..................................................................... 71

    B.   Trial Counsel Made Repeated Discovery Requests.............................. 72

    C.   The Prosecution Suppressed Material Information that
        Impeached the Expert's Opinion that the Hair Found in
        Amber's Underwear Belonged to Wogenstahl ..................... 72

    D.   The Prosecution Suppressed Material Information That
        Both Implicated Peggy Garrett In the Murder of Her
        Daughter and Impeached Her Trial Testimony ................... 75

E.     The Prosecution Suppressed Information That Both Implicated Eric Horn In the Murder of His Sister and Impeached His Trial Testimony............................................ 85

F.     The State Suppressed Material Evidence of the Existence of Other Suspects ................................................... 90

G.     The Prosecution Suppressed Material Information That Impeached the Testimony of, and the Prosecutorial Argument Concerning, the Jail House Informant .............................. 93

H.     The Prosecution Suppressed Material Information that Impeached the Testimony of Two of Its Eyewitnesses ......................... 97

I.     The Prosecution Suppressed Material Information that Two of Its Witnesses Had Participated in Hypnotic Sessions..................... 98

J.     The Prosecution Suppressed Material Information that Impeached Its Theory of the Case ...................................... 101

K.     The Cumulative Weight of the Suppressed Evidence Undermines the Confidence in the Jury's Verdicts in Both Phases of the Trial................................................ 107

L.     Conclusion, First Claim for Relief ..................................... 110

Second Claim for Relief: The Prosecution Knowingly Adduced False Testimony and Engaged in Inaccurate Argument Both Of Which It Neither Corrected Nor Disclosed the Falsity To Trial Counsel...................... 110

A.     The Prosecution Knowingly Adduced The Perjured Testimony Of Peggy Garrett to Obtain a Conviction for Capital Murder and Death Sentence ................................. 111

B.     The Prosecution Knowingly Adduced The Perjured Testimony Of Eric Horn to Obtain a Conviction for Capital Murder and Death Sentence ........................................... 118

C.     The Prosecution Knowingly Adduced The Perjured Testimony Of Bruce Wheeler and Argument Concerning His Testimony to Obtain a Conviction for Capital Murder and Death Sentence ...................................................... 120

D.     The Prosecution Knowingly Used The Perjured Testimony Of Michelle Hunt to Obtain a Conviction for Capital Murder and Death Sentence ...................................... 124

E.     The Prosecution Knowingly Adduced The Perjured Testimony Of Brian Noel to Obtain a Conviction for Capital Murder and Death Sentence........................................... 125

ii

F.    The Prosecution Knowingly Adduced The Perjured Testimony Of Special Agent Douglas Deedrick to Obtain a Conviction for Capital Murder and Death Sentence........................... 126

G.    Because Of The Nature And Quantity Of The Perjured Testimony, A    Reasonable Probability Exists That It Could Have Affected The Jury's Verdicts In The Trial And/Or Sentencing Phases ......................................................................... 128

H.    Conclusion, Second Claim for Relief ................................................. 129


Third Claim for Relief: Trial Counsel's Acts And Omissions Deprived Jeffrey Wogenstahl Of Effective Assistance Of Counsel During The Pretrial, Trial, And Mitigation Phases ......................................... 130

A.    Counsel Performed Unreasonably And Deficiently In The Trial  Phase ......................................................................................... 130

B.    Counsel Performed Unreasonably And Deficiently At Sentencing Phase  Hearing.......................................................... 139

C.    Wogenstahl Was Prejudiced By Counsel's Deficient Performance In Both The Trial And Sentencing Phases .................... 145

D.    Conclusion, Third Claim For Relief ..................................................... 146


Fourth Claim for Relief: The Cumulative Effect of the Federal Constitutional Errors Denied Wogenstahl Due Process Under the Fifth, Sixth, Eighth and Fourteenth Amendments ......................................... 146


Prayer For Relief ................................................................................................ 147

Certificate of Service......................................................................................... 149

## <u>PETITION FOR WRIT OF HABEAS CORPUS, 28 U.S.C. 2254</u>

1.    Jeffrey Wogenstahl, pursuant to Artice I, § 9 and Article III, of the United States Constitution, as well as the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments, 28 U.S.C. § 2241 *et seq.* (including 28 U.S.C. § 2254) and 18 U.S.C. § 3006(A) and all other applicable law, and respectfully moves this Court for: 1) a Writ of Habeas Corpus declaring unconstitutional and invalid his conviction for Aggravated Murder and sentence of death, imposed by the Court of Common Pleas, Hamilton County, Ohio on March 15, 1993 and 2) an order for a new trial, or in the alternative a new sentencing hearing. Wogenstahl further requests that he be granted leave to engage in discovery pursuant to Fed. R. Civ. P, 26, *et seq.* and Rule 6 of the Rules Governing Section 2254 Cases.

2.    Wogenstahl states that he previously unsuccessfully sought federal habeas relief. *See, Wogenstahl v. Mitchell*, 668 F.3d 307 (6th Cir. 2012); cert denied 133 S. Ct. 311, 184 L. Ed. 2d 185 (6th Cir. April 12, 2012). However, he could not have previously raised the claims identified herein because almost all of the facts on which he relies were unavailable during initial habeas proceedings.

3.    Should Wogehstahl discover additional facts or claims not in this Petition, he will necessarily seek leave of court to amend this Petition.

## <u>JURISDICTION</u>

4.    Wogenstahl invokes the jurisdiction of this Court under 28 U.S.C. § 2241, *et seq.* including 28 U.S.C. § 2254. Jeffrey Wogensthal, Inmate No.

1

A269-357875, is being restrained of his liberty by Warden Charlotte Jenkins and the Ohio Department of Rehabilitation and Correction and the Chillicothe Correctional Institution, 15802 State Route 104 North, Chillicothe, Ohio 45601, on death row. Wogenstahl has been under restraint since his transfer to the Ohio Department of Rehabiliation and Correction in 1993, following his convictions and sentences.

5.      Wogenstahl petitions this Honorable Court to be relieved of his convictions and sentences imposed on March 15, 1993 because said convictions and sentences violate the United States Constitution, including the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments, as well as the various treaty and obligations of the United States.

## PROCEDURAL BACKGROUND

**A.      Trial Proceedings**

6.      On September 1, 1992, the Hamilton County Grand Jury indicted Petitioner Jeffrey A. Wogenstahl (hereafter "Wogenstahl") in a three count indictment. *State of Ohio v. Jeffrey A. Wogenstahl*, Case No. B-926287.  The first count charged Petitioner with aggravated murder for causing the death of Amber Garrett on November 24, 1991 during the commission of an aggravated burglary and a kidnapping. This count contained three death penalty specifications: the aggravated murder was committed in conjunction with a kidnapping and an aggravated burglary, and for the purpose of escape.  The second count charged Petitioner with kidnapping Amber Garrett, and contained a prior conviction specification. The third count charged Petitioner with the

2

aggravated burglary of the home of Amber Garrett, and contained a prior conviction specification.

7.    Petitioner was represented throughout the trial court proceedings by attorneys Dale Schmidt and Mark Krumbein.  On February 8, 1993, jury selection commenced. The trial phase began on February 11, 1993.  On February 25, 1993 the jury returned verdicts of guilty on all counts and specifications as charged in the indictment.

8.    On March 2, 1993, the penalty phase of the trial began, and ended that same day with instructions to the jury.  On March 3, 1993, the jury returned a verdict recommending that Petitioner be sentenced to death.

9.    On March 15, 1993, the trial court pronounced sentence, imposed a sentence of death on the first count of the indictment, and consecutive sentences of fifteen years actual incarceration to twenty-five years on the second and third counts of the indictment.  The trial court's judgment entry was filed on March 15, 1993.  The trial court filed its sentencing opinion on March 19, 1993.

**B.    Direct Appeal**

**1.    Direct Appeal, Court of Appeals**

10.    On March 24, 1993, Petitioner filed a notice of appeal from the judgment of conviction and sentence to the Court of Appeals.  *State v. Wogenstahl,* 1st Dist. No. C-930222. Petitioner, through new counsel David Boyd and Herbert Freeman, raised thirty-five assignments of error:

3

FIRST ASSIGNMENT OF ERROR

THE TRIAL COURT ERRED TO THE PREJUDICE OF THE DEFENDANT-APPELLANT IN THAT IT FAILED TO SUPPRESS EVIDENCE GATHERED FROM SEVERAL SEARCHES OF DEFENDANT-APPELLANT'S AUTOMOBILE AND APARTMENT.

SECOND ASSIGNMENT OF ERROR

THE TRIAL COURT ERRED TO THE PREJUDICE OF THE DEFENDANT-APPELLANT IN THAT IT OVERRULED DEFENDANT-APPELLANT'S OBJECTIONS TO INTRODUCTION INTO EVIDENCE OF PHOTOGRAPHS OF THE DECEDENT.

THIRD ASSIGNMENT OF ERROR

THE TRIAL COURT ERRED TO THE PREJUDICE OF THE DEFENDANT-APPELLANT IN THAT IT ADMITTED VIDEOTAPE TESTIMONY OF BRIAN WRAXALL, A NON- EXPERT, AS TO THE IDENTITY OF BLOOD SAMPLES.

FOURTH ASSIGNMENT OF ERROR

THE TRIAL COURT AND THE JURY ERRED TO THE PREJUDICE OF THE DEFENDANT-APPELLANT IN THAT THEY RENDERED A VERDICT THAT WAS MANIFESTLY AGAINST THE WEIGHT OF THE EVIDENCE.

1. A judgment of conviction based upon direct and circumstantial evidence shall be overturned on appeal where the record shows that insufficient evidence was present upon which the trier of fact could reasonably have concluded that all elements of the offense had been proven beyond a reasonable doubt.

2. Where a conviction upon review can be shown to have been attained only by the trier of fact's enhancement of almost exclusively circumstantial evidence with conjecture and sympathy from the victim, the conviction shall not stand.

FIFTH ASSIGNMENT OF ERROR

THE TRIAL COURT ERRED TO THE PREJUDICE OF THE DEFENDANT-APPELLANT IN THAT IT FAILED TO GRANT DEFENDANT-APPELLANT'S MOTION FOR APPOINTMENT OF A PRIVATE INVESTIGATOR AND A MITIGATION EXPERT, AND IN THAT IT FAILED TO ALLOW THE COURT CLINIC EXPERT TO BE

4

GIVEN CONFIDENTIALITY AS WOULD OTHERWISE BE INVOLVED BETWEEN DOCTOR AND PATIENT.

## SIXTH ASSIGNMENT OF ERROR

THE TRIAL COURT ERRED TO THE PREJUDICE OF THE APPELLANT IN THAT IMPOSING THE DEATH SENTENCE, FOR THE OHIO DEATH PENALTY STATUES ARE UNCONSTITUTIONAL, VIOLATE THE EIGHTH AMENDMENT PRESCRIPTION OF CRUEL AND UNUSUAL PUNISHMENT THE FOURTEENTH AMENDMENT GUARANTEES OF DUE PROCESS OF LAW AND TO THE EQUAL PROTECTION OF THE LAWS, AND ALSO BY THE CONCOMITANT PROVISIONS OF THE OHIO CONSTITUTION.

## SEVENTH ASSIGNMENT OF ERROR

THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT BY DENYING HIS MOTION TO SUBMIT A WRITTEN QUESTIONNAIRE TO BE COMPLETED BY PROSPECTIVE JURORS PRIOR TO THE VOIR DIRE THUS UNLAWFULLY AND IMPERMISSIBLY INTERFERING WITH APPELLANT'S CONSTITUTIONALLY GUARANTEED RIGHT TO QUESTION AND EXAMINE PROSPECTIVE JURORS IN A MEANINGFUL MANNER.

## EIGHTH ASSIGNMENT OF ERROR

THE TRIAL COURT COMMITTED REVERSIBLE, PREJUDICIAL ERROR BY DENYING APPELLANT'S MOTION TO ALLOW HIM TO INDIVIDUALLY [EXERCISE] [SIC] TWELVE PEREMPTORY CHALLENGES TO THE PROSPECTIVE JURORS.

1. In a capital case where the ultimate sanction is to be imposed, there is a correspondingly greater need for the reliability of the jury's verdict and recommendation.

2. In a bifurcated capital case, the jurors selected sit in two trials, and make separate deliberations as to guilt and punishment; and both the guilt trial and the penalty trial must satisfy due process requirements, necessitating the use of additional peremptory challenges in order to decide the case on the basis of the evidence before them and not otherwise.

NINTH ASSIGNMENT OF ERROR

THE TRIAL COURT COMMITTED PLAIN ERROR TO THE SUBSTANTIAL PREJUDICE OF DEFENDANT-APPELLANT BY INSTRUCTING THE JURY THAT THEIR SENTENCING DECISION WAS MERELY A "RECOMMENDATION" THUS IMPROPERLY DIMINISHING THE JURY'S RESPONSIBILITY, THEREBY VIOLATING DEFENDANT-APPELLANT'S RIGHTS UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND THEIR CORRESPONDING PROVISIONS UNDER THE OHIO CONSTITUTION.

TENTH ASSIGNMENT OF ERROR

THE TRIAL COURT COMMITTED PLAIN ERROR TO THE SUBSTANTIAL PREJUDICE OF DEFENDANT-APPELLANT BY SUBMITTING TO THE JURY A VERDICT FORM AT THE PENALTY PHASE STATING THAT THE JURY'S VERDICT WOULD ONLY BE A "RECOMMENDATION."

    1.    Was it constitutionally proper for the trial court to instruct the jury that their [sic] verdict is merely a recommendation, thereby diminishing its sense of responsibility in sentencing defendant-appellant. [sic]

ELEVENTH ASSIGNMENT OF ERROR

THE TRIAL COURT ERRED TO THE SUBSTANTIAL PREJUDICE OF DEFENDANT-APPELLANT IN DENYING HIS MOTION FOR INDIVIDUAL EXAMINATION OF PROSPECTIVE JURORS AND FOR THE SEQUESTRATION OF THOSE PASSED FOR CAUSE AND PROVISIONALLY SEATED.

    1.    The trial court abused its discretion in denying the motion of defendant-appellant for individual examination of prospective jurors and for the sequestration of these [sic] jurors passed for cause and provisionally seated.

TWELFTH ASSIGNMENT OF ERROR

THE TRIAL COURT ERRED TO THE SUBSTANTIAL PREJUDICE OF DEFENDANT-APPELLANT BY REFUSING TO ALLOW TWO SEPARATE JURIES FOR DECIDING THE GUILT AND PENALTY PHASES RESPECTIVELY, THEREBY DENYING DEFENDANT-APPELLANT HIS RIGHT TO A FAIR TRIAL UNDER THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION.

1.     Was the defendant-appellant denied a fair trial when the trial court refused to have separate juries decide the guilt and penalty phases?

THIRTEENTH ASSIGNMENT OF ERROR

THE TRIAL COURT COMMITTED PLAIN ERROR IN FAILING TO INSTRUCT THE JURY THAT, IN THE EVENT OF A LIFE SENTENCE, THE ACCUSED MUST EITHER SERVE TWENTY FULL YEARS BEFORE PAROLE ELIGIBILITY ATTACHES OR THIRTY FULL YEARS BEFORE PAROLE ELIGIBILITY ATTACHES, RESULTING IN VIOLATION OF APPELLANT'S CONSTITUTIONAL RIGHT TO RELIABILITY IN THE DETERMINATION OF THE SENTENCE.

FOURTEENTH ASSIGNMENT OF ERROR

THE JUDGMENT OF THE TRIAL COURT, AS WELL AS THE JURY, THAT THE AGGRAVATING FACTOR OF WHICH APPELLANT WAS CONVICTED OUTWEIGHED THE MITIGATING FACTORS PRESENTED BY THE DEFENSE IS CONTRARY TO THE MANIFEST WEIGHT OF THE EVIDENCE AND TO BE FREE FROM CRUEL AND UNUSUAL PUNISHMENT UNDER THE EIGHTH AMENDMENT, AND UNDER ART. I, SEC. 9 OF THE OHIO CONSTITUTION.

1.     Where the state fails to prove beyond a reasonable doubt that the aggravating factor of which the accused was convicted outweighs the mitigating factors presented by the defense, a death verdict, and a death sentence imposed by the trial court must be reversed and the accused resentenced to life imprisonment.

FIFTEENTH ASSIGNMENT OF ERROR

THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT'S CONSTITUTIONAL RIGHT TO RELIABILITY IN THE IMPOSITION OF THE SENTENCE OF DEATH BY BASING IT'S DECISION TO IMPOSE THE DEATH SENTENCE UPON THE NONSTATUTORY AGGRAVATING FACTOR OF THE NATURE AND CIRCUMSTANCES OF THE OFFENSE, BY GIVING INSUFFICIENT CONSIDERATION TO VALID MITIGATING FACTORS, AND BY CONSIDERING THE NONEXISTENCE OF SOME STATUTORY MITIGATING FACTORS AS NONSTATUTORY AGGRAVATING FACTORS.

1.    The consideration of the nature and circumstances of the offense as an aggravating factor in an Ohio capital prosecution is unconstitutional both under the Eighth Amendment requirement of reliability in capital sentencing, also contained in the Ohio Constitution, and a further violation of the right to due process under the Ohio and Federal Constitutions.

## SIXTEENTH ASSIGNMENT OF ERROR

THE LOWER COURT COMMITTED PREJUDICIAL ERROR IN SENTENCING THE APPELLANT TO DEATH WHERE THE SENTENCE OF DEATH WAS EXCESSIVE AND DISPROPORTIONATE IN TERMS OF THE UNDERLYING FACTS TO SIMILAR CASES IN OTHER JURISDICTIONS WHERE THE DEATH PENALTY WAS IMPOSED.

## SEVENTEENTH ASSIGNMENT OF ERROR

THE REQUIREMENT THAT JURY [SIC] MUST RECOMMEND DEATH UPON PROOF BEYOND A REASONABLE DOUBT THAT THE AGGRAVATING CIRCUMSTANCES OUTWEIGH ONLY TO THE SLIGHTEST DEGREE THE MITIGATING CIRCUMSTANCES RENDERS THE OHIO CAPITAL STATUTES [SIC] EVEN THOUGH THE MITIGATING EVIDENCE FALLS JUST SHORT OF EQUIPOISE WITH THE AGGRAVATING FACTORS, WITH THE RESULT THAT THE RISK OF PUTTING SOMEONE TO DEATH WHEN IT IS PRACTICALLY AS LIKELY AS NOT THAT HE DESERVES TO LIVE RENDERS THE OHIO CAPITAL PROCESS ARBITRARY AND CAPRICIOUS, AND, IN THE ABSENCE OF A REQUIREMENT THAT, BEFORE DEATH MAY BE IMPOSED, AGGRAVATING FACTORS MUST SUBSTANTIALLY OUTWEIGH MITIGATING FACTORS, UNCONSTITUTIONAL.

THE OHIO CAPITAL STATUTES ARE CONSTITUTIONALLY INFIRM IN THAT THEY DO NOT PERMIT THE EXTENSION OF MERCY BY THE JURY EVEN THOUGH AGGRAVATING FACTORS MAY ONLY SLIGHTLY OUTWEIGH MITIGATING FACTORS.

## EIGHTEENTH ASSIGNMENT OF ERROR

THE LOWER COURT COMMITTED PREJUDICIAL ERROR IN OVERRULING THE APPELLANT'S MOTION TO REQUIRE THE PROSECUTOR TO DISCLOSE PRIOR TO TRIAL ALL STATEMENTS OF WITNESSES WHOM HE INTENDED TO CALL AT TRIAL.

8

## NINETIETH ASSIGNMENT OF ERROR

THE LOWER COURT ERRED IN OVERRULING APPELLANT'S MOTION FOR THE COURT TO INSTRUCT THE JURY TO CONSIDER MERCY IN THEIR MITIGATION PHASE DELIBERATIONS.

## TWENTIETH ASSIGNMENT OF ERROR

THE LOWER COURT ERRED IN OVERRULING APPELLANT'S MOTION TO BE ALLOWED TO ARGUE FIRST AND LAST AT THE MITIGATION PHASE.

## TWENTY-FIRST ASSIGNMENT OF ERROR

THE LOWER COURT ERRED IN OVERRULING APPELLANT'S MOTION TO SUPPRESS IDENTIFICATION TESTIMONY.

## TWENTY-SECOND ASSIGNMENT OF ERROR

APPELLANT WAS DENIED HIS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL BY THE DECISION OF COUNSEL TO SUBMIT TO THE JURY FOR THEIR [SIC] DETERMINATION THE SPECIFICATION AS TO COUNTS II AND III OF THE INDICTMENT AS TO WHETHER OR NOT THE APPELLANT HAD BEEN PREVIOUSLY CONVICTED OF AGGRAVATED BURGLARY AND THUS DENIED THE APPELLANT HIS RIGHTS UNDER THE SIXTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION AND HIS CONCOMITANT RIGHTS UNDER ARTICLE ONE SECTION 10 OF THE OHIO CONSTITUTION.

## TWENTY-THIRD ASSIGNMENT OF ERROR

THE LOWER COURT COMMITTED PREJUDICIAL ERROR IN OVERRULING THE APPELLANT'S MOTION FOR CHANGE OF VENUE.

## TWENTY- FOURTH ASSIGNMENT OF ERROR

APPELLANT WAS DENIED HIS CONSTITUTIONAL RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL DURING VOIR DIRE OF THE JURY.

TWENTY-FIFTH ASSIGNMENT OF ERROR

THE LOWER COURT ERRED IN THE ADMISSION OF TESTIMONY AS TO THE RESULTS OF THE HALDO ALPHA TEST DONE ON THE BLOOD FOUND IN THE APPELLANT'S CAR SINCE IT DID NOT ESTABLISH TO A REASONABLE DEGREE OF SCIENTIFIC CERTAINTY THAT SAID BLOOD WAS THAT OF THE DECEDENT.

TWENTY-SIXTH ASSIGNMENT OF ERROR

THE LOWER COURT ERRED IN REFUSING TO GRANT A MISTRIAL AFTER THE PROSECUTOR IMPROPERLY COMMENTED IN HIS OPENING STATEMENT AT THE GUILT PHASE OF THE TRIAL THAT THE DEFENDANT'S OFFENSE [SIC] WAS THAT OF ALIBI.

TWENTY-SEVENTH ASSIGNMENT OF ERROR

THE LOWER COURT COMMITTED PREJUDICIAL ERROR AND DENIED THE APPELLANT DUE PROCESS OF LAW BY DENYING APPELLANT'S COUNSEL THE RIGHT TO CROSS EXAMINE THE STATE'S WITNESS [SIC] BASED UPON THEIR PRIOR INCONSISTENT STATEMENTS.

TWENTY-EIGHTH ASSIGNMENT OF ERROR

THE LOWER COURT COMMITTED PREJUDICIAL ERROR IN ADMITTING INTO EVIDENCE TESTIMONY AS TO THE UNDERLYING FACTS COMMITTED BY THE APPELLANT IN A PREVIOUS AGGRAVATED BURGLARY AND THEREAFTER CHARGING THE JURY THAT THEY MIGHT CONSIDER THOSE FACTS AS PROOF THAT THE APPELLANT MURDERED THE DECEDENT USING THE SAME TYPE OF PLAN, DESIGN OR SCHEME THAT HE HAD EMPLOYED IN COMMITTING THE PREVIOUS AGGRAVATED BURGLARY.

TWENTY- NINTH ASSIGNMENT OF ERROR

APPELLANT WAS DENIED DUE PROCESS OF LAW AND A FAIR TRIAL AS A RESULT OF THE PROSECUTOR OFFERING INTO EVIDENCE TESTIMONY HE KNEW TO BE INADMISSIBLE AS TO HOW APPELLANT COMMITTED A PREVIOUS AGGRAVATED BURGLARY AND THEREAFTER ARGUING SAID FACTS TO THE JURY AS CONSTITUTING PROOF THAT THE APPELLANT COMMITTED THE WITHIN MURDER USING THE SAME PLAN, DESIGN, SCHEME OR METHOD.

10

THIRTIETH ASSIGNMENT OF ERROR

THE LOWER COURT COMMITTED PREJUDICIAL ERROR IN ADMITTING THE JAILHOUSE TESTIMONY OF A FORMER FELLOW INMATE OF THE APPELLANT WHICH THE COURT KNEW TO BE TOTALLY UNRELIABLE AND UNWORTHY OF BELIEF.

THIRTY-FIRST ASSIGNMENT OF ERROR

APPELLANT WAS DENIED DUE PROCESS OF LAW AND A FAIR TRIAL BECAUSE OF GROSS MISCONDUCT COMMITTED BY THE PROSECUTOR IN OFFERING THE TESTIMONY OF A FORMER FELLOW INMATE OF THE APPELLANT WHICH HE KNEW TO BE TOTALLY UNRELIABLE AND WHICH WOULD CONTAIN STATEMENTS THAT WOULD PREJUDICE THE JURY AGAINST APPELLANT.

THIRTY-SECOND ASSIGNMENT OF ERROR

THE LOWER COURT COMMITTED PREJUDICIAL ERROR IN THE ADMISSION AS WELL AS THE EXCLUSION OF EVIDENCE AT TRIAL.

THIRTY-THIRD ASSIGNMENT OF ERROR

APPELLANT WAS DENIED DUE PROCESS OF LAW AND A FAIR TRIAL BECAUSE OF GROSS MISCONDUCT CONSISTING OF TOTALLY IMPROPER AND PREJUDICIAL ARGUMENT MADE BY THE PROSECUTOR IN BOTH THE GUILT PHASE AND THE MITIGATION PHASE OF THE TRIAL.

THIRTY- FOURTH ASSIGNMENT OF ERROR

THE TRIAL COURT ERRED TO THE PREJUDICE OF THE DEFENDANT-APPELLANT IN THAT IT REFUSED TO ADMIT INTO EVIDENCE EACH AND EVERY DEFENSE EXHIBIT THAT WAS NOT SUBMITTED WITHOUT OBJECTION.

THIRTY- FIFTH ASSIGNMENT OF ERROR

THE TRIAL COURT ERRED TO THE PREJUDICE OF THE DEFENDANT-APPELLANT IN THAT IT DENIED DEFENDANT-APPELLANT'S REQUEST TO HAVE THE JURY CHARGE INCLUDE SPECIFIC INSTRUCTIONS AS TO THE RELIABILITY (OR LACK THEREOF) OF SO-CALLED EYEWITNESS TESTIMONY.

11.     On November 30, 1994, the Court of Appeals overruled each of the assignments of error and affirmed the judgment of the trial court. *State v. Wogenstahl*, Hamilton App. No. C-930222, 1994 Ohio App LEXIS 5321, unreported (Nov. 30, 1994).

## 2.     Direct Appeal, Supreme Court of Ohio

12.     On January 9, 1995, Petitioner appealed to the Supreme Court of Ohio from the November 30, 1994 judgment of the Court of Appeals. *State v. Wogenstahl,* Case No. 95-42. Petitioner, through new counsel, Fred Hoefle, and prior appellate counsel, Herbert Freemen, raised the following thirty-three propositions of law:

PROPOSITION OF LAW NO. I

SPECIFICATIONS UNDER R.C. 2929.04(A)(3) AND (A)(7) ARE DUPLICATIVE, AND MUST BE MERGED PRIOR TO THE WEIGHING BY THE SENTENCING JURY, THE TRIAL JUDGE, AND AN APPELLATE COURT CONSIDERING THE APPROPRIATE SENTENCE IN A CAPITAL CASE.  THE FAILURE TO MERGE SUCH SPECIFICATIONS CONSTITUTES A VIOLATION OF THE RIGHTS OF THE ACCUSED UNDER THE UNITED STATES CONSTITUTION AND THE OHIO CONSTITUTION AS WELL WHERE THE DEATH SENTENCE IS IMPOSED THEREAFTER.

PROPOSITION OF LAW NO. II

THE POWER CONFERRED BY R.C. 2929.05 UPON APPELLATE COURTS TO REVIEW AGGRAVATING AND MITIGATING FACTORS, AND TO DETERMINE THE APPROPRIATENESS OF A GIVEN DEATH SENTENCE, IS SUBORDINATE TO THE RIGHT OF THE ACCUSED TO TRIAL BY JURY UNDER ART. I. SECS. 5 AND 10 OF THE OHIO CONSTITUTION.

PROPOSITION OF LAW NO. III

UNLESS IT CAN FAIRLY BE HELD BEYOND A REASONABLE DOUBT THAT PENALTY PHASE ERROR IN A CAPITAL TRIAL HAD NO EFFECT UPON THE JURY'S SENTENCING VERDICT, APPELLATE COURTS ARE RENDERED POWERLESS BY THE RIGHT TO TRIAL BY JURY SET FORTH IN THE OHIO CONSTITUTION, ART. I SECS. 5 AND 10, FROM PURPORTING TO "CURE" THE ERROR AND TO AFFIRM THE DEATH SENTENCE; ANY SUCH AFFIRMANCE VIOLATES THE RIGHT OF THE ACCUSED TO TRIAL BY JURY, AND THE DEATH SENTENCE MUST BE VACATED AND SET ASIDE.

PROPOSITION OF LAW NO. IV

THE AFFIRMANCE OF A DEATH SENTENCE BY AN APPELLATE COURT WHICH HAS REWEIGHED THE AGGRAVATING AND MITIGATING FACTORS WITHOUT MERGING SPECIFICATIONS REQUIRED TO BE MERGED, WHERE THE JURY WHICH RECOMMENDED THE DEATH SENTENCE UPON UNMERGED SPECIFICATIONS, AND THE TRIAL JUDGE ALSO DID NOT MERGE THE SPECIFICATIONS IN DETERMINING THE SENTENCE, CONSTITUTES A VIOLATION OF THE RIGHT OF THE ACCUSED UNDER THE EIGHTH AMENDMENT TO HAVE THE DEATH SENTENCE IMPOSED ONLY AFTER THE PROPER PROCEDURES HAVE BEEN FOLLOWED UNDER THE STATE SCHEME FOR IMPOSING THE DEATH SENTENCE, AND ALSO CONSTITUTES A VIOLATION OF THE RIGHT TO DUE PROCESS OF LAW IN THAT SUCH APPELLATE REWEIGHING ABROGATES THE LIBERTY INTEREST CREATED BY STATE LAW, WHICH REQUIRES JURY PARTICIPATION IN THE CAPITAL SENTENCING PROCESS.

1. The trial court committed prejudicial error in failing to merge the capital specifications for felony murder and escaping detection.

2. The imposition of the death sentence by the trial court constitutes an independent violation of Ohio law, the Ohio Constitution, and the Eighth and Fourteenth Amendments to the Constitution of the United States.

3. The affirmance of the death sentence by the Court of Appeals constitutes an independent violation of Ohio law, the Ohio Constitution, and the Eighth and Fourteenth Amendments to the Constitution of the United States.

4.     Even if an appellate court, in presuming to substitute its judgment for that of the jury by merging the specifications as the trial court ought to have done, and then itself reweighed the aggravating and mitigating factors, it would deny to appellant the right to have his jury participate in the sentencing process, which right is secured to him by the Ohio Constitution, the Revised Code, and the Sixth, Eighth and Fourteenth Amendments, together with his right to due process of law under the Fourteenth Amendment to the U.S. Constitution and Art. I, Sec.16 of the Ohio Constitution.

5.     The due process clause of the Fourteenth Amendment protects the right of Ohio capital defendants under the Revised Code and the Ohio Constitution to jury participation in the sentencing process, and is violated where appellate courts usurp the function of the jury and make specific factual findings with respect to mitigating factors, and purport to re-weigh the aggravating circumstances against the mitigating factors as the jury would have done absent error in penalty phase proceedings involving the presentation to, and consideration by, the jury of improper, duplicative aggravating factors.

6.     The Eighth Amendment requires that states adhere to their own constitutional procedures for implementation of the death sentence; where the state courts deny to the defendant his state-protected right to jury participation in sentencing, the Eighth Amendment has been violated, though neither the Sixth nor the Eighth Amendment protects the right of a capital defendant to jury participation in sentencing.

PROPOSITION OF LAW NO. V

WHERE A TRIAL COURT, IN ITS OPINION JUSTIFYING A DEATH SENTENCE, INCORPORATES VERBATIM THEREIN *AS THE TRIAL COURT'S OWN CONCLUSIONS* NEGATIVE STATEMENTS ABOUT THE ACCUSED MADE IN THE PROSECUTOR'S OPENING STATEMENT FIVE WEEKS PRIOR TO THE SENTENCING PROCEEDINGS, AND ALSO INCORPORATES PRACTICALLY VERBATIM FROM SIMILAR OPINIONS OF OTHER JUDGES, AND OF THE SAME JUDGE, IN PRIOR CAPITAL CASES, CONCLUSIONS PURPORTEDLY RESULTING FROM THE SENTENCING PROCESS IN THE CASE AT BAR, THEN THE OFFENDER HAS BEEN DENIED HIS EIGHTH AMENDMENT RIGHT TO INDIVIDUALIZED AND INDEPENDENT CONSIDERATION BY THE TRIAL COURT OF THE APPROPRIATE

SENTENCE IN HIS CASE, AND HIS FOURTEENTH AMENDMENT RIGHT TO DUE PROCESS OF LAW.

      1.    The Eighth Amendment requirement of individualized sentencing determinations in capital cases is violated where the trial court, in its sentencing opinion, merely parrots prior sentencing opinions by the sentencing judge and other judges in the jurisdiction, in other capital cases totally unrelated to that in which the death sentence is imposed.

      2.    Where the trial court, in its sentencing opinion purporting to justify the sentence of death imposed upon an offender, adopts verbatim from the prosecutor's opening statement in a capital trial negative and pejorative comments about the accused, the accused has been denied his Eighth Amendment right to an individualized sentencing determination, and to his right to due process under the Fourteenth Amendment by an impartial court, and to the fundamental fairness required by the due process clause. Similar provisions of the Ohio Constitution were also violated by these actions of the trial court.

PROPOSITION OF LAW NO. VI

WHERE, IN A CAPITAL CASE, THE SENTENCING COURT CONSIDERS AND WEIGHS INVALID OR IMPROPER AGGRAVATING FACTORS IN IMPOSING THE DEATH SENTENCE, THAT SENTENCE OFFENDS THE EIGHTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES, AND THE RIGHT TO DUE PROCESS UNDER THE FOURTEENTH AMENDMENT, AND THEIR COUNTERPARTS IN THE OHIO CONSTITUTION, AND MUST BE REVERSED.

      1.    The consideration of the nature and circumstances of the offense as an aggravating factor in an Ohio capital prosecution is unconstitutional both under the Eighth Amendment requirement of reliability in capital sentencing, also contained in the Ohio Constitution, and a further violation of the right to due process under the Ohio and federal Constitutions.

      2.    The nature and circumstances of the case were unlawfully considered and relied upon as nonstatutory aggravating factors, were improperly and illegally weighed, and thus contributed to an unconstitutionally unreliable decision for death.

      3.    Reliance upon the heinousness, malice, or cruelty implicit in the facts of a homicide as an aggravating factor is

unconstitutional, and a death sentence imposed in reliance upon such factors is unconstitutional.

4. Reliance upon nonstatutory aggravating factors in the weighing process is unlawful, and requires reversal of the resulting death sentence.

5. The consideration of the history, character, and background of the offender as a (nonstatutory) aggravating factor by a sentencing court in a capital case is contrary to the law and to the Eighth and Fourteenth Amendments to the Constitution of the United States, and to their counterparts in the Ohio Constitution.

6. Where the trial court's sentencing opinion in a capital case fails to state the reasons why aggravation outweighs mitigation, the death sentence imposed must be reversed as contrary to Ohio law and to the Eighth and Fourteenth Amendments to the Constitution of the United States.

## PROPOSITION OF LAW NO. VII

THE DEFENDANT IN A CAPITAL CASE IS ENTITLED TO 12 PEREMPTORY JURY CHALLENGES, AND THE RESTRICTION OF THE DEFENSE TO 6 PEREMPTORY CHALLENGES VIOLATES OHIO LAW AND THE RIGHTS OF THE ACCUSED TO A FAIR AND IMPARTIAL JURY UNDER THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION, AND UNDER ART. I, SECS. 5 AND 9 OF THE OHIO CONSTITUTION.

## PROPOSITION OF LAW NO. VIII

THE DENIAL OF THE RIGHT OF THE ACCUSED TO JURY INSTRUCTIONS AS TO THE MITIGATING FACTORS OF RESIDUAL DOUBT AND MERCY VIOLATES THE RIGHT OF THE ACCUSED TO CONSIDERATION BY THE SENTENCER IN A CAPITAL PROSECUTION OF ALL RELEVANT MITIGATING FACTORS, IN VIOLATION OF HIS RIGHTS UNDER THE EIGHTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES, TO DUE PROCESS UNDER THE FOURTEENTH AMENDMENT, AND TO HIS RIGHTS UNDER THE OHIO CONSTITUTION, ART. I, SECS. 9 AND 16.

PROPOSITION OF LAW NO. VIII

THE APPLICATION AGAINST THE ACCUSED BY AN INTERMEDIATE APPELLATE COURT OF A CHANGE IN THE LAW OCCURRING BETWEEN THE IMPOSITION OF A DEATH SENTENCE AND THE DECISION OF THE APPELLATE COURT TO AFFIRM, WHICH CHANGE DEPRIVES THE ACCUSED OF THE BENEFIT OF MITIGATING FACTORS TO WHICH HE WAS ENTITLED WHEN HIS CASE WAS TRIED, VIOLATES HIS PROTECTION AGAINST *EX POST FACTO* LAWS, IN VIOLATION OF ART. I, SEC. 10 OF THE UNITED STATES CONSTITUTION, AND ART. II, [SEC.] 28 OF THE OHIO CONSTITUTION, AS WELL AS R.C. 1.48.

PROPOSITION OF LAW NO. X

THE TRIAL COURT COMMITTED ERROR PREJUDICIAL TO APPELLANT'S EIGHTH AMENDMENT AND DUE PROCESS RIGHTS IN PERMITTING THE PROSECUTION TO ARGUE THAT THE JURY'S DEATH VERDICT WAS ONLY A RECOMMENDATION, AND ALSO IN INSTRUCTING THE JURY, AND PROVIDING VERDICT FORMS TO THE EFFECT THAT THE JURY'S VERDICT WAS ONLY A RECOMMENDATION, AND WAS NOT BINDING ON THE TRIAL COURT.

PROPOSITION OF LAW NO. XI

THE DENIAL OF DEFENSE REQUESTS FOR FUNDS TO RETAIN THE SERVICES OF AN INVESTIGATOR, AND FOR A MITIGATION SPECIALIST, DENIED APPELLANT THE RIGHT TO THE EQUAL PROTECTION OF THE LAWS, SECURED TO HIM BY THE FOURTEENTH AMENDMENT TO THE U.S. CONSTITUTION, AND RENDERED HIS DEATH SENTENCE CONSTITUTIONALLY INFIRM UNDER THE EIGHTH AMENDMENT, AS WELL AS VIOLATING HIS RIGHT TO DUE PROCESS OF LAW UNDER THE U.S. AND OHIO CONSTITUTIONS.

PROPOSITION OF LAW NO. XII

WHERE THE PROSECUTION, AT THE PENALTY PHASE OF A CAPITAL PROSECUTION, IS PERMITTED, OVER OBJECTION AND MOTIONS FOR MISTRIAL, TO ADDUCE EVIDENCE OF A SINGLE INCIDENT OF A PRIOR "BAD ACT" OCCURRING TEN YEARS PRIOR TO THE OFFENSE AT BAR, AND THE NATURE OF SUCH ACT, AND EVEN ITS EXISTENCE, WAS NOT SHOWN TO HAVE OCCURRED; THE ACCUSED WAS NOT INDICTED FOR A

SPECIFICATION BASED UPON SUCH INCIDENT; AND NO CONVICTION RESULTED FROM SUCH INCIDENT, THEN THE IMPOSITION OF THE DEATH SENTENCE WAS THE RESULT OF UNCONSTITUTIONAL WEIGHING AND CONSIDERATION OF A NONSTATUTORY AGGRAVATING FACTOR, THE RIGHT OF THE ACCUSED UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS HAS BEEN VIOLATED, AND REVERSAL OF THE DEATH SENTENCE IS REQUIRED.

## PROPOSITION OF LAW NO. XIII

EGREGIOUS MISCONDUCT BY THE PROSECUTOR IN THE PENALTY PHASE OF CAPITAL PROCEEDINGS REQUIRES REVERSAL OF THE DEATH SENTENCE, AND WHERE THE PROSECUTOR, IN THE GUISE OF REBUTTAL, OFFERS GROSSLY PREJUDICIAL AND INADMISSIBLE EVIDENCE OF A NONSTATUTORY AGGRAVATING FACTOR, AND HIS FINAL ARGUMENT FOR DEATH ARGUES NONSTATUTORY AGGRAVATING FACTORS, MISSTATES THE EVIDENCE, CONTAINS INFLAMMATORY REMARKS AND INVECTIVE AGAINST THE ACCUSED AND HIS COUNSEL, A DEATH SENTENCE BASED ON A JURY VERDICT FOLLOWING SUCH ARGUMENTS VIOLATES DUE PROCESS AND THE EIGHTH AMENDMENT OF THE UNITED STATES CONSTITUTION, AND THEIR COUNTERPARTS IN THE OHIO CONSTITUTION.

## PROPOSITION OF LAW NO. XIV

IT IS ERROR FOR THE TRIAL COURT IN A CAPITAL PROSECUTION TO REFUSE A DEFENSE REQUEST TO SUBMIT A QUESTIONNAIRE PROMULGATED BY DEFENSE COUNSEL TO PROSPECTIVE JURORS PRIOR TO VOIR DIRE, IN VIOLATION OF THE RIGHTS OF THE ACCUSED UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION OF THE UNITED STATES, AND ART. I, SECS. 9 AND 16 OF THE OHIO CONSTITUTION.

## PROPOSITION OF LAW NO. XV

IT IS ERROR FOR THE TRIAL COURT IN A CAPITAL PROSECUTION TO REFUSE A DEFENSE REQUEST TO CONDUCT INDIVIDUAL, SEQUESTERED VOIR DIRE, IN VIOLATION OF THE RIGHTS OF THE ACCUSED UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION OF THE UNITED STATES, AND ART. I, [SECS.] 9 AND 16 OF THE OHIO CONSTITUTION.

PROPOSITION OF LAW NO. XVI

IT IS ERROR FOR THE TRIAL COURT IN A CAPITAL PROSECUTION TO REFUSE A DEFENSE REQUEST TO ARGUE FIRST AND LAST TO THE JURY AT THE PENALTY PHASE OF THE PROSECUTION, IN VIOLATION OF THE RIGHTS OF THE ACCUSED UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION OF THE UNITED STATES, AND ART. I., [SECS.] 9 AND 16 OF THE OHIO CONSTITUTION.

PROPOSITION OF LAW NO. XVII

IT IS ERROR FOR THE TRIAL COURT IN A CAPITAL PROSECUTION TO REFUSE A DEFENSE REQUEST FOR SEPARATE JURIES FOR THE GUILT AND, IF NECESSARY, THE PENALTY PHASES OF THE PROSECUTION, IN VIOLATION OF THE RIGHTS OF THE ACCUSED UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION OF THE UNITED STATES, AND ART. I, SECS. 9 AND 16 OF THE OHIO CONSTITUTION.

PROPOSITION OF LAW NO. XVIII

THE OHIO DEATH PENALTY STATUTES ARE UNCONSTITUTIONAL, VIOLATING THE EIGHTH AMENDMENT PROSCRIPTION OF CRUEL AND UNUSUAL PUNISHMENTS, THE FOURTEENTH AMENDMENT GUARANTEE TO DUE PROCESS OF LAW AND TO THE EQUAL PROTECTION OF THE LAWS, AND ALSO VIOLATES THE CONCOMITANT PROVISIONS OF THE OHIO CONSTITUTION.

(A)    The death penalty is so totally without penological justification that it results in the gratuitous infliction of suffering, and that consequently, there is no rational state interest served by the ultimate sanction.

(B)    Both locally, statewide and nationally, the death penalty is inflicted disproportionately upon those who kill whites as opposed to those who kill blacks, and even within Hamilton County, the death penalty is selectively imposed, rendering the penalty as applied in Hamilton County arbitrary and capricious on the one hand, and the product of racial discrimination on the other.

19

(C)     The use of the same operative fact to first elevate what would be "ordinary" murder to aggravated murder, and then to capital, death-eligible aggravated murder permits the state (1) to obtain a death sentence upon less proof in a felony murder case than in a case involving prior calculation and design, although both crimes are ostensible [sic] equally culpable under the Revised Code, and (2) fails to narrow the capital class to those murderers for whom the death penalty is constitutionally appropriate.

(D)     The requirement that a jury must recommend death upon proof beyond a reasonable doubt that the aggravating circumstances outweigh only to the slightest degree the mitigating circumstances renders the Ohio capital statutes quasi-mandatory and permits the execution of an offender even though the mitigating evidence falls just short of equipoise with the aggravating factors, with the result that the risk of putting someone to death when it is practically as likely as not that he deserves to live renders the Ohio capital process arbitrary and capricious, and, in the absence of a requirement that, before death may be imposed, aggravating factors must *substantially* outweigh mitigating factors, unconstitutional.

(F)     [sic]  The provisions of Crim. R. 11(C)(3) permitting a trial court to dismiss specifications upon a guilty plea only under the nebulous and undefined concept "in the interests of justice" (1) needlessly encourages guilty pleas and the concomitant waiver of the right to jury, to compulsory process and to confrontation and (2) reintroduces the possibility that the death sentence will be imposed arbitrarily and capriciously.

(G)     [sic]  The Ohio capital sentencing scheme is unconstitutional because it provides no standards for sentencing or review at several significant stages of the process and consequently death sentences are imposed, and reviewed, without sufficient statutory guidance to juries, trial courts and reviewing courts to prevent the unconstitutional, arbitrary and capricious infliction of the death penalty.

PROPOSITION OF LAW NO. XIX

A CONVICTION AND DEATH SENTENCE FOR AGGRAVATED MURDER MUST BE REVERSED AS VIOLATIONS OF THE FUNDAMENTAL FAIRNESS REQUIRED BY THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT, AND THE SIXTH AMENDMENT RIGHT TO TRIAL BEFORE A FAIR AND IMPARTIAL JURY, AS WELL AS THEIR COUNTERPARTS IN THE OHIO

CONSTITUTION, AS WELL AS THE EIGHTH AMENDMENT PROHIBITION AGAINST CRUEL AND UNUSUAL PUNISHMENT, WHERE THE CONVICTION AND DEATH SENTENCE WERE OBTAINED THROUGH USE OF REPETITIVE, CUMULATIVE PHOTOGRAPHS OF THE CORPSE OF THE DECEASED, THE NET PREJUDICIAL EFFECT OF WHICH FAR OUTWEIGHED THEIR PROBATIVE VALUE.

## PROPOSITION OF LAW NO. XX

UNLESS AND UNTIL THE ACCUSED PUTS HIS CHARACTER IN ISSUE, IT IS IMPROPER, PREJUDICIAL ERROR TO PERMIT THE STATE TO PRESENT EVIDENCE IN ITS CASE IN CHIEF PURPORTING TO DEMONSTRATE THAT THE ACCUSED IS A BAD PERSON, IN VIOLATION OF THE RIGHT OF THE ACCUSED TO DUE PROCESS OF LAW AND TO A FAIR AND IMPARTIAL JURY, UNDER THE SIXTH AND FOURTEENTH AMENDMENTS, RESPECTIVELY, TO THE CONSTITUTION OF THE UNITED STATES, AND, WHERE A DEATH SENTENCE IS THE RESULT OF THE PROCEEDINGS, IN VIOLATION OF THE EIGHTH AMENDMENT AS WELL; SIMILAR RIGHTS PROTECTED BY THE OHIO CONSTITUTION WERE SIMILARLY VIOLATED.

## PROPOSITION OF LAW NO. XXI

IT IS PREJUDICIAL ERROR, AND A VIOLATION OF THE RIGHT OF THE ACCUSED TO DUE PROCESS OF LAW, SECURED BY THE FOURTEENTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES TO ADMIT EVIDENCE OF A PRIOR OFFENSE WHICH IS TEMPORALLY REMOTE, AND NOT AT ALL SIMILAR TO THE OFFENSE IN THE CASE AT BAR, UNDER THE PURPORTED "SAME AND SIMILAR ACT" EXCEPTION TO THE GENERAL RULE THAT EVIDENCE OF PRIOR CRIMINAL CONDUCT IS NOT ADMISSIBLE TO PROVE AN ELEMENT OF THE SUBSEQUENT OFFENSE THEN BEING TRIED.

## PROPOSITION OF LAW NO. XXII

A DEATH SENTENCE MUST BE REVERSED AS CONTRARY TO THE REVISED CODE, AS WELL AS THE EIGHTH AMENDMENT, WHERE THE TRIAL COURT FAILS TO INSTRUCT THE JURY THAT THE AGGRAVATING CIRCUMSTANCE UNDER R.C. 2929.04(A)(7) CONTAINS TWO MUTUALLY EXCLUSIVE ALTERNATIVES, AND THUS PERMITS CONVICTION OF THE AGGRAVATING CIRCUMSTANCE UPON LESS THAN A UNANIMOUS VOTE OF THE JURY; SUCH AN ERROR IS ALSO AN INDEPENDENT VIOLATION

OF THE RIGHT OF THE ACCUSED TO DUE PROCESS OF LAW; SIMILAR RIGHTS SECURED BY THE OHIO CONSTITUTION ARE ALSO VIOLATED THEREBY.


PROPOSITION OF LAW NO. XXIII

ADMISSION OF AN EXPERT OPINION WITH RESPECT TO A HALDO-ALPHA BLOOD TEST INSUFFICIENT TO ESTABLISH TO A REASONABLE SCIENTIFIC CERTAINTY THAT BLOOD FOUND IN THE DEFENDANT'S AUTO WAS THAT OF THE DECEASED VICTIM, WHERE THE EXPERT POSSESSES INSUFFICIENT EXPERTISE, AND WHERE THE DEFENDANT OWNED THE AUTO FOR BUT THREE DAYS PRIOR TO THE OFFENSE, AND WHERE THE BLOOD REMOVED FROM THE DEFENDANT'S AUTO COULD HAVE BEEN THERE AS LONG AS TEN YEARS, IS PREJUDICIAL ERROR, AND A DENIAL OF DUE PROCESS.

PROPOSITION OF LAW NO. XXIV

WHERE THE IDENTIFICATION OF THE ACCUSED BY A WITNESS IS THE RESULT OF OVERLY SUGGESTIVE POLICE INVESTIGATIVE TACTICS, THE REFUSAL OF THE TRIAL COURT TO SUPPRESS THE WITNESS' IDENTIFICATION TESTIMONY VIOLATES THE RIGHT OF THE ACCUSED TO DUE PROCESS OF LAW, REQUIRING REVERSAL.

PROPOSITION OF LAW NO. XXV

WHERE THE STATE FAILS TO PROVE BEYOND A REASONABLE DOUBT THAT THE ACCUSED IS THE PERPETRATOR OF THE CRIMES WITH WHICH HE HAS BEEN CHARGED, CONVICTIONS FOR AGGRAVATED MURDER, AGGRAVATED BURGLARY AND KIDNAPPING, AND THE CAPITAL SPECIFICATIONS ATTENDANT THERETO, MUST BE REVERSED AS CONTRARY TO THE RIGHT OF THE ACCUSED TO DUE PROCESS OF LAW UNDER THE OHIO AND FEDERAL CONSTITUTIONS.

PROPOSITION OF LAW NO. XXVI

CONVICTIONS FOR AGGRAVATED MURDER WHICH ARE CONTRARY TO THE MANIFEST WEIGHT OF THE EVIDENCE MUST BE REVERSED, AS CONTRARY TO THE RIGHT OF THE ACCUSED TO DUE PROCESS OF LAW UNDER THE OHIO AND FEDERAL CONSTITUTIONS.

22

PROPOSITION OF LAW NO. XXVII

THE AGGRAVATING CIRCUMSTANCES APPELLANT WAS FOUND
GUILTY OF VIOLATING DO NOT OUTWEIGH THE MITIGATING
FACTORS, AND HENCE THE DEATH SENTENCE IMPOSED UPON
APPELLANT VIOLATES HIS RIGHTS UNDER THE EIGHTH AND
FOURTEENTH AMENDMENTS TO THE UNITED STATES
CONSTITUTION, AND VIOLATE OHIO LAW AS WELL.

PROPOSITION OF LAW NO. XXVIII

WHERE CONVICTIONS OF CAPITAL MURDER AND RELATED
OFFENSES IS [SIC] TAINTED BY PREJUDICIAL PROSECUTORIAL
MISCONDUCT WHICH DEPRIVES THE ACCUSED OF A FAIR
TRIAL, THOSE CONVICTIONS VIOLATE THE FUNDAMENTAL
FAIRNESS REQUIRED BY DUE PROCESS, AND THE CONVICTION
MUST BE REVERSED AS VIOLATIVE OF THE OHIO AND
FEDERAL CONSTITUTIONS.

PROPOSITION OF LAW NO. XXIX

A DEATH SENTENCE FOLLOWING A VERDICT OF A JURY FROM
WHICH ONE OR MORE VENIRE PERSONS WERE IMPROPERLY
EXCUSED BECAUSE OF THEIR VIEWS WITH RESPECT TO
CAPITAL PUNISHMENT VIOLATES THE RIGHT OF THE ACCUSED
TO A FAIR AND IMPARTIAL JURY UNDER THE SIXTH, EIGHTH
AND FOURTEENTH AMENDMENTS TO THE UNITED STATES
CONSTITUTION, AND THEIR COUNTERPARTS UNDER THE OHIO
CONSTITUTION.

PROPOSITION OF LAW NO. XXX

WHERE ONE ON TRIAL FOR A CAPITAL CRIME IS DENIED THE
EFFECTIVE ASSISTANCE OF COUNSEL, IN VIOLATION OF HIS
RIGHT THERETO UNDER THE SIXTH, EIGHTH AND
FOURTEENTH AMENDMENTS TO THE CONSTITUTION OF THE
UNITED STATES, AND UNDER THE OHIO CONSTITUTION, ART. I,
SEC. 10, HIS CONVICTION AND SENTENCE MUST BE
REVERSED.

PROPOSITION OF LAW NO. XXI

WHERE APPELLATE COUNSEL FAIL TO RAISE ON APPEAL THE
ISSUE OF INEFFECTIVENESS OF TRIAL COUNSEL IN FAILING TO
OBJECT TO PREJUDICIAL PROSECUTORIAL MISCONDUCT IN
ARGUMENT, THE ACCUSED HAS BEEN DENIED THE EFFECTIVE

ASSISTANCE OF APPELLATE COUNSEL SECURED TO HIM BY THE SIXTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION OF THE UNITED STATES, AND BY ART. I, [SEC.] 10 OF THE OHIO CONSTITUTION.

PROPOSITION OF LAW NO. XXXII

WHERE, DURING A CRIMINAL TRIAL, THERE ARE MULTIPLE INSTANCES OF ERROR, AND THE CUMULATIVE EFFECT OF SUCH ERRORS DEPRIVES THE ACCUSED OF A FAIR TRIAL AND UNDERMINES THE RELIABILITY OF THE CONVICTION AND THE SENTENCE OF DEATH IMPOSED UPON A JURY VERDICT, THE RIGHTS OF THE ACCUSED TO DUE PROCESS AND TO BE FREE FROM CRUEL AND UNUSUAL PUNISHMENT, UNDER THE FOURTEENTH AND EIGHTH AMENDMENTS, RESPECTIVELY, OF THE UNITED STATES CONSTITUTION, AND THEIR COROLLARIES IN THE OHIO CONSTITUTION, HAVE BEEN VIOLATED, REQUIRING REVERSAL.

PROPOSITION OF LAW NO. XXXIII

TO COMPORT WITH DUE PROCESS UNDER THE UNITED STATES AND OHIO CONSTITUTIONS, AND THE OHIO CAPITAL STATUTES, FOR PURPOSES OF PROPORTIONALITY REVIEW, DEATH SENTENCES MUST BE COMPARED WITH ALL OTHER CASES WITHIN THE JURISDICTION IN WHICH THE DEATH SENTENCE WAS IMPOSED, AS WELL AS THOSE CAPITAL CASES IN WHICH IT WAS NOT IMPOSED.

13. On March 22, 1995, counsel filed a motion in the Ohio Supreme Court requesting leave to file, Petitioner's *pro se* brief. On April 26, 1995, the Ohio Supreme Court denied the motion. *State v. Wogenstahl,* 72 Ohio St.3d 1411, 647 N.E.2d 1389 (1995). On April 6, 1995, Petitioner filed a *pro se* motion in the Ohio Supreme Court for leave to file his *pro se* brief. In an entry dated May 10, 1995, the Ohio Supreme Court denied that motion. *State v. Wogenstahl,* 72 Ohio St.3d 1428, 648 N.E.2d 1373 (1995).

24

14.     On March 6, 1996, in Case No. 95-42, the Ohio Supreme Court affirmed the judgment of the Court of Appeals and upheld the sentence of death.  *State v. Wogenstahl*, 75 Ohio St.3d 344, 662 N.E.2d 311 (1996).  On March 6, 1996, the Ohio Supreme Court ordered the sentence to be carried into execution on June 4, 1996.  Petitioner, through counsel, moved the Ohio Supreme Court on March 18, 1996 for reconsideration. That Court denied the motion on April 24, 1996.  *State v. Wogenstahl*, 75 Ohio St.3d 1453, 663 N.E.2d 333 (1996).

15.     On May 2, 1996, Petitioner moved the Ohio Supreme Court for a stay of execution pending the filing of a petition for writ of certiorari to the United States Supreme Court.  On May 22, 1996, the Ohio Supreme Court granted a stay until final disposition of the petition for writ of certiorari to the United States Supreme Court.  *State v. Wogenstahl*, 775 Ohio ST.3d 1492664 N.E.2d 948 (1996).

### 3.     Direct Appeal, United States Supreme Court

16.     Petitioner timely filed a petition for certiorari with the United States Supreme Court. Through counsel, Fred Hoefle and Herbert Freemen, Petitioner presented the following questions:

> I.     Whether, in a capital prosecution, the denial of defense requests for funds to retain the services of an investigator, and for a mitigation specialist, denied Petitioner the right to the equal protection of the laws, secured to him by the  Fourteenth Amendment to the United States Constitution, and rendered his death sentence constitutionally infirm under the Eighth Amendment, as well as violating his right to due process of law under the U.S. and Ohio constitutions.

> II.     Whether the Eighth and Fourteenth Amendments are violated by prosecutorial misconduct at the penalty phase of capital murder

25

proceedings in arguing nonstatutory aggravating factors, injecting inadmissible evidence of a nonstatutory aggravating factor, misstating the law and appealing to the passions and prejudices of the jury violates the Eighth Amendment in a "weighing state" where a jury verdict for life imprisonment is absolutely binding upon all courts.

III.    Whether the failure of defense counsel in a capital case to object to egregious prosecutorial misconduct in penalty phase arguments violates the Sixth, Eighth and Fourteenth Amendments in a weighing state where a life verdict by the sentencing jury is absolutely binding upon all courts.

IV.    Whether the Eighth Amendment and the Fourteenth Amendment are violated by a statutory scheme for implementation of the death sentence, as interpreted by the Supreme Court of a "weighing state", which requires the sentencer to "consider" the nature and circumstances of the aggravating circumstances, but forbids the sentencer to weigh the nature and circumstances of the offense.

17.    The United States Supreme Court denied Petitioner's petition for writ of certiorari on October 7, 1996.  *Wogenstahl v. Ohio*, 519 U.S. 895, 117 S.Ct. 240, 136 L.Ed.2d 169 (1996).

## C.  First Application For Reopening

### 1.    First Application for Reopening, Court of Appeals

18.    On December 1, 1994, Petitioner filed a *pro se* application for reconsideration in the Court of Appeals.  In the application for reconsideration, Petitioner raised the following assignments of error:

FIRST ASSIGNMENT OF ERROR

APPELLANT WOGENSTAHL WAS DEPRIVED OF HIS RIGHTS TO DUE PROCESS, A FAIR TRIAL AND A FAIR AND RELIABLE DETERMINATION OF HIS GUILT OR INNOCENCE AS GUARANTEED BY THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS OF THE U.S. CONSTITUTION DUE TO PROSECUTORIAL MISCONDUCT.

1.    Prosecution withholding favorable evidence.

26

2. Appellant was denied due process of law and a fair trial because of misconduct by the prosecution that consisted of totally improper comments, vouching to the credibility of state's witnesses and asserting personal opinion as to the guilt and credibility of appellant during closing arguments of both phases of the trial.

3. Appellant was denied due process of law and a fair trial due to misconduct by the prosecution that consisted of totally improper cross-examination of appellant.

SECOND ASSIGNMENT OF ERROR

ABUSE OF DISCRETION COMMITTED BY THE TRIAL JUDGE WAS REVERSIBLE ERROR AND DENIED APPELLANT A FAIR TRIAL AS GUARANTEED BY THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS OF THE U.S. CONSTITUTION.

1. Judge Nadel committed reversible error by restricting what may be considered during the mitigation phase of appellant's trial.

2. Judge Nadel committed reversible error by misstating Ohio law in his mitigation phase jury instructions.

3. It was abuse [sic] of discretion by the trial judge for giving inaccurate jury instructions which relieved the state burden [sic] of proof.

4. It was abuse [sic] of discretion by the trial judge for not giving proper instructions during both phases of the trial.

(A) Appellant Wogenstahl was entitled to a special instruction on motive.

(B) During the mitigation phase, appellant was also entitled to have the jury informed that they may consider residual doubt while deliberating concerning the matter of sentencing.

5. It was abuse [sic] of discretion by the trial judge for not ruling on any of defense counsel's objections to the improper comments made by the prosecution during closing arguments of both phases of the trial.

6.     It was abuse [sic] of discretion by the trial judge for denying appellant's pretrial motion for disclosure of impeaching evidence.

THIRD ASSIGNMENT OF ERROR

INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL CAUSED APPELLANT'S CONVICTION AND DEATH SENTENCE TO BE IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS OF THE U.S. CONSTITUTION.

1.     Appellant's trial counsel were deficient for not calling Melisa A. Weber, staff molecular biologist from Cellmark Diagnostics, to testify as a defense witness.

2.     Appellant's trial counsel were deficient for not requesting an evidentiary hearing concerning the admission of Mr. Wraxall's HLA DQ Alpha test results as not being a reliable scientific testing method.

4.[sic] Appellant's trial counsel were deficient for eliciting adverse evidence during the mitigation phase.

5.     Appellant's trial counsel were deficient for making prejudicial comments against appellant.

6.     Appellant's trial counsel were ineffective for not requesting a special jury instruction on motive.

7.     Appellant's trial counsel were deficient for not requesting that the jury be instructed they may consider residual doubt during mitigation.

8.     Appellant's trial counsel were ineffective for not objecting to Judge Nadel [sic] giving inaccurate jury instructions.

9.     Appellant's trial counsel were ineffective for not objecting to Judge Nadel [sic] misstating Ohio law in the mitigation phase jury instructions.

10.     Appellant's trial counsel were deficient for not informing the trial judge that the prosecutor was in violation of the motion for discovery.

11.     Appellant's trial counsel were ineffective for not making proper objections during both phases of the trial.

12. Appellant's trial counsel were ineffective for not requesting the trial court to hold an independent hearing outside the jury's presence, to determine the reliability and trustworthiness of state's witness Bruce Wheeler.

FOURTH ASSIGNMENT OF ERROR

APPELLANT'S CONVICTION AND DEATH SENTENCE ARE IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS OF THE U.S. CONSTITUTION DUE TO APPELLANT'S ACTUAL INNOCENCE.

19. The Court of Appeals overruled the application for reconsideration in an entry filed on December 23, 1994. *State v. Wogenstahl,* 1st Dist. No. C-930222 (Entry Denying Application for Reopening).

**2. First Application for Reopening, Supreme Court of Ohio**

20. On June 12, 1995 Petitioner filed his notice of appeal to the Ohio Supreme Court from the Court of Appeals' denial of the application for reopening. *State v. Wogenstahl,* case No. 95-1165.

21. Petitioner raised the following Propositions of Law:

PROPOSITION OF LAW

THE COURT OF APPEALS COMMITTED CONSTITUTIONAL ERROR IN DENYING APPELLANT'S APPLICATION FOR REOPENING BASED UPON THE COURT STATING IT WAS "WITHOUT JURISDICTION TO CONSIDER APPELLANT'S APPLICATION FOR REOPENING."

PROPOSITION OF LAW NO. I

A GUILTY VERDICT WHICH IS CONTRARY TO THE MANIFEST WEIGHT OF THE EVIDENCE AND WHERE THE PROSECUTION HAS FAILED TO MEET THE BURDEN OF PROVING GUILT BEYOND A REASONABLE DOUBT ON ALL ELEMENTS WITH WHICH A DEFENDANT IS CHARGED, THE CONVICTION SHALL BE OVERTURNED BY THE REVIEWING COURT. FAILURE TO DO SO VIOLATES THE RIGHTS GUARANTEED BY THE EIGHTH AND

FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION.

PROPOSITION OF LAW NO. II

MISCONDUCT BY THE GOVERNMENT'S ATTORNEYS DURING BOTH PHASES OF THE TRIAL DEPRIVED APPELLANT WOGENSTAHL HIS [SIC] RIGHTS TO DUE PROCESS, A FAIR TRIAL, A FAIR AND RELIABLE DETERMINATION OF HIS INNOCENCE OR GUILT AND SENTENCE OF DEATH, AS GUARANTEED BY THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION.

1.     Prosecution withholding of favorable evidence.

2.     It was reversible error when the prosecutor vouched for the credibility of the state's witnesses during closing arguments.

3.     It was reversible error when the prosecutor engaged in improper cross-examination of appellant Wogenstahl by constantly asking appellant if state's witnesses were lying.

4.     It was reversible error for the prosecutor to assert personal opinion to the jury during closing arguments.

5.     It was reversible error when the prosecutor misstated facts and spoke of prejudicial facts not in evidence.

6.     It was reversible error by the prosecutor to denigrate defense counsel and refer to defense evidence as "red pepper" during closing arguments.

7.     It was a totally improper "tactic" for the prosecution to attack defense counsel in front of the jury for making objections to the improper comments made by the prosecution.

8.     It was reversible error for the prosecutor to make highly inflammatory and prejudicial remarks designed solely for the purpose of appealing to the passions of the jury.

9.     It was reversible error for the prosecutor to ask appellant accusing type questions that eliminates the presumption of innocence to the jury.

30

10.     It was reversible error for the prosecutor to assert his personal opinion of appellant's testimony to the jury.

11.     It was reversible error for the prosecution to put forth an argument before the jury that appellant had burden [sic] of proving alibi which erroneously shifted the burden of proof.

12.     It was misconduct to elicit inadmissible character testimony on direct examination during the prosecution's case-in-chief.

13.     It was reversible error for the prosecutor to cross-examine appellant's mitigation witnesses with highly prejudicial and unsubstantiated allegations.

14.     It was reversible error when the prosecutor made a totally improper comment on appellant's unsworn statement during the mitigation phase.

15.     It was reversible error for the prosecutor to inform the jury that appellant's own counsel believed appellant guilty.

16.     It was reversible error for the prosecutor to make highly prejudicial and inflammatory remarks appealing to the passions of the jury during mitigation phase closing arguments.

17.     It was reversible error for the prosecutor to inform the jury that appellant's mitigation was to have the jury ignore the judge's instructions.

PROPOSITION OF LAW NO. III

ABUSE OF DISCRETION COMMITTED BY THE TRIAL JUDGE WAS REVERSIBLE ERROR AND DENIED APPELLANT WOGENSTAHL DUE PROCESS, A FAIR TRIAL, AND A FAIR AND RELIABLE DETERMINATION OF HIS SENTENCE OF DEATH, AS GUARANTEED BY THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

1.     It was reversible error for the trial judge to restrict what the sentencing jury could consider on the matter of sentencing during the mitigation phase.

2. It was reversible error for the trial judge to inform the jury that unanimity was required to impose a life sentence.

3. It was reversible error to give jury instructions which relieved the state burden [sic] of proving all material elements with which appellant was charged.

4. Jury instructions and verdict forms which defines [sic] aggravating circumstances that do not specify either "principal offender" or "with prior calculation and design" but gives [sic] the jury both alternatives are erroneous and unconstitutional.

5. It was reversible error for the trial judge to deny appellant's pretrial motion for the disclosure of evidence which could show bias in state's witnesses.

6. It was error by the trial judge for not giving a special jury instruction on motive.

7. It was error by the trial judge for not informing the jury that they may consider residual doubt during mitigation.

8. It was reversible error by the trial judge for not making a ruling on any of the defense objections to the improper comments made by the prosecution during both phases of appellant's trial.

9. It was reversible error by the trial judge for not allowing the jury to see exculpatory evidence while deciding appellant's innocence or guilt.

PROPOSITION OF LAW NO. IV

INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL CAUSED APPELLANT WOGENSTAHL'S CONVICTION AND DEATH SENTENCE TO BE IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

1. Appellant's trial counsel were ineffective for not calling Melisa A. Weber, staff molecular biologist from Cellmark Diagnostics to testify as a defense witness.

2. Appellant's trial counsel were ineffective for eliciting adverse evidence during the mitigation phase.

32

3.     Appellant's trial counsel were ineffective for not objecting to the trial judge [sic] misstating Ohio law by informing the jury unanimity was required to impose life [sic] sentence.

4.     Appellant was denied effective assistance of trial counsel by the prosecution [sic] withholding favorable evidence.

5.     Appellant's trial counsel were ineffective for not informing the trial judge that the prosecution was withholding favorable evidence.

6.     Appellant's trial counsel were ineffective for not objecting to the trial judge [sic] giving inaccurate jury instructions which relieved the state burden [sic] of proof.

7.     Appellant's trial counsel were ineffective for not objecting to the jury instructions and verdict forms which did not specify either "principal offender" or "with prior calculation and design."

8.     Appellant's trial counsel were ineffective for making highly prejudicial comments during the mitigation phase.

9.     Appellant's trial counsel were ineffective for not requesting a special jury instruction be read on motive.

10.     Appellant's trial counsel were ineffective for not requesting the jury be instructed they may consider residual doubt while deliberating on the matter of sentencing.

11.     Appellant's trial counsel were ineffective for stipulating the admission of state's exhibit no. 72 into evidence.

PROPOSITION OF LAW NO. V

THE CUMULATIVE EFFECT OF ALL THE ERRORS COMMITTED DURING APPELLANT WOGENSTAHL'S TRIAL DEPRIVED APPELLANT HIS [SIC] RIGHTS TO DUE PROCESS, A FAIR TRIAL, A FAIR AND RELIABLE DETERMINATION OF HIS INNOCENCE OR GUILT AND MADE THE DEATH SENTENCE UNRELIABLE AS GUARANTEED BY THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION.

PROPOSITION OF LAW NO. VI

APPELLANT WOGENSTAHL'S CONVICTION AND DEATH
SENTENCE ARE IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH,
AND FOURTEENTH AMENDMENTS OF THE UNITED STATES
CONSTITUTION DUE TO APPELLANT'S ACTUAL INNOCENCE OF
THE CRIME WITH WHICH HE HAS BEEN CONVICTED.

22.    On March 6, 1996, the Ohio Supreme Court affirmed the judgment
of the Court of Appeals denying the application for reopening. *State v.
Wogenstahl*, 75 Ohio St.3d 273, 662 N.E.2d 16 (1996).

23.    On March 14, 1996, Petitioner, *pro se*, moved for reconsideration.
The Ohio Supreme Court denied the motion for reconsideration in an entry
filed April 24, 1996. *State v. Wogenstahl*, 75 Ohio St.3d 1442, 663 N.E.2d 334
(1996).

**D.    Post-Conviction**

**1.    Post-Conviction, Trial Court**

24.    On September 20, 1996, Petitioner filed in the trial court, through
attorney W. Joseph Edwards, a petition for post-conviction relief supported by
affidavits and other documents.

25.    The petition raised five claims for relief: (1) a request to have the
bloodstain from the driver's side rear inside door handle of Petitioner's  car
subjected to DNA testing; (2) ineffective assistance of counsel for failing to
interview and prepare witness Mabel Long for the mitigation phase; (3)
ineffective assistance of counsel for failing to impeach the prosecution's DNA
expert on the reliability of the results of the DNA testing of the bloodstain
found in Petitioner's vehicle; (4) ineffective assistance of counsel for failing to

34

cause the testing of the interior of Petitioner's car with forensic blood visualization enhancement techniques; and (5) ineffective assistance of counsel for failing to interview and call witnesses with relevant, beneficial testimony, and failing to properly prepare witnesses resulting in opening the door to evidence damaging to the defense. Petitioner concurrently filed motions for an order directing the prosecuting attorney to disclose evidence and for an order directing the DNA testing of the bloodstain.

26.    On November 27, 1996, the prosecution filed a motion to dismiss the post-conviction petition. The prosecution concurrently filed responses opposing Petitioner's motions for DNA testing and disclosure of evidence.

27.    On February 18, 1997, Petitioner filed a *pro se* supplemental motion to the petition for post-conviction relief requesting if the court granted his motion for DNA testing, Petitioner wanted verification that the blood sample being sent to Cellmark Laboratories, and the sample Cellmark receives, is in fact the same serum left from Brian Wraxall's previous HLA DQ alpha DNA testing.

28.    On February 24, 1997, the trial court filed findings of fact and conclusions of law and an entry dismissing the post-conviction petition. On February 27, 1997 the court filed an entry denying the motions for DNA testing and disclosure of evidence.

### 2.    Post-conviction, Court of Appeals

29.    On March 25, 1997, Petitioner filed a notice of appeal to the Court of Appeals for the First District Court of Appeals from the dismissal of his post-

conviction petition. *State v Wogenstahl,* Case No. C-970238. Petitioner raised the following assignments of error:

FIRST ASSIGNMENT OF ERROR

THE TRIAL COURT ERRED IN FINDING THAT A DEFINITIVE, IDENTITY-SPECIFIC DNA TEST THAT COMPLETELY EXCLUDES AMBER GARRETT AS THE SOURCE OF THE BLOODSTAIN WOULD NOT AFFECT THE OUTCOME OF THE TRIAL AND IN CONCLUDING THAT THE CLAIM OF THE AVAILABILITY OF A DEFINITIVE DNA TEST DOES NOT STATE A CONSTITUTIONAL CLAIM.

SECOND ASSIGNMENT OF ERROR

THE TRIAL COURT ERRED IN FINDING THAT THE TEST RESULTS OF BRIAN WRAXALL OF THE SEROLOGICAL RESEARCH INSTITUTE AND THE TEST RESULTS OF CELLMARK WITH RESPECT TO THE SOURCE OF THE SEMEN ON THE VICTIM'S COMFORTER WERE NOT IN CONFLICT AND IN CONCLUDING THAT THE FAILURE OF DEFENSE COUNSEL TO USE THE CONFLICTING RESULTS TO IMPEACH WRAXALL AS TO THE RELIABILITY OF HIS DNA TEST OF THE BLOODSTAIN WAS NOT INEFFECTIVE ASSISTANCE OF COUNSEL.

THIRD ASSIGNMENT OF ERROR

THE TRIAL COURT ERRED IN FINDING THAT THE EVIDENCE DID NOT SUPPORT THE CONCLUSION THAT THE PROSECUTION FAILED TO DISCLOSE THE USE OF FORENSIC BLOOD VISUALIZATION ENHANCEMENT TECHNIQUES TO DETERMINE WHETHER NON-VISIBLE TRACES OF BLOOD WERE PRESENT IN APPELLANT'S CAR AND IN FINDING THAT DEFENSE COUNSEL WERE NOT INEFFECTIVE IN FAILING TO CAUSE BLOOD VISUALIZATION ENHANCEMENT TECHNIQUES TO BE USED ON APPELLANT'S CAR TO SHOW THAT THE VICTIM WAS NOT KILLED IN APPELLANT'S CAR.

FOURTH ASSIGNMENT OF ERROR

THE TRIAL COURT ERRED IN FINDING THAT THE AFFIDAVITS SUBMITTED WITH THE PETITION DID NOT SHOW THE DEFICIENT PERFORMANCE OF DEFENSE COUNSEL IN FAILING TO INVESTIGATE AND PREPARE WITNESSES FOR THE MITIGATION PHASE OF THE TRIAL AND IN CONCLUDING THAT

36

THE DEFENSE MITIGATION WAS NOT SHALLOW, INEFFECTUAL, AND DAMAGING TO APPELLANT.

30.     On June 12, 1998, the Court of Appeals rendered a decision affirming the dismissal of Petitioner's petition for post-conviction relief.   *State v. Wogenstahl*, 1st Dist. No. C-970238, 1998 Ohio App. LEXIS 2567 (June 12, 1998).

### 3. Post-Conviction, Supreme Court of Ohio

31.     On July 27, 1998, Petitioner appealed the Court of Appeals' decision to the Ohio Supreme Court. *State v. Wogenstahl,* Case No. 98-1501. Petitioner raised the following propositions of law:

PROPOSITION OF LAW NO. I

THE REQUEST TO CONDUCT A DEFINITIVE, IDENTITY-SPECIFIC DNA TEST WHICH COULD EXCLUDE THE VICTIM AS THE SOURCE OF THE BLOODSTAIN WHICH WAS THE KEY PIECE OF EVIDENCE USED BY THE PROSECUTION TO CONNECT THE VICTIM TO THE DEFENDANT STATES A CONSTITUTIONAL CLAIM FOR RELIEF UNDER R.C. 2953.21 IN A POSTCONVICTION DEATH PENALTY CASE.

PROPOSITION OF LAW NO. II

*RES JUDICATA* DOES NOT BAR A CLAIM OF INEFFECTIVE ASSISTANCE OF COUNSEL BASED ON THE FAILURE OF DEFENSE COUNSEL TO IMPEACH THE PROSECUTION'S DNA EXPERT ON THE RELIABILITY OF THE DNA TEST OF THE BLOODSTAIN, WHERE THE CLAIM IS BASED ON CONFLICTING DNA TEST RESULTS FROM THE DNA EXPERT AND ANOTHER DNA LAB AS TO THE SOURCE OF SEMEN ON THE VICTIM'S COMFORTER, AND WHERE THE CLAIM IS BASED ON LAB REPORTS FROM THE DNA EXPERT AND THE DNA LAB WHICH THE TRIAL COURT REFUSED TO ADMIT INTO THE RECORD AND WHERE THE CLAIM COULD NOT HAVE BEEN DETERMINED FROM EVIDENCE IN THE RECORD.

PROPOSITION OF LAW NO. III

*RES JUDICATA* DOES NOT BAR A CLAIM OF INEFFECTIVE ASSISTANCE OF COUNSEL BASED ON THE FAILURE OF DEFENSE COUNSEL TO CAUSE FORENSIC BLOOD VISUALIZATION ENHANCEMENT TECHNIQUES TO BE USED ON THE INTERIOR OF A DEFENDANT'S CAR TO SHOW THAT THE VICTIM WAS NOT KILLED IN THE FRONT SEAT OF THE DEFENDANT'S CAR, WHERE THE AVAILABILITY OF SUCH TECHNIQUES IS BASED ON EVIDENCE OUTSIDE THE RECORD.

PROPOSITION OF LAW NO. IV

A DEFENDANT STATES A POSTCONVICTION CLAIM UNDER BRADY V. MARYLAND (1963), 373 U.S. 83, 83 S. CT. 1194, 10 L.ED.2D 215, WHERE THE PROSECUTION DISCLOSED THAT IT CONDUCTED FORENSIC TESTING ON A DEFENDANT'S CAR BUT FAILED TO DISCLOSE WHETHER THAT TESTING INCLUDED BLOOD VISUALIZATION ENHANCEMENT TECHNIQUES WHICH WOULD SHOW THAT THE VICTIM WAS NOT KILLED IN THE FRONT SEAT OF THE DEFENDANT'S CAR AS ASSERTED BY THE PROSECUTION AT TRIAL.

PROPOSITION OF LAW NO. V

*RES JUDICATA* DOES NOT BAR A CLAIM OF INEFFECTIVE ASSISTANCE OF COUNSEL BASED ON THE FAILURE OF DEFENSE COUNSEL TO INTERVIEW AND PREPARE WITNESSES FOR THE MITIGATION PHASE OF A DEATH PENALTY TRIAL, WHERE THE CLAIM IS BASED ON EVIDENCE OUTSIDE THE RECORD IN THE FORM OF AFFIDAVITS SHOWING THAT DEFENSE COUNSEL DID NOT PREPARE THE WITNESSES FOR THEIR TESTIMONY AND DID NOT CALL WITNESSES WHO COULD HAVE PROVIDED RELEVANT, BENEFICIAL TESTIMONY, WHERE THE RECORD SHOWS THAT THE DEFENDANT WAS SEVERELY DAMAGED BY EVIDENCE INTRODUCED AS A RESULT OF DEFENSE COUNSELS' LACK OF PREPARATION.

32.    On October 7, 1998, the Supreme Court of Ohio declined to exercise its discretionary jurisdiction to hear Petitioner's appeal. *State v. Wogenstahl*, 783 Ohio St. 3d 1449, *700* N.E.2d 332 (1998).

38

**E.      First New Trial Motion**

**1.      First New Trial Motion, Trial Court**

33.      On January 26, 1998, while his post-conviction petition was pending in the court of appeals, Petitioner filed in the trial court a motion pursuant to Criminal Rule 33(D) for leave to file a motion for a new trial based on newly discovered evidence.  The motion was based on new science—which alleged that definitive DNA testing could now identify the source of the bloodstain. At trial, the prosecution attributed the bloodstain to Amber Garrett.

34.      On February 3, 1998, the trial court filed an order denying the motion.  *State v. Wogenstahl,* Ham. C.P. No. B-926287 (Feb. 3, 1992 Entry)

**2.      First New Trial Motion, Court of Appeals**

35.      On February 27, 1998, Petitioner filed a notice of appeal from the denial of his motion for leave to file a motion for a new trial.  *State v. Wogenstahl,* Case No. C-980175. Petitioner raised the following assignment of error:

FIRST ASSIGNMENT OF ERROR

THE TRIAL COURT ABUSED ITS DISCRETION AND VIOLATED APPELLANT'S RIGHT TO DUE PROCESS UNDER THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND HIS RIGHT TO BE FREE FROM CRUEL AND UNUSUAL PUNISHMENT UNDER THE EIGHTH AMENDMENT TO THE UNITED STATES CONSTITUTION BY DENYING APPELLANT'S MOTION FOR LEAVE TO FILE A MOTION FOR A NEW TRIAL BASED ON NEWLY DISCOVERED EVIDENCE, NAMELY, EVIDENCE OF A DEFINITIVE, IDENTITY SPECIFIC DNA TEST WHICH COULD EXCLUDE THE VICTIM AS THE SOURCE OF THE BLOODSTAIN WHICH WAS THE KEY PIECE OF EVIDENCE USED BY THE PROSECUTION TO CONNECT APPELLANT TO THE VICTIM.

36.    On February 19, 1999, the Court of Appeals affirmed the trial court's denial of Petitioner's motion for leave to file a motion for a new trial. *State v. Wogenstahl*, 1st Dist. No. No. C-980175, 1999 Ohio App. LEXIS 546 (Feb. 19, 1999).

37. On February 23, 1999, Petitioner moved for reconsideration.   On March 18, 1999, the Court of Appeals denied the motion.  *State Wogenstahl,* 1st Dist. No. C-980175 (March 18, 1999 Entry).

### 3.    First New Trial Motion, Supreme Court of Ohio

38.    On April 5, 1999, Petitioner filed an appeal and memorandum in support of jurisdiction in the Ohio Supreme Court. *State v. Wogenstahl,* Case No. 99-632. Petitioner raised the following assignments of error [sic]:

FIRST ASSIGNMENT OF ERROR

THE EGREGIOUS MISAPPLICATION OF THE RULE OF *RES JUDICATA* TO PRECLUDE REVIEW OF A CONSTITUTIONAL CLAIM FOR RELIEF WHICH NEITHER WAS NOR COULD HAVE BEEN FULLY LITIGATED IN A PRIOR ACTION IS A DENIAL OF FUNDAMENTAL FAIRNESS RESULTING IN A VIOLATION OF THE DUE PROCESS GUARANTEED IN THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION.


SECOND ASSIGNMENT OF ERROR

A TRIAL COURT ABUSES ITS DISCRETION AND VIOLATES A DEFENDANT'S RIGHT TO DUE PROCESS UNDER THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND HIS RIGHT TO BE FREE FROM CRUEL AND UNUSUAL PUNISHMENT UNDER THE EIGHTH AMENDMENT TO THE UNITED STATES CONSTITUTION BY DENYING A MOTION FOR LEAVE TO FILE A MOTION FOR A NEW TRIAL BASED ON NEWLY DISCOVERED EVIDENCE, NAMELY, A DNA TEST WHICH COULD BE POTENTIALLY EXCULPATORY TO THE DEFENDANT

OR RAISE A REASONABLE DOUBT ABOUT THE DEFENDANT'S GUILT.

39. On June 2, 1999 the Ohio Supreme Court declined jurisdiction to hear the appeal. *Ohio v. Wogenstahl*, 85 Ohio St.3d 1497, 710 N.E.2d 716 (1999).

**F.** **Second Application For Reopening**

**1.** **Second Application for Reopening, Court of Appeals**

40. On March 4, 1998 Petitioner filed a *pro se* delayed application for reopening pursuant to App. R. 26(B) in the Court of Appeals. In his application, Petitioner asserted that appellate counsel rendered ineffective assistance for failing to raise the following assignments of error:

FIRST ASSIGNMENT OF ERROR

IT WAS REVERSIBLE ERROR WHEN THE PROSECUTION VOUCHED FOR THE CREDIBILITY OF STATE'S WITNESSES DURING CLOSING ARGUMENTS.

SECOND ASSIGNMENT OF ERROR

IT WAS REVERSIBLE ERROR WHEN THE PROSECUTION ENGAGED IN IMPROPER CROSS-EXAMINATION OF APPELLANT WOGENSTAHL BY CONSTANTLY ASKING APPELLANT IF STATE'S WITNESSES WERE LYING.

THIRD ASSIGNMENT OF ERROR

IT WAS REVERSIBLE ERROR WHEN THE PROSECUTION MADE A TOTALLY IMPROPER COMMENT ON APPELLANT'S UNSWORN STATEMENT.

FOURTH ASSIGNMENT OF ERROR

IT WAS REVERSIBLE ERROR FOR THE TRIAL JUDGE TO DENY APPELLANT'S PRETRIAL MOTION FOR THE DISCLOSURE OF EVIDENCE WHICH COULD SHOW BIAS IN STATE'S WITNESSES.

41

FIFTH ASSIGNMENT OF ERROR

IT WAS REVERSIBLE ERROR FOR THE TRIAL JUDGE TO
INSTRUCT THE JURY THAT UNANIMITY WAS REQUIRED TO
IMPOSE LIFE [SIC] SENTENCE.

SIXTH ASSIGNMENT OF ERROR

IT WAS REVERSIBLE ERROR FOR THE TRIAL JUDGE TO
RESTRICT WHAT THE SENTENCING JURY COULD CONSIDER ON
THE MATTER OF SENTENCING DURING THE MITIGATION
PHASE.

SEVENTH ASSIGNMENT OF ERROR

JURY INSTRUCTIONS AND VERDICT FORMS WHICH DEFINES
[SIC] AGGRAVATING CIRCUMSTANCES THAT DO NOT SPECIFY
EITHER "PRINCIPAL OFFENDER" OR "WITH PRIOR CALCULATION
AND DESIGN" BUT GIVES THE JURY BOTH ALTERNATIVES ARE
ERRONEOUS AND UNCONSTITUTIONAL.

41. The Court of Appeals granted Petitioner leave to file his application
but denied the application. *State v. Wogenstahl*, Hamilton App. No. C-930222,
(May 21, 1998 Entry).

**1. Second Application for Reopening, Supreme Court of Ohio**

42. Petitioner filed a *pro se* notice of appeal to the Ohio Supreme
Court. *State v. Wogenstahl,* Case No. 98-1146. Petitioner raised the following
propositions of law:

PROPOSITION OF LAW NO. I

THE COURT OF APPEALS ERRED IN DENYING APPELLANT'S
APPLICATION FOR DELAYED REOPENING WHEN STATING THAT
APPELLANT FAILED TO DEMONSTRATE "GOOD CAUSE" FOR
GOING BEYOND THE ALLOWED 90 DAY TIME PERIOD.

42

## PROPOSITION OF LAW NO. II

IT WAS REVERSIBLE ERROR FOR THE TRIAL COURT TO RESTRICT WHAT THE SENTENCING JURY COULD CONSIDER ON THE MATTER OF SENTENCE THEREBY MAKING APPELLANT'S DEATH SENTENCE UNRELIABLE AND IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION.

## PROPOSITION OF LAW NO. III

IT WAS REVERSIBLE ERROR FOR THE TRIAL JUDGE TO INFORM THE JURY THAT UNANIMITY WAS REQUIRED TO IMPOSE A LIFE SENTENCE THEREBY MAKING APPELLANT'S DEATH SENTENCE UNRELIABLE AND IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION.

## PROPOSITION OF LAW NO. IV

JURY VERDICT FORMS WHICH DEFINES [SIC] AGGRAVATING CIRCUMSTANCES THAT DO NOT SPECIFY EITHER "PRINCIPAL OFFENDER" OR "WITH PRIOR CALCULATION AND DESIGN" BUT GIVES [SIC] THE JURY BOTH ALTERNATIVES ARE ERRONEOUS AND MADE APPELLANT'S CONVICTION AND SENTENCE OF DEATH IN VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION.

## PROPOSITION OF LAW NO. V

IT WAS REVERSIBLE ERROR FOR THE TRIAL JUDGE TO DENY APPELLANT'S PRETRIAL MOTION FOR THE DISCLOSURE OF ANY EVIDENCE WHICH COULD SHOW BIAS IN STATE'S WITNESSES THEREBY MAKING APPELLANT'S CONVICTION AND DEATH SENTENCE IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION.

43. On November 10, 1998, the Supreme Court of Ohio issued a decision affirming the judgment of the Court of Appeals. *State v. Wogenstahl*, 83 Ohio St.3d 516, 700 N.E.2d 1254 (1998).

44.    Petitioner filed a timely motion for reconsideration. On December 23, 1998, the Supreme Court of Ohio denied reconsideration. *State v. Wogenstahl*, 84 Ohio St.3d 516, 703 N.E.2d 329 (1998).

## G.    Initial Federal Habeas Proceedings

45.    On May 21, 1999, Petitioner initiated federal habeas proceedings. *Wogenstahl v. Mitchell,* S.D. Ohio 1:99-cv-00843. He raised the following grounds for relief in his initial habeas petition:

<u>FIRST GROUND FOR RELIEF</u>

The trial court committed prejudicial error in violation of Petitioner's constitutional rights under the Fifth, Sixth, Eighth and Fourteenth Amendments by denying Petitioner's pre-trial request for an investigator and mitigation expert.

<u>SECOND GROUND FOR RELIEF</u>

The trial court made a number of improper pre-trial rulings which either individually, or cumulatively, violated Petitioner's constitutional rights as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

1.    The trial court erred in violation of Petitioner's constitutional right to due process of law in denying the defense motion for a change of venue.

2.    The trial court committed error in violation of Petitioner's constitutional rights by denying the defense request for disclosure of evidence of bias of state's witnesses.

3.    The trial court violated Petitioner's constitutional rights by making  the following erroneous rulings prior to trial.

4.    The cumulative effect of the trial court's errors prior to trial   violated the Petitioner's constitutional rights.

## THIRD GROUND FOR RELIEF

Petitioner was denied his Sixth Amendment right to the effective assistance of counsel where trial counsel failed to adequately voir dire prospective jurors to prevent the selection of a jury predisposed to impose the death penalty, failed to request a pretrial hearing on the admission of the deposition testimony of Brian Wraxall concerning his qualification as an expert and the relevance and reliability of his DNA testing, and failed to request a pretrial hearing on the admission of the testimony of inmate Bruce Wheeler.

## FOURTH GROUND FOR RELIEF

Petitioner was denied his Fourteenth Amendment right to due process of law by the prosecution's withholding of evidence of government testing of Petitioner's car with blood visualization enhancement techniques to detect non-visible traces of the victim's blood and by the prosecution's withholding of evidence of a multitude of other forensic tests revealed during trial; Petitioner was also denied his Sixth Amendment right to the effective assistance of counsel for failure of trial counsel to have Petitioner's car tested with blood visualization enhancement techniques to show that the victim's blood was not present in Petitioner's car and that the victim was not killed by Petitioner.

## FIFTH GROUND FOR RELIEF

The trial court committed error in violation of Petitioner's right to due process of law as guaranteed by the Fourteenth Amendment to the United States Constitution in failing to grant Petitioner an acquittal based on the insufficiency of the evidence.

## SIXTH GROUND FOR RELIEF

The trial court erred in admitting evidence and facts regarding a previous crime based on common plan, scheme and design in violation of Petitioner's constitutional rights as guaranteed by the due process clause of the Fourteenth Amendment to the United States' Constitution.

## SEVENTH GROUND FOR RELIEF

The Trial court erred in admitting into evidence prejudicial photos and a videotape of the decedent in violation of Petitioner's constitutional rights as guaranteed by the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution.

## EIGHTH GROUND FOR RELIEF

Petitioner's right to due process of law under the Fourteenth Amendment to the United States Constitution and his right to be free from cruel and unusual punishment under the Eighth Amendment were violated by the trial court's admission of the testimony of Brian Wraxall because he lacked a college or medical degree to enable him to render an expert opinion and because the results of his HLA DQα test could only determine that the bloodstain from Petitioner's call was consistent with the victim's blood allotype.

## NINTH GROUND FOR RELIEF

The trial court erred in providing instructions and verdict forms to the jury containing two alternatives—principal offender or prior calculation and design—that are mutually exclusive under Ohio law in violation of Petitioner's constitutional rights as guaranteed by the Fifth, Eighth and Fourteenth Amendments to the United States Constitution.

## TENTH GROUND FOR RELIEF

The trial court committed additional errors at trial which, either individually or cumulatively, violated Petitioner's constitutional rights as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

## ELEVENTH GROUND FOR RELIEF

The prosecution committed misconduct to the prejudice of Petitioner in introducing inadmissible evidence at trial in violation of Petitioner's constitutional rights as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

## TWELFTH GROUND FOR RELIEF

The prosecution committed misconduct at trial by making improper and prejudicial arguments to the jury in violation of Petitioner's constitutional rights as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

## THIRTEENTH GROUND FOR RELIEF

Petitioner's defense counsel provided ineffective assistance of counsel due to numerous failures and deficiencies in performance at trial which, either individually or cumulatively, violated Petitioner's constitutional rights as guaranteed by the Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

## FOURTEENTH GROUND FOR RELIEF

The trial court's error at sentencing in providing an improper jury instruction that the jury's verdict had to be unanimous resulted in a violation of Petitioner's constitutional rights as guaranteed by the Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

## FIFTEENTH GROUND FOR RELIEF

Petitioner was denied his Eighth Amendment right to be free from cruel and unusual punishment and his Fourteenth Amendment right to due process of law by the failure to merge multiple, duplicative aggravating circumstances for weighing against mitigating factors by the jury, the sentencing court, the court of appeals, and the state supreme court.

## SIXTEENTH GROUND FOR RELIEF

Petitioner's right to due process of law under the Fourteenth Amendment to the United States Constitution and his right to be free from cruel and unusual punishment under the Eighth Amendment to the United States Constitution were violated by the prosecutor's penalty phase closing argument to the jury that the nature and circumstances of the offense, which is a statutory mitigating factor under Ohio's death penalty law, be considered as aggravating circumstances and by the sentencing court's consideration and weighing of the nature and circumstances of the

offense as nonstatutory mitigating circumstances in its sentencing opinion.

## SEVENTEENTH GROUND FOR RELIEF

Petitioner's right to be free from cruel and unusual punishment under the Eighth Amendment to the United States Constitution and his right to due process under the Fourteenth Amendment were violated by the trial court's failure to make an individualized sentencing determination as shown by its incorporating verbatim into its sentencing opinion identical language from the prosecutor's opening statement and from sentencing opinions of other judges in other death penalty cases and from the sentencing opinion of the same judge in other death penalty cases.

## EIGHTEENTH GROUND FOR RELIEF

Petitioner's right to due process of law under the Fourteenth Amendment to the United States Constitution and his right to be free from cruel and unusual punishment under the Eighth Amendment were violated by the trial court's admission of evidence at the penalty phase of the trial that Petitioner had been convicted of robbing a UDF, that he had been convicted of public indecency, that he had violated his parole, and that he had been investigated for making sexual advances to his sister, thereby allowing the jury to consider invalid nonstatutory aggravating circumstances.

## NINETEENTH GROUND FOR RELIEF

Petitioner's right to due process of law under the Fourteenth Amendment to the United States Constitution and his right to be free from cruel and unusual punishment under the Eighth Amendment were violated by the following additional trial court errors at sentencing:

## TWENTIETH GROUND FOR RELIEF

Petitioner was denied his Fourteenth Amendment right to due process of law and his Eighth Amendment right to be free from cruel and unusual punishment by the trial court's refusal to admit and to let the jury consider at the penalty phase of the trial the forensic reports proffered by Petitioner.

## TWENTY- FIRST GROUND FOR RELIEF

Petitioner's right to due process of law under the Fourteenth Amendment to the United States Constitution and his right to be free from cruel and unusual punishment under the Eighth Amendment were violated by the prosecution's misconduct in introducing at the penalty phase of the trial evidence that Petitioner had been convicted of robbing a UDF, that he had been convicted of public indecency, that he had violated his parole, and that he had been investigated for making sexual advances to his sister, thereby introducing invalid nonstatutory aggravating circumstances for the jury's consideration.

## TWENTY- SECOND GROUND FOR RELIEF

Petitioner was denied his Fourteenth Amendment right to due process of law and his Eighth Amendment right to be free from cruel and unusual punishment by prosecutorial misconduct during the penalty phase closing argument by improperly commenting on Petitioner's unsworn statement, by suggesting to the jury that defense counsel believed Petitioner was guilty, by stating that the defense mitigation was to ask the jury to ignore the judge's instructions, and by appealing to the passions of the jury.

## TWENTY-THIRD GROUND FOR RELIEF

Petitioner's right to the effective assistance of counsel under the Sixth Amendment to the United States Constitution, his right to due process of law under the Fourteenth Amendment and, his right to be free from cruel and unusual punishment under the Eighth Amendment were violated by trial counsel's failure to adequately investigate and prepare for the penalty phase hearing and for their deficient performance at the penalty phase hearing.

## TWENTY- FOURTH GROUND FOR RELIEF

Petitioner's right to due process of law under the Fourteenth Amendment to the United States Constitution and his right to be free from cruel and unusual punishment under the Eighth Amendment to the United States Constitution were violated by the state courts' denial of Petitioner's request to have the DNA remaining from the bloodstain obtained from Petitioner's car submitted for a new, identity specific DNA test that could definitively determine the source of the bloodstain.

49

## TWENTY- FIFTH GROUND FOR RELIEF

The imposition of a sentence of death on Petitioner violates his Eighth Amendment right to be free from cruel and unusual punishment and his Fourteenth Amendment right to fundamental fairness when there is insufficient evidence that the aggravating circumstances outweigh the mitigating factors and the sentence of death is disproportionate to the offense.

## TWENTY- SIXTH GROUND FOR RELIEF

Various aspects of the Ohio Death Penalty scheme violate provisions of the Eighth and Fourteenth Amendments to the United States Constitution.

## TWENTY- SEVENTH GROUND FOR RELIEF

The cumulative effect of all the errors at trial and sentencing violated Petitioner's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

## TWENTY-EIGHTH GROUND FOR RELIEF

Petitioner is actually innocent; execution of the sentence of death would violate the Eighth Amendment to the United States Constitution and fundamental considerations of justice.

46.    On January 16, 2001, the District Court granted Petitioner leave to conduct limited discovery.

47.    On June 17, 2003, Petitioner filed an amended habeas petition raising the same grounds for relief.

48.    On August 12, 2003, the District Court ordered that the federal habeas proceedings be held in abeyance pending Petitioner's exhaustion of state court remedies with respect to the claims and facts developed in the limited federal court discovery.

**H.    Second New Trial Motion**

**1.    Second New Trial Motion, Trial Court**

49.    On September 12, 2003, Petitioner filed a motion for leave to file a motion for new trial in the Hamilton County Common Pleas Court.

56.    On December 4, 2003, the Court, without addressing the motion for leave to file a new trial motion, denied Petitioner's motion for a new trial. *State v. Wogenstahl,* Ham. C.P. No. 926287 (Dec. 4, 2003 Entry).

**2.    Second New Trial Motion Court Of Appeals**

50.    Petitioner appealed to the First Appellate District. *State v. Wogenstahl,* 1st Dist. No. C-030945. He raised two assignments of error:

> FIRST ASSIGNMENT OF ERROR:  THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION FOR A NEW TRIAL BASED ON NEWLY DISCOVERED EVIDENCE OF THE PROSECUTORS' WITHHOLDING OF EVIDENCE OF ERIC HORN'S ARREST AND PROSECUTION. (T.d. 191, p.1)
>
> SECOND ASSIGNMENT OF ERROR:  THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION FOR A NEW TRIAL BASED ON NEWLY DISCOVERED EVIDENCE OF THE  SUBORNING OF PERJURY BY PROSECUTORS. (T.d. 191, p. 1)

51.    On November 12, 2004, the court of appeals affirmed the judgment of the trial court. *State v. Wogenstahl,* 1st Dist. No. C-030945, 2004-Ohio-5994, 970 N.E.2d 447.

**3    Second New Trial Motion, Supreme Court Of Ohio**

52.    Petitioner timely appealed to the Supreme Court of Ohio. *State v. Wogenstahl,* Case No, 2004-2120. He raised the following propositions of law:

51

> PROPOSITION OF LAW 1: HAMILTON COUNTY PROSECUTORS COMMITTED MISCONDUCT IN VIOLATION OF APPELLANT'S CONSTITUTIONAL RIGHTS TO DUE PROCESS AND A FAIR TRIAL BY FAILING TO DISCLOSE A KEY STATE WITNESS'S ARREST, JUVENILE ADJUDICATION, AND SENTENCING TO THREE MONTHS PROBATION FOR TRAFFICKING IN MARIJUANA.
>
> PROPOSITION OF LAW 2: HAMILTON COUNTY PROSECUTORS COMMITTED MISCONDUCT IN VIOLATION OF APPELLANT'S CONSTITUTIONAL RIGHTS TO DUE PROCESS AND A FAIR TRIAL BY SUBORNING THE PERJURY OF KEY STATE WITNESS ERIC HORN.

53. On March 16, 2005, the Supreme Court of Ohio declined to exercise its discretionary jurisdiction to hear Petitioner's appeal. *State v. Wogenstahl,* 105 Ohio St.3d 1465, 2005-Ohio-1024, 824 N.E.2d 93.

## I. Resumed Federal Habeas Proceeding

### 1. Resumed Federal Habeas Proceeding, Federal District Court

54. On January 3, 2007, the magistrate judge issued a report and recommendations recommending that Petitioner's petition for writ for habeas corpus be dismissed.

55. On September 12, 2007, the District Court adopted the magistrate's report and recommendations in its entirety and ordered that Petitioner's habeas petition be dismissed. *Wogenstahl v. Mitchell,* S.D. No. 1:99-cv-843, 2007 U.S. Dist. LEXIS 67388 (Sept. 12, 2007).

56. On October 15, 2007, Petitioner moved the district court to grant him a certificate of appealability.

57. On March 5, 2008, the district court granted in part and denied in part Wogenstahl's motion for a certificate of appealability.

52

## 2. Resumed Federal Habeas Proceeding, United States Court of Appeals for the Sixth Circuit

58. Petitioner timely appealed to the Sixth Circuit. *Wogenstahl v. Mitchell,* Case No. 07-4285.

59. On June 13, 2008, Petitioner moved to expand the certificate of appealability granted by the District Court.

60. On March 2, 2009, the Court of Appeals granted in part and denied in part Petitioner's motion to expand the certificate of appealability.

61. Petitioner raised the following issues in his appeal:

### ARGUMENT # 1

The prosecution failed to disclose favorable evidence and permitted perjury from a material witness in violation of Wogenstahl's constitutional rights. U.S. amends. 5th, 6th, 8th, and 14th. *(Hab. Pet. Claim 2(ii))*

### ARGUMENT # 2

Misconduct during closing argument at both phases of trial violated Wogenstahl's right against cruel and unusual punishment and his right to due process under U.S. Const. amends. 5th, 6th, 8th, and 14th. *(Hab. Pet. Claim 12 (first phase), and Claim 22(iv) (mitigation phase))*

### ARGUMENT # 3

Wogenstahl's due process rights under the 5th, 6th, 8th, and 14th Amendments were violated by the prosecutor's improper mitigation phase closing argument which upended Ohio's capital sentencing scheme by arguing that the nature and circumstances of the offense were factors that weighed in favor of death. *(Hab. Pet. Claim 16)*

### ARGUMENT # 4

Wogenstahl's defense counsel provided ineffective assistance of by making damaging arguments in closing, thereby violating his constitutional rights as guaranteed by the 5th, 6th, 8th, and 14th Amendments to the United States Constitution. *(Hab. Pet. Claim 13(vi))*

ARGUMENT # 5

Wogenstahl's rights to present a defense and effective assistance of mitigation-phase counsel were violated by the trial court's refusal to authorize the funds adequate for effective representation, and by counsel's rudimentary failure to prepare for and present mitigation evidence, in violation of the 5th, 6th, 8th and 14th Amendments. *(Hab Pet.. Claims 1 and 23)*

ARGUMENT # 6

The trial court's mitigation instruction that required jurors to be unanimous in acquitting on "Death" before they considered "Life" violated Wogenstahl's constitutional rights under the 5th 6th, 8th, and 14th Amendments to the United States Constitution. *(Hab. Pet. Claim 14)*

62. On February 2, 2012, the Sixth Circuit Court affirmed the district court's denial of Petitioner's petition for writ of habeas corpus. *Wogenstahl v. Mitchell,* 668 F.3d 307 (6th Cir. 2012).

63. On March 19, 2012, Petitioner timely filed a motion for rehearing en banc.

64. On April 12, 2012, the Sixth Circuit denied Petitioner's motion for rehearing en banc. *Wogenstahl v. Mitchell,* 2012 U.S. App. LEXIS 7487 (6th Cir. April 12, 2012).

**3. Resumed Habeas Proceedings, United States Supreme Court**

65. On July 18, 2012, Petitioner filed a Petition for Writ of Certiorari in the United States Supreme Court. He raised the following issues:

I. Suborned perjury by the State from a material witness in a capital case should no longer be subject to harmless error review. Alternatively, the prosecutions' suborning perjury from a material witness (a felony in Ohio) to help secure a capital conviction and death sentence was a violation of Wogenstahl's constitutional rights. U.S. Const. amends. V, VI, VIII, and XIV

54

II.    Egregious misconduct during closing argument at both phases of trial violated Wogenstahl's right to due process and his right against cruel and unusual punishment and presents the Court with an opportunity to affirm that the cumulative effect of such misconduct violates the accused's constitutional rights. And, that his counsel's failure to object to such misconduct during the mitigation-phase constituted ineffective assistance of counsel. U.S. Const. amends. V, VI, VIII, and XIV

III.    When defense counsel states in culpability-phase closing that if the jury finds the defendant guilty they should execute him, that constitutes ineffective assistance of counsel because it eviscerates a meaningful "appropriateness of death" adjudication in the mitigation phase of a capital trial in violation of U.S. Const. amends. V, VI, VIII, and XIV

IV.    Conflicting rules that arbitrarily block state courts from a merits review do not create a default that blocks merits review in federal habeas litigation.

66.    On October 1, 2012, the United States Supreme Court denied the petition for writ of certiorari. *Wogenstahl v. Robinson*, __ U.S. __, 133 S.Ct. 311, 184 L. Ed. 2d 185 (2012).

## J.    Third New Trial Motion

### 1.    Third New Trial Motion, Trial Court

67.    In August of 2013, almost one year after the United States Supreme Court denied his petition for certiorari, the United States Department of Justice notified Petitioner that the Special Agent Douglas Deedrick's trial testimony at trial (that the hair found in the victim's panties belonged to Petitioner) was not supported by the applicable science.

68.     On January 29, 2014, Petitioner, based on the information provided by the FBI and Department of Justice, filed in the trial court a motion for leave to file a motion for new trial with a new trial motion attached.

69.     On January 29, 2014, the trial court denied the motion for leave to file the new trial motion in a five word entry: "not to be well taken." *State v. Wogenstahl,* Ham C.P. No. B-926287 (Jan. 29, 2014 Entry).

## 2.    Third New Trial Motion, Court of Appeals

70.     Petitioner timely appealed that decision. *State v. Wogenstahl*, 1st App. Dist. No. C-140683.  He raised the following assignments of error:

> FIRST ASSIGNMENT OF ERROR:  THE TRIAL COURT ABUSED ITS DISCRETION IN DENYING WOGENSTAHL LEAVE TO FILE HIS NEW TRIAL MOTION AND IN FAILING TO HOLD A HEARING.

> SECOND ASSIGNMENT OF ERROR:  THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION FOR A NEW TRIAL BASED ON NEWLY DISCOVERED EVIDENCE OF THE ERRONEOUS TESTIMONY PRESENTED BY THE STATE THROUGH AN EXPERT WITNESS.

71.     On December 23, 2015, the Court of Appeals ruled that the trial court erred when it denied Petitioner leave to file his motion for a new trial. *State v. Wogenstahl*, 1st App. Dist. No. C-140683, 2015 Ohio 5346. However, the court of appeals denied Petitioner relief on the merits of his motion for a new trial. (*Id.* at ¶ 41).

## 3.    Third New Trial Motion, Supreme Court of Ohio

72.     On March 21, 2016, Petitioner filed his notice of appeal and memorandum in support with the Supreme Court of Ohio. He raised the following propositions of law:

56

PROPOSITION OF LAW I

When a defendant moves the court for new trial pursuant to Crim.R. 33 based upon newly discovered, exculpatory evidence that was previously suppressed by the State, the court must apply the *Brady*, not the *Petro* standard when assessing the significance of the evidence.

PROPOSITION OF LAW II

A capital appellant must be granted a new trial when it has been conclusively determined that the State admitted false forensic testimony at his trial, and this testimony materially infected the conviction.

PROPOSITION OF LAW III

When highly prejudicial, newly discovered evidence comes to light, pursuant to Crim.R. 33 and *State v. Petro*, relief must be granted when the new evidence discloses a strong probability that it will change the result if a new trial is granted.

73.   On October 7, 2016, Petitioner filed a motion to remand the proceedings based on exculpatory evidence first disclosed by the State after Petitioner had filed his January 29, 2014 motion for leave to file a motion for a new trial.

74.   Most of the *Brady* evidence that the motion to remand was based upon was not obtained by Wogenstahl until May 3, 2016 when he was able to review and copy what was asserted to be the full and complete Harrison Police Department file on this case.

75.   The remaining *Brady* evidence was uncovered through a Freedom of Information Act (FOIA) request. Records were released by the Federal Bureau of Investigation on March 5, 2015 and March 27, 2015. These records totaled over 500 pages. These records were highly redacted, and certain pages were not

57

turned over. (*See* Exhibit 84, US Department of Justice cover letter from March 27, 2015). An expedited administrative appeal was filed. The Department of Justice agreed to expedite that appeal, yet a response was not received until August 16, 2016. The appeal was affirmed in part, and remanded in part back "to the FBI for further processing of certain pages of responsive records withheld pursuant to Exemption 7(E)." (*See* Exhibit 85). On November 16, 2016, the FBI responded and released 29 additional pages. Another administrative appeal was filed. This appeal was denied via letter on March 23, 2017. (*See* Exhibit 85). A lawsuit may be filed in federal district court in accordance with 5 § U.S.C. 552(a)(4)(B).

76. On March 15, 2017, the Supreme Court of Ohio declined to exercise its discretionary jurisdiction to hear Petitioner's appeal. *State v. Wogenstahl,* __ Ohio St.3d __, 2017-Ohio-906, __ N.E.3d __.

## K.  Reopening Of Direct Appeal

77. On October 9, 2015, Petitioner filed with the Supreme Court of Ohio a motion to reopen his direct appeal contending that the trial court had lacked jurisdiction because the murder did not take place in the State of Ohio. *State v. Wogenstahl,* Case No. 1995-0042.

78. On May 4, 2016, the Supreme Court of Ohio granted Petitioner's motion to reopen his direct appeal. *State v. Wogenstahl,* 145 Ohio St. 3d 1455, 2016-Ohio-2807, 49 N.E.3d 318.

79. Petitioner raised the following propositions of law in his briefing before that Court:

### Proposition of Law No. I

An Ohio court lacks subject matter jurisdiction when the state fails to prove such jurisdiction beyond a reasonable doubt. Any resulting conviction is void and violates a defendant's constitutional rights to fair trial and due process. U.S. Const. amends. VI and XIV.

### Proposition of Law No. II

A defendant is denied the effective assistance of counsel, when a trial court lacks subject matter jurisdiction and defense counsel fails to raise the issue. U.S. Const. amends. VI and XIV.

### Proposition of Law No. III

Trial of a defendant in a court without subject matter jurisdiction would necessarily violate the defendant's substantive and procedural constitutional rights to a fair trial and due process. U.S. Const. amends. VI and XIV.

80. The Supreme Court conducted oral argument on April 4, 2017.

81. The parties are currently awaiting a decision from the Supreme Court of Ohio.

## L. Second Post-Conviction Proceedings

82. On April 26, 2017, Wogenstahl initiated post-conviction proceedings with the trial court. *State v. Wogenstahl,* Ham. C. P. No. B 926287. He raised the following grounds for relief:

### First Ground for Relief

Petitioner's convictions and sentences are void or voidable because Ohio's post-conviction procedures do not provide an adequate corrective process, in violation of the constitution. U.S. Const. amends. V, VI, VIII, and XIV; Ohio Const. art. I, §§ 1, 2, 5, 9, 10, 16, and 20.

59

## Second Ground for Relief

Petitioner's convictions and sentences are void and/or voidable because the prosecution failed to provide trial counsel with material, exculpatory evidence that its witness, Peggy Garrett, had been hypnotized to refresh her memory concerning the events surrounding the disappearance and murder of Amber.  U.S. Const. Amends. V, VIII, XIV, Ohio Const. Art. I, §§ 1, 2, 5, 9, 10, 16, and 20.

## Third Ground for Relief

Petitioner's convictions and sentences are void and/or voidable because the trial prosecutors failed to provide trial counsel with material, exculpatory evidence: the police reports that contradicted Peggy Garrett's trial testimony. U.S. Const. Amends. V, VIII, XIV, Ohio Const. Art. I, §§ 1, 2, 5, 9, 10, 16, and 20.

## Fourth Ground for Relief

Petitioner's convictions and sentences are void and/or voidable because the trial prosecutors failed to provide trial counsel with material, exculpatory evidence as to the pretrial statements of Peggy Garrett's that contradicted her trial testimony. U.S. Const. Amends. V, VIII, XIV, Ohio Const. Art. I, §§ 1, 2, 5, 9, 10, 16, and 20.

## Fifth Ground for Relief

Petitioner's convictions and sentences are void and/or voidable because the trial prosecutors failed to provide trial counsel with material, exculpatory evidence: police reports that contradicted Peggy Garrett's trial testimony as to the extent of her prior criminal record and her whereabouts on the night in question. U.S. Const. Amends. V, VIII, XIV, Ohio Const. Art. I, §§ 1, 2, 5, 9, 10, 16, and 20.

## Sixth Ground for Relief

Petitioner's convictions and sentences are void and/or voidable because the prosecution did not provide trial counsel with the additional material, exculpatory information identified herein that contradicted Peggy Garrett's testimony as to the (a) whereabouts of her son Justin Horn and (b) nature of her relationship with Amber. U.S. Const. Amends. V, VIII, XIV, Ohio Const. Art. I, §§ 1, 2, 5, 9, 10, 16, and 20.

## Seventh Ground for Relief

Petitioner's convictions and sentences are void and/or voidable because the prosecution suppressed the material, exculpatory information, that its witness, Eric Horn, had been hypnotized to refresh his memory concerning the events surround the disappearance and murder of Amber. U.S. Const. Amends. V, VIII, XIV, Ohio Const. Art. I, §§ 1, 2, 5, 9, 10, 16, and 20.

## Eighth Ground for Relief

Petitioner's convictions and sentences are void and/or voidable because the prosecution failed to provide trial counsel with material, exculpatory evidence, or information identified in this ground for relief, the three police reports that indicated that the brother, Eric Horn was a suspect in the disappearance and murder of Amber. U.S. Const. Amends. V, VIII, XIV, Ohio Const. Art. I, §§ 1, 2, 5, 9, 10, 16, and 20.

## Ninth Ground for Relief

Petitioner's convictions and sentences are void and/or voidable because the prosecution failed to provide trial counsel with material, exculpatory information that impeached its witness Eric Horn's testimony at Petitioner's trial. U.S. Const. Amends. V, VIII, XIV, Ohio Const. Art. I, §§ 1, 2, 5, 9, 10, 16, and 20.

## Tenth Ground for Relief

Petitioner's convictions and sentences are void and/or voidable because the prosecution failed to provide trial counsel with material, exculpatory information that impeached its witness Eric Horn's testimony at Petitioner's trial. U.S. Const. Amends. V, VIII, XIV, Ohio Const. Art. I, §§ 1, 2, 5, 9, 10, 16, and 20.

## Eleventh Ground for Relief

Petitioner's convictions and sentences are void and/or voidable because the prosecution failed to provide trial counsel information that jail house informant Bruce Wheeler had received consideration in exchange for his testimony. U.S. Const. Amends. V, VIII, XIV, Ohio Const. Art. I, §§ 1, 2, 5, 9, 10, 16, and 20.

### Twelfth Ground for Relief

Petitioner's convictions and sentences are void and/or voidable because the prosecution failed to provide trial counsel material, exculpatory information concerning Wheeler's purported role in the assault of a two year old child and Wheeler's willingness to admit his involvement. U.S. Const. Amends. V, VIII, XIV, Ohio Const. Art. I, §§ 1, 2, 5, 9, 10, 16, and 20.

### Thirteenth Ground for Relief

Petitioner's convictions and sentences are void and/or voidable because the prosecution failed to provide trial counsel material, exculpatory information that calls into question the credibility of the testimony of two of the State's eyewitnesses, Michelle Hunt and Brian Noel. U.S. Const. Amends. V, VIII, XIV, Ohio Const. Art. I, §§ 1, 2, 5, 9, 10, 16, and 20.

### Fourteenth Ground for Relief

Petitioner's convictions and sentences are void and/or voidable because the prosecution failed to provide trial counsel with the material, exculpatory information concerning Amber Garrett. V, VIII, XIV, Ohio Const. Art. I, §§ 1, 2, 5, 9, 10, 16, and 20.

### Fifteenth Ground for Relief

Petitioner's convictions and sentences are void and/or voidable because the prosecution failed to provide trial counsel with material, exculpatory information involving the kidnapping and homicide of Amber Garrett. U.S. Const. Amends. V, VIII, XIV, Ohio Const. Art. I, §§ 1, 2, 5, 9, 10, 16, and 20.

### Sixteenth Ground for Relief

Petitioner's convictions and sentences are void and/or voidable because the prosecution failed to provide trial counsel with material, exculpatory information that impeached its theory of the case, the manner in which Amber was kidnapped. U.S. Const. Amends. V, VIII, XIV, Ohio Const. Art. I, §§ 1, 2, 5, 9, 10, 16, and 20.

### Seventeenth Ground for Relief

Petitioner's convictions and sentences are void and/or voidable because the prosecution failed to provide trial counsel with

material, exculpatory information concerning the death of Amber Garrett. U.S. Const. Amends. V, VIII, XIV, Ohio Const. Art. I, §§ 1, 2, 5, 9, 10, 16, and 20.

### Eighteenth Ground for Relief

Petitioner's convictions and sentences are void and/or voidable because the prosecution failed to provide trial counsel with material, exculpatory information concerning the blood found in his apartment. U.S. Const. Amends. V, VIII, XIV, Ohio Const. Art. I, §§ 1, 2, 5, 9, 10, 16, and 20.

### Nineteenth Ground for Relief

Petitioner's convictions and sentences are void and/or voidable because the prosecution failed to provide trial counsel with material, exculpatory evidence concerning Special Agent Douglas Deedrick's testimony that linked Petitioner to a hair found in the victim's underwear. U.S. Const. Amends. V, VIII, XIV, Ohio Const. Art. I, §§ 1, 2, 5, 9, 10, 16, and 20.

### Twentieth Ground for Relief

Petitioner's convictions and sentences are void and/or voidable because the prosecution did not provide trial counsel with the material, exculpatory evidence identified in the Second through Nineteenth Grounds for Relief. U.S. Const. Amends. V, VIII, XIV, Ohio Const. Art. I, §§ 1, 2, 5, 9, 10, 16, and 20. U.S. Const. Amends. V, VIII, XIV, Ohio Const. Art. I, §§ 1, 2, 5, 9, 10, 16, and 20.

### Twenty-First Ground for Relief

Petitioner's convictions and sentences are void or voidable because the prosecution knowingly employed false testimony and/or argument, Peggy Garrett's testimony concerning her relationship with Petitioner and the condition his coat, without correcting the same to convict Petitioner and obtain a death sentence. U.S. Const. Amends. V, VIII, XIV, Ohio Const. Art. I, §§ 1, 2, 5, 9, 10, 16, and 20.

### Twenty-Second Ground for Relief

Petitioner's convictions and sentences are void or voidable because the prosecution knowingly employed false testimony and/or argument without correcting the same, the testimony of Peggy

Garrett concerning the presence of Amber Garrett when Peggy Garret arrived home that night and Amber Garrett's eyesight, to convict Petitioner and obtain a death sentence. U.S. Const. Amends. V, VIII, IX, XIV, Ohio Const. Art. I, §§ 1, 2, 5, 9, 10, 16, and 20.

### Twenty-Third Ground for Relief

Petitioner's convictions and sentences are void or voidable because the prosecution knowingly employed false testimony and/or argument without correcting the same, the testimony of Peggy Garrett's criminal record and her whereabouts on the morning of Amber's disappearance to obtain Petitioner's conviction and death sentence. U.S. Const. Amends. V, VIII, IX, XIV, Ohio Const. Art. I, §§ 1, 2, 5, 9, 10, 16, and 20.

### Twenty-Fourth Ground for Relief

Petitioner's convictions and sentences are void or voidable because the prosecution knowingly employed false testimony and/or argument without correcting the same, the testimony of Peggy Garret concerning the whereabouts of Justin Horn and her relationship with Amber Garrett, to convict Petitioner and to obtain a death sentence. U.S. Const. Amends. V, VIII, IX, XIV, Ohio Const. Art. I, §§ 1, 2, 5, 9, 10, 16, and 20.

### Twenty-Fifth Ground for Relief

Petitioner's convictions and sentences are void or voidable because the prosecution knowingly employed false testimony and/or argument without correcting the same, the testimony of Eric Horn concerning his whereabouts on the morning of the murder and the condition of Petitioner's jacket, to convict Petitioner and obtain a death sentence. U.S. Const. Amends. V, VIII, IX, XIV, Ohio Const. Art. I, §§ 1, 2, 5, 9, 10, 16, and 20.

### Twenty-Sixth Ground for Relief

Petitioner's convictions and sentences are void or voidable because the prosecution knowingly employed false testimony and/or argument without correcting the same, the testimony of Eric Horn concerning his sale of marijuana to convict Petitioner and obtain a death sentence. U.S. Const. Amends. V, VIII, XIV, Ohio Const. Art. I, §§ 1, 2, 5, 9, 10, 16, and 20.

### Twenty-Seventh Ground for Relief

Petitioner's convictions and sentences are void or voidable because the prosecution knowingly employed false testimony and/or argument without correcting the same, the testimony of Bruce Wheeler concerning the consideration that he received in exchanged for his testimony, to convict Petitioner and obtain a death sentence. U.S. Const. Amends. V, VIII, XIV, Ohio Const. Art. I, §§ 1, 2, 5, 9, 10, 16, and 20.

### Twenty-Eighth Ground for Relief

Petitioner's convictions and sentences are void or voidable because the prosecution knowingly employed false testimony and/or argument without correcting the same, the prosecution's argument that Bruce Wheeler had readily accepted blame for assaulting his girlfriend's daughter, to convict Petitioner and obtain a death sentence. U.S. Const. Amends. V, VIII, XIV, Ohio Const. Art. I, §§ 1, 2, 5, 9, 10, 16, and 20.

### Twenty-Ninth Ground for Relief

Petitioner's convictions and sentences are void or voidable because the prosecution knowingly employed false testimony and/or argument without correcting the same, the testimony of Michelle Hunt concerning the vehicle that she saw that morning and Brian Noel's testimony concerning the amount of alcohol he had consumed, to convict Petitioner and obtain a death sentence. U.S. Const. Amends. V, VIII, XIV, Ohio Const. Art. I, §§ 1, 2, 5, 9, 10, 16, and 20.

### Thirtieth Ground for Relief

Petitioner's convictions and sentences are void or voidable because the prosecution knowingly employed false testimony and/or argument without correcting the same, the testimony of Special Agent Douglas Deedrick linking Petitioner to a hair found in the victim's underwear, to convict Petitioner and obtain a death sentence. U.S. Const. Amends. V, VIII, XIV, Ohio Const. Art. I, §§ 1, 2, 5, 9, 10, 16, and 20.

### Thirty-First Ground for Relief

Petitioner's convictions and sentences are void or voidable because the prosecution knowingly employed false testimony and/or argument without correcting the same, the cumulative impact of

the perjured testimony identified in the Twenty-First to Thirtieth Grounds for Relief, to convict Petitioner and obtain a death sentence. U.S. Const. Amends. V, VIII, XIV, Ohio Const. Art. I, §§ 1, 2, 5, 9, 10, 16, and 20.

### Thirty-Second Ground for Relief

Petitioner's convictions are void or voidable because he was denied the effective assistance of counsel during the trial stage of his capital case because trial counsel failed to retain a pathologist. U.S. Const. amends. V, VI, VIII, and XIV; Ohio Const. art. I, §§ 1, 2, 5, 9, 10, 16 and 20

### Thirty-Third Ground for Relief

Petitioner's convictions are void or voidable because he was denied the effective assistance of counsel during the trial stage of his capital case because trial counsel failed to retain an expert involving crime scene investigation. U.S. Const. amends. V, VI, VIII, and XIV; Ohio Const. art. I, §§ 1, 2, 5, 9, 10, 16 and 20.

### Thirty-Fourth Ground for Relief

Petitioner's convictions are void or voidable because he was denied the effective assistance of counsel during the trial stage of his capital case because trial counsel failed to retain an expert in the area of eyewitness identification. U.S. Const. amends. V, VI, VIII, and XIV; Ohio Const. art. I, §§ 1, 2, 5, 9, 10, 16 and 20.

### Thirty-Fifth Ground for Relief

Petitioner's convictions are void or voidable because he was denied the effective assistance of counsel during the trial stage of his capital case because trial counsel failed to conduct a reasonable investigation concerning Peggy Garrett. U.S. Const. amends. V, VI, VIII, and XIV; Ohio Const. art. I, §§ 1, 2, 5, 9, 10, 16 and 20.

### Thirty-Sixth Ground for Relief

Petitioner's convictions are void or voidable because he was denied the effective assistance of counsel during the trial stage of his capital case because trial counsel failed to conduct a reasonable investigation concerning Peggy Garrett. U.S. Const. amends. V, VI, VIII, and XIV; Ohio Const. art. I, §§ 1, 2, 5, 9, 10, 16 and 20.

### Thirty-Seventh Ground for Relief

Petitioner's convictions are void or voidable because he was denied the effective assistance of counsel during the trial stage of his capital case because trial counsel failed to conduct a reasonable investigation concerning Eric Horn. U.S. Const. amends. V, VI, VIII, and XIV; Ohio Const. art. I, §§ 1, 2, 5, 9, 10, 16 and 20.

### Thirty-Eighth Ground for Relief

Petitioner's convictions are void or voidable because he was denied the effective assistance of counsel during the trial stage of his capital case because trial counsel failed to conduct a reasonable investigation concerning Bruce Wheeler. U.S. Const. amends. V, VI, VIII, and XIV; Ohio Const. art. I, §§ 1, 2, 5, 9, 10, 16 and 20.

### Thirty-Ninth Ground for Relief

Petitioner's convictions are void or voidable because he was denied the effective assistance of counsel during the trial stage of his capital case because trial counsel failed to conduct a reasonable investigation concerning Michelle Hunt and Brian Noel. U.S. Const. amends. V, VI, VIII, and XIV; Ohio Const. art. I, §§ 1, 2, 5, 9, 10, 16 and 20.

### Fortieth Ground for Relief

Petitioner's convictions are void or voidable because he was denied the effective assistance of counsel during the trial stage of his capital case because trial counsel failed to conduct a reasonable investigation concerning Amber Garrett. U.S. Const. amends. V, VI, VIII, and XIV; Ohio Const. art. I, §§ 1, 2, 5, 9, 10, 16 and 20.

### Forty-First Ground for Relief

Petitioner's convictions are void or voidable because he was denied the effective assistance of counsel during the trial stage of his capital case because trial counsel failed to conduct a reasonable investigation concerning Peggy Garret's involvement in the death of Amber Garrett. U.S. Const. amends. V, VI, VIII, and XIV; Ohio Const. art. I, §§ 1, 2, 5, 9, 10, 16 and 20.

### Forty-Second Ground for Relief

Petitioner's convictions are void or voidable because he was denied the effective assistance of counsel during the trial stage of his

capital case because trial counsel failed to conduct a reasonable investigation concerning the facts surrounding the kidnapping of Amber Garrett. U.S. Const. amends. V, VI, VIII, and XIV; Ohio Const. art. I, §§ 1, 2, 5, 9, 10, 16 and 20.

### Forty-Third Ground for Relief

Petitioner's convictions are void or voidable because he was denied the effective assistance of counsel during the trial stage of his capital case because trial counsel failed to conduct a reasonable investigation concerning the time and location of the murder of Amber Garrett. U.S. Const. amends. V, VI, VIII, and XIV; Ohio Const. art. I, §§ 1, 2, 5, 9, 10, 16 and 20.

### Forty-Fourth Ground for Relief

Petitioner's convictions are void or voidable because he was denied the effective assistance of counsel during the trial stage of his capital case because trial counsel failed to conduct a reasonable investigation concerning the source of the blood that officers found in Petitioner's apartment. U.S. Const. amends. V, VI, VIII, and XIV; Ohio Const. art. I, §§ 1, 2, 5, 9, 10, 16 and 20.

### Forty-Fifth Ground for Relief

Petitioner's convictions are void or voidable because he was denied the effective assistance of counsel during the trial stage of his capital case because trial counsel failed to conduct a reasonable investigation concerning Special Agent Douglas Deedrick's testimony linking Petitioner to a hair found in the victim's underwear.. U.S. Const. amends. V, VI, VIII, and XIV; Ohio Const. art. I, §§ 1, 2, 5, 9, 10, 16 and 20.

### Forty-Sixth Ground for Relief

Petitioner's death sentence is void or voidable because he was denied the effective assistance of counsel during the sentencing stage of his capital case because trial counsel failed to retain a competent psychological expert to testify as to the relevant biological and environment facts in Petitioner's background. U.S. Const. amends. V, VI, VIII, and XIV; Ohio Const. art. I, §§ 1, 2, 5, 9, 10, 16 and 20.

## Forty-Seventh Ground for Relief

Petitioner's death sentence is void or voidable because he was denied the effective assistance of counsel during the sentencing stage of his capital case because trial counsel failed to fully develop the testimony of Diane Linz.  U.S. Const. amends. V, VI, VIII, and XIV; Ohio Const. art. I, §§ 1, 2, 5, 9, 10, 16 and 20.

## Forty-Eighth Ground for Relief

Petitioner's death sentence is void or voidable because he was denied the effective assistance of counsel during the sentencing stage of his capital case because trial counsel failed to present the testimony of Edith Long, Mabel Long and Tom Wilson. U.S. Const. amends. V, VI, VIII, and XIV; Ohio Const. art. I, §§ 1, 2, 5, 9, 10, 16 and 20.

## Forty-Ninth Ground for Relief

Petitioner's death sentence is void or voidable because he was denied the effective assistance of counsel during the sentencing stage of his capital case because trial counsel failed to fully develop the testimony of Teresa Smith and Chris Oldendick.  U.S. Const. amends. V, VI, VIII, and XIV; Ohio Const. art. I, §§ 1, 2, 5, 9, 10, 16 and 20.

## Fiftieth Ground for Relief

Petitioner's death sentence is void or voidable because he was denied the effective assistance of counsel during the sentencing stage of his capital case because trial counsel failed to present the testimony of Phyllis Myers. U.S. Const. amends. V, VI, VIII, and XIV; Ohio Const. art. I, §§ 1, 2, 5, 9, 10, 16 and 20.

## Fifty-First Ground for Relief

Petitioner's convictions and death sentence are void or voidable because he was denied the effective assistance of counsel during the trial and sentencing stages of his capital case for the reasons set forth in Thirty-Second to Fiftieth Grounds for Relief. U.S. Const. amends. V, VI, VIII, and XIV; Ohio Const. art. I, §§ 1, 2, 5, 9, 10, 16 and 20.

### Fifty-Second Ground for Relief

Petitioner's conviction for capital murder and the resultant death sentence are void or voidable because the trial court lacked jurisdiction on the capital offenses because Amber Garrett was murdered in the State of Indiana. U.S. Const. amends. V, VI, VIII, and XIV; Ohio Const. art. I, §§ 1, 2, 5, 9, 10, 16 and 20, and R.C. § 2901.11 (1993).

### Fifty-Third Ground for Relief

Petitioner's conviction for capital murder and the resultant death sentence are void or voidable because the State failed to establish by proof beyond a reasonable that Amber Garrett was killed in the State of Ohio. V, VI, VIII, and XIV; Ohio Const. art. I, §§ 1, 2, 5, 9, 10, 16 and 20, and R.C. § 2901.11 (1993).

### Fifty-Fourth Ground for Relief

Petitioner's conviction for capital murder and death sentence are void or voidable because the trial court failed to instruct the jury that the State had to establish by proof beyond a reasonable doubt that Amber Garrett was killed in the State of Ohio. V, VI, VIII, and XIV; Ohio Const. art. I, §§ 1, 2, 5, 9, 10, 16 and 20, and R.C. § 2901.11 (1993).

### Fifty-Fifth Ground for Relief

Petitioner's conviction for capital murder and death sentence are void or voidable because he was denied the effective assistance of counsel during the trial and sentencing stages, trial counsel failed to raise the trial court's lack of subject matter jurisdiction, present evidence on the issue and request the appropriate jury instruction. U.S. Const. amends. V, VI, VIII, and XIV; Ohio Const. art. I, §§ 1, 2, 5, 9, 10, 16 and 20.

### Fifty-Seventh [sic] Ground for Relief

Petitioner's convictions and death sentences are void or voidable because of the effect of the cumulative error that occurred at all stages of his capital trial. U.S. Const. amends. V, VI, VIII, and XIV; Ohio Const. art. I, §§ 1, 2, 5, 9, 10, 16 and 20.

83.    That post-conviction petition is still pending before the Hamilton

County Common Pleas Court.

70

# CONSTITUTIONAL VIOLATIONS

**First Claim For Relief: The Prosecution Suppressed Material, Exculpatory Evidence. United States Constitution, Sixth and Fourteenth Amendments.**

84. Petitioner incorporates all of the allegations contained elsewhere in this Petition as if fully restated in this claim for relief.

85. The prosecution has the affirmative duty to timely provide trial counsel all exculpatory evidence that is relevant to either the trial or sentence. That constitutional duty applies not only to information contained in the prosecutor's file, but all information in the possession of other state agencies.

**A. The Hamilton County Prosecutor's Office Did Not Have Adequate Controls in Place at the Time of Wogenstahl's Trial to Identify and Provide Counsel with Exculpatory Evidence.**

86. In 1992 and 1993, the Hamilton County Prosecutor's Office ("Office") did not have any guidelines in place to assist trial prosecutors in identifying and exculpatory evidence.

87. That Office did not provide any training or guidance for its members concerning exculpatory evidence.

88. As a result, the prosecutors in that Office did not have sufficient expertise to identify exculpatory evidence which should be timely provided to trial counsel.

89. In 1992 and 1993, the Office did not have in place a system that required the law enforcement agencies to forward to the Office all records generated during the course of an investigation that led to an indictment.

71

90.     As a result of this failure to implement regulations or internal guidelines that required the investigating agencies to forward their entire investigatory files to the Office, the trial prosecutors were unable to conduct the review for favorable exculpatory information that the Fourteenth Amendment required.

**B.      Trial Counsel Made Repeated Discovery Requests.**

91.     Prior to the commencement of trial, Wogenstahl's counsel diligently pursued discovery. They filed motions for: (a) Crim R. 16 discovery (Exhibit 2), (b) a bill of particulars. (Exhibit 3), (c) to compel the investigating officers to provide the prosecution with all of their investigatory files (Exhibit 4), (d) pretrial disclosure of witness statements (Exhibit 5), (e) an order directing that a sealed copy of the prosecution's file be made part of the record for review on appeal (Exhibit 6), (f) a notice of intention to use evidence, pursuant to Crim. R 12(D)(2) (Exhibit 7), (g) Disclosure of Favorable Evidence (Exhibit 8), and (h) Disclosure of Impeaching Evidence (Exhibit 9). (*See also* Exhibits 10, 11, and 12).

**C.      The Prosecution Suppressed Material Information that Impeached the Expert's Opinion that the Hair Found in Amber's Underwear Belonged to Wogenstahl.**

92.     Federal Bureau of Investigation Special Agent Douglas Deedrick testified about the hair found in Amber's underwear. The basis of this testimony was hair microscopy.

93. On direct examination, Deedrick testified that it was his opinion, to a reasonable degree of scientific certainty, that the hair found in the victim's underwear belonged to Wogenstahl. (Tr. 1286; Tr. 1290-91).

94. Deedrick bolstered his opinion by testifying about the thousands of cases in which he conducted hair microscopy analysis and the hundreds of hair samples he had reviewed. (Tr. 1297). He further bolstered the reliability of analysis by testifying to the hundreds of samples he was able to eliminate. *Id.*

95. The prosecution made Deedrick's opinion a focus of its case.

96. The prosecution used Deedrick's opinion testimony to cross examine Wogenstahl:

> Q: Do you want to tell the jury how your pubic hair got in her underwear?
>
> A: It is not my pubic hair. That is all I can say.
>
> ***
>
> Q: Another terrible coincidence or is this FBI agent lying also?
>
> A: I believe that the FBI agent stated that it was similar to mine but he could not positively say it was mine.
>
> Q: To the exclusion of everyone in the world.
>
> ***
>
> Q: The FBI agent said to the exclusion of everyone in the world but exhibited every one of the characteristics of your pubic hair and you are telling the jury that was not your pubic hair?

(Trial Tr. 2373-74).

73

97.    In closing argument, the prosecutor personally vouched for the credibility of Agent Deedrick and argued that that his opinion eliminated all possibility that the hair belonged to another individual:

> In fact, during the time that he testified I had to admit I have never seen a witness with as much expertise in a particular area that is knowledgeable on his subject as Special Agent Deedrick. Here's a person who runs the most advanced crime lab . . . in the world and teaches forensic technicians how to make comparisons of trace evidence.
>
> ***
>
> He has examined four thousand hairs and he has told you that he has never found two known head hairs or two known pubic hairs that you could not distinguish and you could not say this goes to that person and that goes to that person. And he said that is Wogenstahl's hair.

(Trial Tr. 2456-58).

98.    The Department of Justice has determined that Agent Deedrick's testimony is inaccurate and identified three specific errors therein. Agent Deedrick inaccurately:

A.    Stated or implied that the hair could be associated with a specific individual to the exclusion of all others. (Exhibit 87).

B.    Assigned to the positive association a statistical weight or probability or likelihood that the questioned hair originated from a particular source or an opinion as to the likelihood or rareness of the positive association that could lead the jury to believe that valid statistical weight can be assigned to a microscopic hair association. (*Id.*)

C.    Cited the number of cases of hair analysis conducted in the laboratory and the number of samples from different individuals that could not be distinguished from one another as a predictive value to bolster the conclusion that a hair belongs to a specific individual. (*Id.*)

99.    According to the Department of Justice, Agent Deedrick's testimony exceeded the limits of science. (*Id.*)

100.    The prosecution did not provide to trial counsel any the above information concerning the flaws found in Agent Deedrick's exaggerated testimony and opinion. Instead, the State capitalized on the testimony in order to convict Petitioner.

**D.    The Prosecution Suppressed Material Information That Both Implicated Peggy Garrett In the Murder of Her Daughter and Impeached Her Trial Testimony.**

101.    Peggy Garrett was the mother of the victim, Amber Garrett. The prosecution suppressed material information that: (a) implicated her involvement in the murder of her daughter and (b) impeached six portions her trial testimony.

102.    The prosecution was constitutionally obligated to provide defense counsel with information that Peggy Garrett may have been involved in the death of her daughter Amber Garrett and that impeached Peggy Garrett's testimony.

**1.    The prosecution suppressed information that Peggy Garrett killed or was involved in the killing of her daughter.**

103.    On December 2, 1991, FBI Special Agent Knight interviewed Kim Bischoff, Amber's homeroom teacher. (Exhibit 49). Ms. Bischoff advised that "PAM REAMER, a friend of Amber's who had stated that AMBER had told her that her [Amber's] mother, brother, and her mother's boyfriend engages in

dealing drugs. Bischoff advised that her brother had wanted AMBER to get a tattoo with the word ICE on it." (*Id.*)

104. On December 3, 1991, Special Agent Edward P. Woods interviewed Lorretta Garrett, Amber's grandmother. (Exhibit 48). She reported that Amber had stated that Amber's mother, Peggy Garrett, had drugs in her house. (*Id.*)

105. Several other individuals reported to the investigating officers that the mother was a frequent abuser of drugs. (Exhibit 50, 51, 52, and 53).

106. Tammy Schuck relayed that Peggy Garrett was a known drug user and a number of people were always present in the mother's apartment. (Exhibit 43). Frequently, a lot of motorcycles were parked outside the apartment. (*Id.*) Schuck reported that Amber complained about some of the men who were present in the apartment. Once Schuck, herself, saw some men rub Amber's hair and legs as she walked by them. (*Id.*) Amber told Schuck that when her mother saw the men touching her, her mother would just laugh. (*Id.*)

107. Various other individuals reported to the police that Peggy Garret was heavily in debt to the individuals who supplied her drugs. (Exhibits 51, 52, and 53).

108. The police received reports that Peggy Garrett had sold Amber to the individual to whom she owed money for her drugs. (Exhibit 53, 56).

A. Ms. Burke informed one of the investigating officers that Peggy Garrett was in the waffle house crying and stating that she had really "fucked up" because she had sold Amber for fifteen hundred dollars. (Exhibit 56).

B.     Russell Holton similarly advised the police that, the day prior to Amber's disappearance, Peggy Garrett was at the Waffle House and had no money. (Exhibit 57). Two days later, Holton advised that she returned to the Waffle House claiming to have fifteen hundred dollars in her purse. (*Id.*).

C.     Similarly, Jack Brewer told Sergeant Harrison Police Department Sergeant Jack Tremain that, after Amber's body was found, Peggy Garrett stated that "He said that he wasn't going to beat her that bad." (Exhibit 58).

D.     April Kennedy reported that she, "saw Peggy doing Coke Sat. Eve (Sun. Morn) 24 Nov. @1230/ w/ 2 guys: 'Bikers' @ Escape." (Exhibit 23).

109.   On December 6, 1991, member of the Harrison Police Department interviewed Ollie and Tracey Wolf.  Notes from those interviews reflected that Jamie Wiemeyer, who lived in the apartment above Peggy Garrett's apartment, had information that Amber's body would be found in Bright, Indiana. (Exhibit 59).

### 2.    The prosecution suppressed information that Peggy Garrett had repeatedly abused Amber.

110.   Garrett testified that she and Amber were very close. (Tr. 860-62). However, this was not true. The prosecution suppressed four reports that impeached her testimony that she was "very close" to her daughter:

111.  Amber wrote in her diary, which the prosecution possessed at the time of trial:

> I hate myself. I hate my life. I hate my classmates. . . .
> Sometimes I just feel like running away or killing
> myself. . . . *Just yesterday before I came to school my*

77

> *mom beat me she was punching me in the back. She*
> *just would not stop.*

(Exhibit 17 – Diary) (emphasis added).

112. Gil Reuhle reported "that Amber and Peggy got into an argument, and [Peggy] hit daughter 3 times in the head, it happened the night before she was missing." (Exhibit 18).

113. A redacted report reflects that Amber told a witness that she (Amber) was not permitted to enter the apartment "which forced AMBER GARRETT to stay elsewhere on several weekends." (Exhibit 19). Amber went missing on a weekend.

114. The police received a report that "Amber has been talking about running away alot [sic] lately." (Exhibit 20).

### 3. The prosecution suppressed information that impeached Peggy Garrett's testimony concerning her whereabouts at the time of Amber's kidnapping.

115. Peggy Garrett testified in detail concerning the bars she had frequented on the night and early morning hours of the kidnapping. (Tr. 868-76). On direct examination, she testified that she began the evening at a bar named "the Escape" (Tr. 868) and her friend Lynn Williams arrived at midnight (*Id.*) Garrett testified that Williams and she left the Escape between "12:30 or quarter to 1" (Tr. 907), and Peggy had two drinks consisting of "Pepsi and a shot of rum" prior to leaving the Escape. (Tr. 908).

116. The prosecution possessed a statement that impeached her testimony as to whom she was with and what she consumed while at the

Escape.  April Kennedy reported that she "saw Peggy doing Coke Sat. Eve (Sun. Morn) 24 Nov. @1230/ w/ 2 guys: 'Bikers' @ Escape." (Exhibit 23).

117.   Peggy Garrett testified that after leaving the Escape, Williams and she went to multiple other bars, and then to the waffle house where they remained from "probably 3 or a quarter after . . . "[u]ntil 4 or a quarter after 4." (Tr. 876).

118.   The prosecution also suppressed a document that impeached this portion of her testimony. Donald B. Ellis reported to Patrolman C. Petty that "on 11-24-91 at approx. 0300 -0330 hrs. He observed Peggy Garrett at the Waffle House in Harrison and was with a m/w subject short hair possibly having a mustache and approx 602." (Exhibit 24).

### 4.   The prosecution suppressed information that impeached Peggy Garrett's testimony concerning Amber's kidnapping.

119.   Peggy Garrett testified that she arrived home at 5:00 a.m. (Tr. 878). On her arrival at her apartment:

> The kid's bedroom door was cracked open a little bit and I peeked in and *I assumed they were all there*. I saw arms and legs so –

(Tr. 880) (emphasis added).

120.   The prosecution had a report that impeached this portion of Peggy Garrett's testimony. (Exhibit 22). A summary prepared by one of the investigating officers provides, "Peg say's [sic] She got home about 505/ from Troy's (Troy and Lynn rode her home) Peg *looked in and thought she saw all three kids in there.*" (*Id.*) (Emphasis added).

121.   In her testimony, Peggy Garrett reported that Amber's eyesight without her glasses "was very, very bad." (Tr. 862). To illustrate her point, Peggy Garrett offered the following anecdote: when "she [Amber] would have to go to the bathroom in the night she would not walk from the bedroom to the bathroom just here from to there real close without putting her glasses on." (Tr. 862).

122.   However, the prosecution suppressed information that impeached Peggy Garrett's testimony and prosecution's argument concerning Amber's eyesight.

A.     An investigating officer's notes reflect, "Kim Garrett advises Amber can be without her glasses." (Exhibit 21).

B.     In another report, then Patrolman Mathews noted, "Kim also advised that Amber is very capable to be without her eyeglasses and has on several occasions." (*Id.*)

C.     In yet another report by Special Agent Rogers, he noted that "Both Kim and April advised that even though the victim wore glasses, she was able to see without them." (*Id.*)

**5.     The prosecution suppressed information that impeached Peggy Garrett's testimony that inculpated Wogenstahl.**

123.   Peggy Garrett provided critical testimony linking Wogenstahl to the murder of Amber. The prosecution suppressed information that contradicted this portion of her testimony.

*Her relationship with Wogenstahl*

80

124. Peggy Garrett testified that she had little interaction with Wogenstahl prior to the night of the kidnapping. She told the jury that Wogenstahl:

A.    Had visited her apartment "four or five times maybe" and she could not remember the last time he had visited her apartment prior to the Saturday in question. (Tr. 896-97).

B.    A couple of the four or five times he visited the apartment "he just came in the kitchen door and asked me if I needed a way to the store." (Tr. 901).

C.    "Twice" gave her a ride to the store and "the longest he ever stayed [at the apartment] was maybe twenty minutes to a half hour." (Tr. 902).

125. The prosecution suppressed a report from Peggy Garrett's son, Justin Horn, in which he reported that Wogenstahl "would stop by for a few minutes every day. He would take Peggy to the grocery store or make little trips for her. . . . Most of the time JEFFREY WOGENSTAHL would come to see his mom or his brother Eric. JEFFREY was new to the area and seemed not to know very many people and was trying to catch on by knowing PEGGY and Eric." (Exhibit 14, p. 2). His mother even had a nickname for Wogenstahl, "the Canadian Jeff." (*Id.*).

126. The prosecution suppressed another report that Wogenstahl's vehicle had been "parked in the alley behind 308 Harrison Avenue, the GARRETT residence, several times in the past." (Exhibit 15).

127. Finally, the prosecution suppressed a report in which Troy Russell stated that he had seen Wogenstahl in Peggy Garrett's apartment more than once and in early November he had witnessed Peggy Garrett and Wogenstahl smoking crack in her apartment. (Exhibit 16). Russell had previously lived with the Garretts. (*Id.*)

*Wogenstahl's Coat*

128. On direct examination, Peggy Garrett testified that when she saw Wogenstahl earlier that evening he was wearing a brown jacket that "was nice . . . did not have any cuts in it or anything." (Tr. 870). In response to a question posed by the trial judge, she reiterated that the jacket did not have any "cuts" or "rips" in it that evening. (Tr. 871).

129. The prosecution suppressed a report memorializing that Peggy Garrett had previously informed Detective Lowery that "She remembered the jacket because 'he showed me a spot on it and asked me if it could be fixed.'" (Exhibit 13a).

**6.    The prosecution suppressed information that impeached Peggy Garrett's testimony concerning the extent of her criminal history.**

130. On cross examination, trial counsel questioned Peggy Garrett concerning her prior criminal record:

Q.    You were convicted of selling it [marijuana]?

A.    No.

Q.    What were you convicted of ?

A.    *It was a couple of pills.*

82

Q.    Pills?

A.    Mm-mm.

(Tr. 897-98) (emphasis added).

131.   The prosecution suppressed three documents from the Indiana Highway Patrol and an Indiana court that impeached Peggy Garrett's testimony that it was just "a couple of pills."

A.    One document related that on February 25, 1982, while tending to two small children, Peggy Garrett sold five white tablets to Trooper S.E. Todd of the Indiana State Police Department. (Exhibit 25). The five pills were determined to be Methaqualone. (*Id.*)

B.    A second document contained information that on March 5, 1982, Peggy Garrett sold to Trooper Todd six "small light blue tablets in an approximately one inch square piece of aluminum foil." (Exhibit 42). The tablets were later determined to be Lysergic Acid Diethylamide (LSD). (*Id.*) On June 29, 1983, Garrett pled guilty to a *couple* (two) counts of dealing in a controlled substance. (Exhibit 26).

C.    The third document indicated that the Indiana trial court sentenced Garrett to two to ten years on each count, the sentences to be served concurrently. (*Id.*)

**7.    The prosecution suppressed information that impeached Garrett's testimony concerning the whereabouts of her son, Justin Horn.**

132.   Peggy Garrett testified that her son, Justin Horn, "was gone for the weekend" that Amber went missing. (Tr. 864). He left "[s]ometime in the

afternoon on Friday" and did not return until "[p]robably around 3 o'clock or something like that" on Sunday. (Tr. 865).

133. The prosecution suppressed two reports that contradicted this portion of her testimony.

134. Justin Horn had informed Special Agents Douglas Knight and Ronald Danielson that "on Saturday, November 23, 1991, he left [the apartment] at about twelve noon and went to the apartment of Chris Marshall." (Exhibit 14, p. 1). He returned to the apartment Saturday evening at "approximately 7 to 10 p.m., more likely around 8:30 to 9:00" to get something to eat and left not long after because "there was very little to eat." (*Id.*) He returned to the apartment on Sunday morning "at approximately 8:00 a.m." and woke her [Peggy Garrett] up and "said hi to her." (*Id.*) Justin added that his friend, Steve, was also with him at this time. (*Id.*)

135. Another Harrison Police Department report reflects that "Justin came home about 4:45 a.m. and Erick [sic] left about 0500." (Exhibit 27; *see also* Exhibit 81).

136. Peggy Garrett's inaccurate testimony concerning the whereabouts of her son, Justin, becomes even more critical when considered in the context of yet another suppressed police report.

137. On November 29, 1991, Douglas Dalton and Robert Hess gave written statements in which they both reported that on October 3, 1991, they

heard a young child screaming.  (Exhibits 46 and 47).[1]  "A few seconds later" a young girl matching the physical description of Amber ran from an alley, screaming. (Exhibit 46). Hess and Dalton stopped her and asked her what was wrong, yet she remained silent. (Exhibits 46 and 47).  She then ran down the street and two boys, matching the physical descriptions of Amber's brothers, chased her. (*Id.*)

**E.    The Prosecution Suppressed Material Information That Both Implicated Eric Horn In the Murder of His Sister and Impeached His Trial Testimony.**

138.  Eric Horn was the brother of Amber Garrett. He was supposedly babysitting her on the night and early morning hours of her kidnapping. He provided critical trial testimony against Wogenstahl.  Like Peggy Garrett, the prosecution suppressed information that both pointed to him as a suspect and impeached his trial testimony.

**1.    The prosecution suppressed evidence that implicated Eric Horn in his sister's murder.**

139.  The prosecution suppressed three police reports that indicated that the brother, Eric Horn, was a suspect in the disappearance and murder of Amber.

140. Notes in the police file dated "12-7-91" stated "need to talk to Eric again. How would Eric get her [Amber] to Jamison Road?" where the body was found. (Exhibit 29).

---

[1] Douglas Dalton in his report states that the incident occurred on "3rd of October *1992*." (Exhibit 32) (emphasis added). The reported year was a misstatement given that he gave the written statement on November 29, 1991. (*Id.*)

141. Two individuals came forward with information concerning Eric, one of whom indicated that they saw Eric with a "knife". (*Id.*)

142. In a written statement to then Patrolman Matthews two weeks prior to Amber's death, Steven Kemper stated "Eric Horn had told me that he hated his sister and that he wished she was dead." (Exhibit 30).

143. The fact that investigating officers asked Horn to submit to a polygraph indicates Horn was a suspect in Amber's disappearance and death. (Exhibit 28). *See* Section 4, *infra.*

### 2. The prosecution suppressed evidence that impeached Eric Horn's testimony as to his whereabouts when his sister was kidnapped.

144. On direct examination Horn testified that, he: (a) did not leave his mother's apartment from eleven o'clock when his mother left, until 3:00 a.m. when Wogenstahl appeared (Tr. 953); (b) left the apartment with Wogenstahl at 3:00 a.m. (Tr. 953-57) and returned to the apartment at approximately 3:30 a.m. (Tr. 1007); and (c) remained in the apartment until 4:45 a.m., when he left to go to his grandfather's residence. (Tr. 1007-08).

145. The prosecution suppressed two documents that called into question this portion of Horn's testimony.

146. In a statement to Special Agent Mark Rogers, Chris T. Brickner said that he saw Horn on Harrison Avenue at 2:30 a.m. (Exhibit 31). Daniel Brock was with Brickner, and reportedly saw Horn as well. Brock also stated that he did not see "the suspected [Wogenstahl's] vehicle." (*Id.*)

147. The police also received a report that Horn "left @ 3/30 and left the door locked returned @ 500/ and the door was not locked Mom returned at @ 505/." (Exhibit 32).

> ### 3. The prosecution suppressed a report that Eric Horn and/or Justin Horn may have previously assaulted their sister.

148. On November 29, 1991, Douglas Dalton and Robert Hess gave written statements that on October 3, 1991, they heard a young child screaming. (Exhibits 46 and 47). "A few seconds later" a young girl matching the physical description of Amber ran from an alley, screaming. (Exhibit 46). Hess and Dalton stopped her and asked her what was wrong, yet she remained silent. (Exhibits 46 and 47). She subsequently ran down the street and two boys, matching the physical descriptions of Amber's brothers, chased her. (Exhibits 46 and 47).

> ### 4. The prosecution suppressed a report that Eric Horn failed a polygraph examination involving Amber's death.

149. On May 26, 1992, Cincinnati Police Officer Timothy T. Tighe administered a polygraph examination to Horn and posed the following questions:

> 1. Did you lie about your involvement in Amber's death?
>
> 2. To the best of your knowledge, were you in the apartment when Amber was taken?
>
> 3. Did you lie to me today about knowing who took Amber? and
>
> 4. Do you know for sure who took Amber out of Peggy's apartment?

(*Id.*)

150.    Officer Tighe concluded "[t]here were significant emotional and physiological disturbances indicative of deception in Eric Horn's polygraph when he answered the aforementioned questions." (*Id.*) After Officer Tighe confronted Horn with his deception, the following occurred:

| | |
|---|---|
| Horn: | Am I under arrest? |
| Examiner: | No. |
| Horn: | Then fuck you, fuck the machine, and I'm out of here. |

(*Id.*)

151.    At the conclusion of the examination, Officer Tighe sent a report to the three Hamilton Prosecutors who eventually tried Wogenstahl's case. (Exhibit 28). The report reflected Horn's deception. (*Id.*)

**5.    The prosecution suppressed evidence that impeached Eric Horn's testimony concerning his trafficking in marijuana and favorable judicial treatment.**

152.    At a pretrial deposition, Horn testified that he had never sold marijuana and/or narcotics. (*See* Eric Horn pretrial videotaped deposition). At trial on cross examination, Horn repeated this same testimony:

| | |
|---|---|
| Q: | And have you ever seen any marijuana around your house? |
| A: | No. |
| Q: | None at all? |
| A. | No. |
| Q. | Did you ever sell it? |

    A.    No.

(Trial Tr. at 986).

153.   Prior to Wogenstahl's trial, law enforcement officers dearched Horn's residence and found a "CUT tray" with approximately sixty-three grams of marijuana in two separate plastic baggies, and Horn's billfold containing $769.00 in cash. (Exhibit 34).

154.   Horn was arrested and charged with a fourth degree felony, possession of marijuana. The prosecution, without any hearing or paperwork, reduced Horn's felony to a misdemeanor; Horn was adjudicated delinquent, fined, and placed on probation.  (Exhibit 34).

155.   On January 4, 1993, less than four months after being placed on probation and just one month prior to the start of Wogenstahl's trial, Horn's probation was terminated. The entry record terminating his probation reflects that the entry was made anonymously, by: "Judge, Visiting." (Exhibit 34).

**6.    The prosecution suppressed evidence that impeached Eric Horn's testimony concerning Wogenstahl's clothing.**

156.   The investigating officers seized a brown leather jacket (State's Exhibit 9) from Wogenstahl's apartment.  (Tr. 1682-83).

157.   Eric Horn identified State's Exhibit 9 as the jacket that Wogenstahl was wearing when he gave Horn a ride to the Beard residence. (Tr. 954, 997, 999).

158.   The prosecution possessed two reports that contradicted this portion of Horn's testimony:

A.      Horn told Patrolman Lowery that Wogenstahl was wearing "a wine colored windbreaker type jacket." (Exhibit 16).

B.      In a second report, Horn indicated, "What Wogenstahl wearing, Eric *Possibly* wht [sic] Sweater + jeans. . . . Hypnosis." (Exhibit 33).

159.    The jacket was a critical piece of evidence to the State's case. The prosecution claimed the Wogenstahl was wearing a brown jacket at the time of the murder/kidnapping and the rips in that jacket were caused by the thorns in the plants located in the vicinity where Amber's body was found. (Tr. 849-50, 1360-63, 2454-55, 2584).

## F.      The State Suppressed Material Information of the Existence of Other Suspects.

160.    The prosecution suppressed information concerning other suspects.

### 1.      The bikers who frequented Peggy Garrett's residence.

161.    Rilda Kaiser reported that many of Peggy Garrett's friends were "biker-types." (Exhibit 50).

162.    Numerous motorcycles were frequently parked outside Peggy Garrett's apartment. (Exhibit 43).

163.    Amber complained about inappropriate touching by some of the men who were present inside the apartment. (*Id.*)  Amber said that her mother just laughed when witnessing this touching. (*Id.*)

164. Tammy Shuck witnessed this inappropriate touching and informed the investigating officers.

165.    One cryptic note in the police file reflects "She [Amber] was raped by one of [sic] men who come in there." (Exhibit 54).

166.  In another suppressed report, April Kennedy reported to the officers that she "saw Peggy doing Coke Sat. Eve (Sun. Morn) 24 Nov. @1230/ w/ 2 guys: 'Bikers' @ Escape." (Exhibit 23).

**2.  The unidentified individuals who had previously sexually assaulted Amber.**

167.  In a diary entry dated September 27, 1991, Amber described being sexually assaulted three months earlier:

> One day me and my friends were in the parking lot and a guy came up behind me and started chasing me and he threw me on the ground twice and pulled out his you know what and told me to tattoo on it but I said no and started running and he caught me and threw me down again and he got on top of me . . . we [my mother and two older brothers] went to the police station and we have not found him yet and it was three months ago.

> PS. he is 17teen and his name is Doug

(Exhibit 17).

168.  In a November 26, 1991 report, Diane Fritz informed Patrolman Sogsdill that "last summer Amber was a victim of an attempt [sic] rape by a 14 yoa m/w." (Exhibit 41).

169.  A November 29, 1991 report memorialized a telephone call that Harrison Police Patrolman Gambill received from an unidentified Caucasian female (Exhibit 42). The caller stated "she had received information from [Amber's] cousin that approx., one month ago [Amber] was raped by one of the men who came to the house." (*Id.*)

170.  A report from an individual who worked at Emmarson [sic] North Hospital stated that the individual "believes Amber was treated for sex abuse about 6 mo ago." (Exhibit 55).

171.  During the summer prior to Amber's murder, a "creepy guy" approached Amber's bedroom window when it was open. (Exhibit 43). This happened on more than one occasion.  (*Id.*)  The male attempted to speak with her. (*Id.*) Eventually, Amber complained to Bobby Perkins who chased the man away from the window, but did not catch him. (*Id.*) Perkins called the Harrison Police Department and Patrolman Mathews responded. (*Id.*) Mathews was never able to identify the male. (*Id.*)  Amber was so terrified of the man that she often stayed with her friend Pamela (Reamer) Petti. (*Id.*)

172.  The Harrison Police Department had two reports that indicated that Amber was the victim of an importuning in May 1991. (Exhibits 13b, 44). Sergeant Bettinger, of the Harrison Police Department, thought that the missing report might contain possible "leads" in the investigation of the murder. (Exhibit 13b).[2]

173.  In the summer prior to Amber's murder, Pam Petti and Amber were playing in the woods behind the local community center. (Exhibit 43). They saw a man watching them and he started walking towards them. (*Id.*)  She and Amber fled. (*Id.*)

174.  Barbara Goins provided the police information concerning Amber's secret, "older boyfriend", named "Jeff Ertzel." (Exhibit 45).

175.  On November 29, 1991, Douglas Dalton and Robert Hess provided the police with written statements. They both reported that on October 3, 1991,

---

[2] The supplemental report has never been provided to Wogenstahl's counsel. The report was also not in the materials counsel viewed at the Harrison Police Department.

they heard a young child screaming.  (Exhibits 46 and 47).[3]  "A few seconds later" a young girl matching the physical description of Amber ran from an alley, screaming. (Exhibit 46). Hess and Dalton stopped her and asked her what was wrong, and she remained silent. (Exhibits 46 and 47).  She then ran down the street and two boys chased her. (*Id.*) Mr. Dalton telephoned the Harrison Police Department and an officer took their statement. (*Id.*) Later, "[w]hen we saw the picture of Amber Garrett in the newspaper, it looked like the girl that we saw almost dead on her so we decided to come down file an official statement." (Exhibit 46).

## G.   The Prosecution Suppressed Material Information That Impeached the Testimony of, and the Prosecutorial Argument Concerning, the Jail House Informant.

176. Bruce Wheeler and Wogenstahl were housed at the Hamilton County Justice Center at the same time.

177. The prosecution called Wheeler in its case in chief. Wheeler testified that Wogenstahl said that he: (a) went to Peggy Garrett's apartment in the early morning hours, and deceived the victim's brother, Eric Horn, into leaving the residence (Tr. 2142); (b) returned to the apartment, entered the bedroom where three children were sleeping and grabbed a girl out of the bed with the intention of having sex with her  (Tr. 2144); (c) stuck his penis in her but did not ejaculate (Tr. 2145); (d) unsuccessfully attempted to again have

---

[3] Douglas Dalton in his report states that the incident occurred on "3rd of October *1992*." (Exhibit 32) (emphasis added). The reported year was a misstatement given that he gave the written statement on November 29, 1991. (*Id.*).

sexual relations with her, but she resisted; and (e) responded by hitting and stabbing her. (Tr. 2146).

1. **The prosecution suppressed information that impeached Wheeler's testimony that he had not received consideration in exchange for his testimony.**

178. Wheeler, in response to the prosecutor's questions, denied that he had received or expected to receive favorable treatment because of his testimony:

> Q:    Has anyone ever made any promises or offered you any rewards or inducements in exchange for your testimony?
>
> A:    No.

(Tr. 2156).

> Q.    Bruce if you are endangering your life by testifying against Wogenstahl and if you are not getting anything from the State for testifying, will you tell the jurors why you're doing it and why you're here today?
>
> Mr. Schmidt:  You Honor, there is no showing he is in danger of his life.
>
> The Court: He may answer.
>
> Q.    Go ahead.
>
> A.    Because he told me he killed the girl and I have a daughter of my own, a 5 year old daughter, and I just could not go away not saying anything knowing he probably would get off.

(Tr. 2158). On cross examination, Wheeler continued to deny he received consideration in return for his testimony. (Tr. 2180-81).

179.   In closing argument, the prosecution emphasized the credibility of Wheeler's testimony: "*Bruce Wheeler got nothing for his appearance in this courtroom, He got nothing.* He pled guilty before Judge Winkler as charged. *Nothing reduced, nothing dismissed.* Guilty as charged." (Tr. 2464) (emphasis added).

180.  However,  contrary  to  his  testimony,  Wheeler  did  receive consideration in exchange for his agreement to testify.   In a sworn affidavit, Wheeler stated:

A.    The prosecution: "[i]mplied that [Wheeler] would do less time in prison if [he] testified" against Petitioner. (Exhibit 35).

B.    The prosecution promised him that if Wheeler testified, the Office would write a letter on his behalf to the Parole Board. (*Id.*) The prosecution subsequently wrote a letter to the Parole Board on Wheeler's behalf. (Exhibit 36).

C.    Wheeler requested that he be transferred to Ross Correctional Institution. (Exhibit 35). He was later transferred to Ross Correctional Institute. (*Id.*)  Wheeler was led to believe that this transfer was due to his cooperation in Wogenstahl's case.

**2.    The prosecution suppressed information concerning the informant's failure to accept responsibility for the charge on which he was incarcerated.**

181.   At the time of Wogenstahl's trial, Wheeler was incarcerated for the offense of involuntary manslaughter. Wheeler fatally struck his girlfriend's two year-old daughter while he [Wheeler] and his girlfriend were having intercourse. He pled guilty and received a sentence of five to ten years in prison.

182.  In his initial closing statement during the trial phase, the prosecution vouched for Wheeler's credibility by claiming that Wheeler had readily admitted his guilt:

> I will tell you this. There is a difference between this defendant and Bruce Wheeler. The difference is that Bruce Wheeler did something stupid, he did a thoughtless, unthinking act, he accepted responsibility for it and actually feels some remorse.

(Tr. 2466).

183.  In the grand jury proceedings considering Wheeler's case, the same prosecutor provided a much different assessment of Wheeler's acceptance of responsibility:

> I don't understand how he [Wheeler] can back hand this child with this kind of force and not know how it happened. It stretches the bounds of credibility. Quite frankly, I just don't believe it.

(Exhibit 37, p. 3).

184.  Cincinnati Police Department Specialist William Davis told Wheeler's grand jury that Wheeler did not initially admit to hitting the child. Instead, Davis testified that Wheeler told the investigation officers that he (Wheeler) had awakened and found the child was vomiting. Davis testified that Wheeler did not admit to hitting the child until Wheeler failed a polygraph examination:

> We asked him to take a polygraph exam . . . It showed that he was not being totally truthful with us. We questioned him further, and he finally admitted that he had struck the infant at approximately 4:00 p.m. on the twenty-third.

(Exhibit 37, p. 8).

**H.  The Prosecution Suppressed Material Information that Impeached the Testimony of Two of Its Eyewitnesses.**

185.  The prosecution's duty of disclosure encompasses impeachment evidence as well as exculpatory evidence. The trial prosecutors suppressed evidence that impeached two of its witnesses.

**1.  Michele Hunt**

186.  Michelle Hunt testified in the State's case in chief that:

A.  She worked at the Waffle house and Peggy Garrett and Lynn Williams arrived at the Waffle House at approximately 2:30 to 3:00 a.m. on the night/early morning hours of Amber's disappearance. (Tr. 1083-84).

B.  Shortly after Williams and Garrett arrived, a vehicle entered the parking lot and immediately left the lot without anyone exiting the vehicle. (Tr. 1086-87).

C.  She believed that two persons were in the car, both of whom were in the front seat. (Tr. 1096, 1098).

D.  State's Exhibit 50 was a photograph of the vehicle that she saw entering and immediately leaving the parking lot (Tr. 1088, 1095).

E.  FBI agents showed her the photograph of the vehicle shortly after Amber's body was found.

187.  State's Exhibit 50 was subsequently identified as a photograph of Wogenstahl's vehicle.

188.  The prosecution suppressed a police report the contradicted her testimony.

189.  On November 25 1991, Hunt gave a statement to the Harrison Police Department (Exhibit 38) and on November 27, 1991, Hunt gave another statement to FBI Special Agent Woods. (Exhibit 39). Hunt made no mention in either of these statements of having seen a car enter and leave the parking lot. (*Id.*) Further, her second statement makes no mention of Special Agent Woods having shown her photograph(s) of vehicle. (*Id.*)

### 2.    Brian Noel

190.  Brian Noel testified that he was driving on Jamison Road at approximately 3:40 a.m. on November 24, 1991, when he saw Wogenstahl standing next to a car that was parked in the vicinity of where Amber's body was later found. (Tr. 1510-15, 1524-25).

191.  On cross examination, Noel stated that, earlier that evening (from 9:00 p.m. until 2:30 a.m.), he had been at Hymie's, a tavern, and drank two beers. (Tr. 1529). In cross-examination, trial counsel unsuccessfully attempted to develop the point that Noel had consumed more than two beers. (Tr. 1529-30).

192.  The prosecution suppressed a document in which Noel indicated that he drank more than two beers while at Hymie's. (Exhibit 40). The notes reflect that Noel reported that he drank "5 beers." (*Id.*)

### I.    The Prosecution Suppressed Material Information that Two of Its Witnesses Had Participated in Hypnotic Sessions.

193.  The prosecution's duty of disclosure extends to any facts involving any hypnosis sessions conducted of its witnesses. The Harrison Police Department had at least two of the prosecution's witnesses placed under

hypnosis in an effort to refresh their memories. The prosecution did not provide discovery as to these two sessions.

194. "Testimony supplied by a witness whose memory has been refreshed by hypnosis prior to trial is admissible only if the trial court determines that, under the totality of the circumstances, the proposed testimony is sufficiently reliable to merit admission." *State v. Johnston,* 39 Ohio St.3d 48, 529 N.E.2d 898 (1998), paragraph 3 of the syllabus.

195. The Supreme Court of Ohio created a non-exhaustive list of factors that trial courts should consider in making the reliability determination when potential witnesses have been questioned under hypnosis concerning the events to which they will testify ("Johnson requirements"):

(a) The hypnosis session should be conducted by a licensed psychiatrist or psychologist trained in the use of hypnosis, to ensure the most accurate recall possible.

(b) The qualified professional conducting the hypnosis session should be independent from any of the parties in the case, to avoid any biased procedures or questions.

(c) Any information given to the hypnotist by any of the parties to the case prior to the hypnosis session should be recorded, at a minimum in writing, so that the trial court can determine the extent to which the subject may have received any information from the hypnotist.

(d) Before the hypnosis session, the hypnotist should obtain a description of the facts from the subject, avoiding adding new elements to the subject's description, so that the trial court can compare the subject's pre- and post-hypnotic recollection.

(e) The hypnosis session and all other contact between the hypnotist and the subject should be recorded, preferably on video tape, so that a permanent record is available to reveal the presence of any suggestive procedures or questions.

(f) Generally, only the hypnotist and the subject should be present

during the hypnosis session, in order to protect against inadvertent influence. However, other persons may be present if their attendance is necessary and steps are taken to prevent their influencing the results of the session.

*Id.* at 55.

196. On November 28, 1991, unknown to defense counsel, Patrolman Lowry of the Harrison Police Department placed Horn under hypnosis. (Exhibit 16).

197. On November 30, 1991, again unknown to defense counsel, Patrolman Lowery placed Peggy Garrett under hypnosis. (Exhibit 13a).

198. Patrolman Lowry was neither a licensed psychiatrist nor psychologist. He also was not independent of any of the parties in the case. (Exhibit 13a and 13b).

199. The State has never provided Wogenstahl with that recording of either hypnosis session. Until recently, Wogenstahl was not even aware of the existence of the hypnosis sessions, let alone the recordings of the sessions. Consequently, Wogenstahl is unable to determine if Patrolman satisfied any of the other four *Johnson* factors.

200. Defense counsel could have used the suppressed reports of the hypnosis session to contest the admissibility of the testimony of Peggy Garrett and Eric Horn. The trial court made no determination that her hypnotically refreshed testimony was reliably admissible. If it had made such a determination, it would have found that at a minimum two of the *Johnston* criteria were not met: Patrolman Lowery was neither a licensed psychiatrist nor

psychologist, nor was he independent of the law enforcement department investigating the case.

201.  In the alternative, if the trial court had ruled the testimony of Garrett and Horn admissible, trial counsel could have used the suppressed reports to challenge the credibility of their testimony because they had been hypnotized.

**J.    The Prosecution Suppressed Material Information that Impeached Its Theory of the Case.**

202.  The prosecution's duty of disclosure extends to evidence that rebuts or contradicts its theory of the case.

203.  The prosecution suppressed the evidence identified herein that contradicted three critical parts of its theory.

**1.    The prosecution's theory concerning the manner in which Amber was kidnapped.**

204.  The prosecution went forward with the theory that Wogenstahl removed Amber from her mother's apartment without affording her an opportunity to change from her bed clothes or put on her eyeglasses (without which Amber could barely see).

205.  In the opening statement, the prosecution stated "it's important to note that she was almost totally blind without her glasses." (Tr. 834).

206.  In the trial phase closing argument, the prosecution told the jury to convict Wogenstahl because:

> Well, we know from the evidence that Amber Garrett was in bed early the morning of November 24th, that someone took her out of that house. They removed her without letting her put on her shoes,

they removed her without letting her get her glasses that she needed in order to see, they removed her without letting her get dressed or put on a coat. And we know from the evidence a few days later Amber's body was found out in Bright, Indiana *still wearing these panties and these clothes that she had worn in the bed on the evening* of Saturday, November 23rd.

(Tr. 2428) (emphasis added).

207. In the trial phase rebuttal closing argument, the prosecution returned to this same inaccurate argument:

How about a person who would return to the Garrett household, pick up a half naked Amber Garrett and get her out into his car?

(Tr. 2594).

208. In the sentencing closing argument, the prosecution told the jury to return a death recommendation because:

He returns and now knows nobody is there. This is aggravation. This is balancing on the end of this scale the mitigation and it is a simple balancing test. He returns and he takes a 10-year-old girl, takes a sleeping 10-year-old girl from her warm bed which she is sharing with her little sister and her little brother. Incredible in terms of an aggravating circumstance in this crime. He takes her sound asleep from her home or half-asleep so quickly on this freezing cold night and he removes her. *There is not time to have shoes put on her, a coat put on her and she is half blind without her glasses, and what kind of aggravation is it? What kind of a person would commit that kind of a crime?*

(Tr. 2837-38) (emphasis added).

209. The prosecution suppressed several documents that contradicted its theory that in the middle of the night Amber was grabbed from her bed without an opportunity to change from her clothes in which she was sleeping or her put on her glasses without which she could barely see.

A.  Amber could see without her glasses and had in the past not worn her glasses all of the time. *See* First Claim for Relief, Section C1, Exhibits 21-22 *supra.*

B.  Peggy Garrett told the investigating officers that Amber was wearing clothes other than the clothes she wore to bed when her body was discovered.  Peggy Garrett stated, "Amber had the Loretta Lynn shirt on" when she went to bed. (Exhibit 60, p. 2).

C.  Peggy Garrett told Patrolman Lindsey "that even the nightshirt she slept in was still there [in the house]." (Exhibit 61, p. 2).

D.  Amber was wearing a red dress when her body was recovered. (State's Exhibit 52). Cheryl Hadley's daughter, Michelle Bickel, originally owned the dress. (Exhibit 62). Hadley gave the dress and other clothes to Brenda Philpot to give to a needy family. (*Id.*) Ms. Philpot "in turn took them to Peggy Garrett's home and gave them to her for her daughter Amber." (Exhibit 63). When Patrolman Steve Mathews showed a photograph of the dress to Michelle Bickel, she provided a written statement which in part affirmed that the "[p]hotographs of the dress that Steve Mattews [sic] showed me was the dress that I gave to Philpote (sic)." (Exhibit 64).

D.  Annette Knox (f.k.a. Ida Philpot) confirmed that the dress in the photograph was the same dress that she had lent to Amber for church. (Exhibit 43).

## 2. The prosecution's theory concerning the time of Amber's death.

210. The prosecution adduced evidence to show, and argued, that Amber was killed at approximately 3:30 a.m. on November 24, 1991.

A. Vicki Mozena testified that at approximately 3:15 a.m., she saw a vehicle driven by Wogenstahl travelling in the direction of Jamison Road (where the body was later found) and saw the same car approximately a half hour later returning from that area. (Tr. 1446-47).

B. Three witnesses testified that, at approximately 3:40 a.m., they saw Wogenstahl standing next to a vehicle parked in the vicinity where Amber's body was found. (Tr. 1524-25, 156-63). The prosecution relied on this testimony in both its opening and closing argument. (Tr. 845-47, 2437-50).

211. The prosecution possessed nine documents that impeached its evidence and theory as to the time of Amber's death:

A. Charlene Macaluso reported that she "saw a white car by guard rail on Sunday morning around 8:30 a.m. green army jacket on m/w 5'10 – 5'10½ at Jamison Creek near or at scene." (Exhibit 65). The trunk of the vehicle was open. (Exhibit 55, 65).

B. Matt Barnes reported that his spouse "Saw a car pulled off the road Sunday nite about 12:30 a.m." (Exhibit 66).

C. Susan Crowder told Sergeant Bettinger that "she had some info regarding Amber. She seen [sic] 2 trucks on Jamison Road, one was a brown truck with Ky plates. . . ." (Exhibit 67).

D.      Amanda Beard, a classmate of Amber's, reported seeing her at 10:00 a.m. the following day in a "blue p/u with white cap" which was "going toward Indiana." (Exhibit 68, 69). Amber was "leaning against the window of truck crying wearing jean overalls."(*Id.*)  Amanda reported that it was "definitely Amber." (*Id.*) Amber's mother reported to the media that "Amber may be wearing blue jean overalls. The overalls are gone." (Exhibit 78).

E.      Mary Jo Puckett reported that on Monday, November 25, 1991, at approximately 4:10 a.m. to 4:15 a.m., she saw an "old, dark, small car off to the side of the road." (Exhibit 70).  She added that this car was "reddish in color, two door.  Reddish as in rusty-red, not bright red." (*Id.*)

F.      Jo Ann Black reported to Harrison Police Department then Patrolman Steve Mathews that she also saw a car parked on Jamison Road "at the top of the hill." (Exhibit 71, 72).  She saw this car while travelling to work on either Saturday or Sunday morning at 6:00 a.m.  (*Id.*)

G.      Two other individuals reported seeing either a person and/or a car on Jamison Road that seemed suspicious during the timeframe when Amber was missing.  (Exhibit 72).

### 3.      The source of the spot of blood found in Wogenstahl's apartment.

212.    The investigating officers found a small speck of blood on the outside of his bathtub. (Tr. 2460-62).

213.    Wogenstahl testified that, during the week prior to Amber's disappearance, his cat jumped from the seat of the toilet towards the top of the shower curtain. (Tr. 2297). The cat hit his mouth on the side of the tub,

causing it to bleed. (*Id.*) Wogenstahl testified that he wiped blood off the side of the tub and the toilet. (*Id.*)

214. In closing argument, the State ridiculed Wogenstahl's testimony concerning the cat and injury to his mouth:

> How did that blood that was found on the outside of his bathtub, on the side of his bathtub, how did that get there? We didn't find enough to type but we found enough to tell us it was blood. How did it get there? No, it didn't have anything to do with cleaning up that night. My cat fell. Now this is terrible. This is tragic. Have you ever heard of a cat that falls with such force that it knocks itself unconscious and knocks out a tooth? *That story is absolutely ridiculous.* I have heard people who have cats fall off windows and land on their feet, but his cat falls in the bathroom where there is blood in it and knocks out a tooth. That is tragic.

(Tr. 2460-62) (emphasis added).

215. In rebuttal closing argument, the state again attacked Wogenstahl's testimony concerning his cat:

> And you heard yesterday about the psychopathic cat that fell off of the curtain rod and was knocked out cold and was bleeding all over the bathroom.

(Tr. 2592).

216. The prosecution suppressed a report that supported Wogenstahl testimony concerning his cat and rebutted the prosecution's argument concerning the "psychopathic cat."

A. Prior to trial, and unbeknownst to Wogenstahl, the investigating officers seized his cat and transported it to the office of Doctor William Kuhlman, a veterinarian. The Doctor confirmed that the cat had a chipped tooth. (Exhibit 73).

B.     The Doctor also found that the cat had a scabbed tail. (*Id.*)

C.     Doctor Kuhlman drew a blood sample from the cat and gave it to Jeffrey Schaefer, of the Hamilton County Coroner's Office, for testing.  (*Id.*)

217.  On March 23, 1992, Schaefer issued a report concerning the serological testing that he conducted on the items the officers seized during their investigation. (Exhibit 74). The report did not reference the blood sample that Doctor Kuhlman drew from the cat. (*Id.* at pp. 1-6).

218.  On August 25, 1992, Brian Wraxall, Chief Forensic Serologist for the Serological Research Institute, issued a report concerning the testing that he had conducted on the various items seized during the course of the investigation. (Exhibit 75). His report also did not reference the blood sample taken from the cat. (*Id.*)

219.  If the prosecution had provided trial counsel with Doctor Kuhlman's report concerning the cat, it would have bolstered Wogenstahl's testimony and rebutted the prosecution's closing arguments.

**K.     The Cumulative Weight of the Suppressed Evidence Undermines the Confidence in the Jury's Verdicts in Both Phases of the Trial.**

220. The test for the materiality of suppressed evidence is a cumulative assessment; if a reasonable probability exists that the cumulative effect of all of the suppressed evidence calls into question the jury's verdict in either the trial and/or sentencing phase, then Wogenstahl is entitled to a new trial and/or sentencing phase.

221. The Fourteenth Amendment is violated when the totality of the suppressed favorable evidence causes the reviewing court to conclude that a reasonable probability exists that, had the prosecution disclosed the favorable evidence to trial counsel, the result of the proceeding would have been different.

222. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.

223. The information/documents that the State suppressed raises serious questions concerning the jury's verdicts.

224. The United States Department of Justice has conceded that its Agent's expert testimony and conclusion concerning the hair found in Amber's underwear is not support by the applicable science.

225. The State's theory that Amber was abducted from a bed in which two of her siblings were also sleeping and quickly (and evidently quietly) removed from the apartment without permitting a change of clothes no longer has any support in the evidence.

226. The State's evidence concerning Wogenstahl's brown coat that it claimed he was wearing on the night/morning of Amber's kidnapping and it was damaged by the thorns from the plants in the area in which her body was found has now been called into question.

227. The accuracy and reliability of the testimony of two of the State's witnesses, Eric Horn and Peggy Garrett, is now in doubt given that they were administered hypnosis by an unqualified and biased witness. In addition, both of these individuals lied under oath at trial concerning their criminal histories. Finally, the prosecution suppressed information that: (a) called into question other portions of their testimony and (b) pointed to their own involvement in the murder of Amber.

228. Contrary to her trial testimony, Peggy Garrett had a history of physically abusing Amber and locking her out of the apartment.

229. The prosecution suppressed information that two of its eyewitnesses, Michelle Hunt and Brian Noel, lied in their testimony.

230. The jail house informant lied when he said that he did not receive any consideration in exchange for his testimony. In closing argument, the prosecution not only improperly vouched for the informant's testimony but advanced a totally different version of the facts than it had placed before the grand jury that considered the informant's case.

231. Finally, the prosecution: (a) suggested on cross examination that Wogenstahl had lied about the source of the spot of blood found in his apartment, and (b) reiterated the same argument in closing statement, knowing full well that the argument had no basis in fact.

232. A reasonable probability exists that at least one juror would have struck a different balance in the trial and sentencing phases if the prosecution had not suppressed the information identified in this ground for relief.

**L.      Conclusion, First Claim for Relief**

233.   The prosecution's suppression of the favorable, material evidence violated Wogenstahl's right to due process as guaranteed by the Fourteenth Amendment.

234.   To the extent that the Ohio courts adjudicated the federal constitutional merits of this claim, their adjudications were contrary to, or were unreasonable applications of, clearly established federal law, and/or were based on an unreasonable determination of the facts.

235.   This Court should issue the writ.

**<u>Second Claim for Relief</u>: The Prosecution Knowingly Adduced False Testimony and Engaged in Inaccurate Argument Both Of Which It Neither Corrected Nor Disclosed the Falsity of To Trial Counsel.**

236.   Wogenstahl incorporates all of the allegations contained elsewhere in this petition as if fully restated herein.

237.   A conviction and death sentence obtained by the knowing use of perjured testimony is fundamentally unfair and violates the Eighth and Fourteenth Amendments.

238.   The same result occurs when the prosecution engages in argument that he knows to be false.

239.   The prosecution has a constitutionally imposed duty to either correct the false testimony/argument or the make defense counsel aware of the false testimony/argument.

240.   The knowledge of one member of the prosecutor's office is imputed to all other members of the prosecutor's office for purposes of this analysis.

**A.  The Prosecution Knowingly Adduced The Perjured Testimony Of Peggy Garrett to Obtain a Conviction for Capital Murder and Death Sentence.**

241.  The victim's mother, Peggy Garrett, provided critical testimony concerning the facts surrounding the kidnapping and murder of Amber and the involvement of Wogenstahl.

242.  Peggy Garrett perjured herself in six portions of her testimony and the prosecution had knowledge of that perjury.

**1.  Peggy Garrett lied about her relationship with Amber.**

243.  Peggy Garrett testified that she and Amber were very close. (Tr. 860-62).  However, this was not true. The prosecution suppressed four reports that impeached her testimony that Garrett was "very close" to her daughter:

244.  At the time of trial, the prosecution possessed Amber's diary, in which Amber wrote:

> I hate myself. I hate my life. I hate my classmates. . . . Sometimes I just feel like            running away or killing myself. . . . *Just yesterday before I came to school my            mom beat me she was punching me in the back. She just would not stop.*

(Exhibit 17 – Diary) (emphasis added).

245.  Gil Reuhle reported "that Amber and Peggy got into an argument, and [Peggy] hit daughter 3 times in the head, it happened the night before she was missing." (Exhibit 18).

246.  A redacted report reflects that Amber told a witness that she (Amber) was not permitted to enter the apartment "which forced AMBER

GARRETT to stay elsewhere on several weekends." (Exhibit 19). Amber went missing on a weekend.

247.  The police received a report that "Amber has been talking about running away alot [sic] lately." (Exhibit 20).

### 2.    Peggy Garrett lied concerning her whereabouts at the time of Amber's kidnapping.

248.  Peggy Garrett testified in detail concerning the bars she had frequented on the night and early morning hours of the kidnapping. (Tr. 868-76). On direct examination, Peggy Garrett testified that she began the evening at a bar named "the Escape" (Tr. 868) and her friend Lynn Williams arrived at midnight (*Id.*) Garrett testified that Williams and she left the Escape between "12:30 or quarter to 1" (Tr. 907), and Peggy had two drinks consisting of "Pepsi and a shot of rum" prior to leaving the Escape. (Tr. 908).

249.  April Kennedy reported that she "saw Peggy doing Coke Sat. Eve (Sun. Morn) 24 Nov. @1230/ w/ 2 guys: 'Bikers' @ Escape." (Exhibit 23).

250.  Garrett testified that, after leaving the Escape, Williams and she went to several other bars, and then to the waffle house where they remained from "probably 3 or a quarter after . . . "[u]ntil 4 or a quarter after 4." (Tr. 876).

251.  Donald B. Ellis reported to Patrolman C. Petty that "on 11-24-91 at approx. 0300 -0330 hrs. He observed Garret at the Waffle House in Harrison and was with a m/w subject short hair possibly having a mustache and approx 602." (Exhibit 24).

252.  The prosecution was aware that, in her testimony, Peggy Garrett lied about her relationship with Amber.

### 3.    Peggy Garrett lied about the facts involving Amber's kidnapping.

253.    Peggy Garrett testified that she arrived home at 5:00 a.m. (Tr. 878). On her arrival at her apartment:

> The kid's bedroom door was cracked open a little bit and I peeked in and *I assumed they were all there*. I saw arms and legs so –

(Tr. 880) (emphasis added).

254.    On the other hand, Peggy Garrett told one of the investigating officers, "She got home about 505/ from Troy's (Troy and Lynn rode her home) Peg *looked in and thought she saw all three kids in there."* (Exhibit 22). (*Id.*) (Emphasis added).

255.    In her testimony, Peggy Garrett reported that Amber's eyesight without her glasses "was very, very bad." (Tr. 862).

256.    Kim Garrett told one of the investigating officers that "Amber can be without her glasses." (Exhibit 21).

257.    Another time, April Garrett advised then Patrolman Mathews, "Amber is very capable to be without her eyeglasses and has on several occasions." (*Id.*)

258.    In yet another report, Special Agent Rogers noted that "Both Kim and April advised that even though the victim wore glasses, she was able to see without them." (*Id.*)

259.    The prosecution was aware that Garrett perjured herself in this portion of her testimony.

### 4. Garrett lied in the portions of her testimony inculpating Wogenstahl.

*Her relationship with Wogenstahl*

260. Peggy Garrett testified that she had little interaction with Wogenstahl prior to the night of the kidnapping. She told the jury that Wogenstahl:

A. Had visited her apartment "four or five times maybe" and she could not remember the last time he had visited her apartment prior to the Saturday in question. (Tr. 896-97).

B. A couple of the four or five times he visited the apartment "he just came in the kitchen door and asked me if I needed a way to the store." (Tr. 901).

C. "Twice" he gave her a ride to the store and "the longest he ever stayed [at the apartment] was maybe twenty minutes to a half hour." (Tr. 902).

261. Contrary to Peggy Garrett's testimony, Justin Horn informed the investigating officers that Wogenstahl "would stop by for a few minutes every day. He would take Peggy to the grocery store or make little trips for her. . . . Most of the time JEFFREY WOGENSTAHL would come to see his mom or his brother Eric. JEFFREY was new to the area and seemed not to know very many people and was trying to catch on by knowing PEGGY and Eric." (Exhibit 14, p. 2). His mother even had a nickname for Wogenstahl, "the Canadian Jeff." (*Id.*).

262. Contrary to Garrett's testimony, Hannah D. Russell and Misty L. Auer reported that Wogenstahl's vehicle had been "parked in the alley behind

308 Harrison Avenue, the GARRETT residence, several times in the past."
(Exhibit 15).

263.  Troy Russell told Harrison Police Officer Ed Bettinger that he had
seen Wogenstahl in Garrett's apartment more than once and in early November
he had witnessed Peggy Garrett and Wogenstahl smoking crack in her
apartment. (Exhibit 16).

*Wogenstahl's Coat*

264.  On direct examination, Peggy Garrett testified that when she saw
Wogenstahl on the morning Amber was kidnapped, he was wearing a brown
jacket that "was nice . . . did not have any cuts in it or anything." (Tr. 870). In
response to a question posed by the trial judge, Garrett reiterated that the
jacket did not have any "cuts" or "rips" in it that evening. (Tr. 871).

265.  Peggy Garrett had previously informed Detective Lowery that "She
remembered the jacket because 'he showed me a spot on it and asked me if it
could be fixed.'" (Exhibit 13a).

**5.  Peggy Garrett lied about the extent of her criminal record.**

266.  On cross examination, trial counsel questioned Peggy Garrett
concerning her prior criminal record:

Q.    You were convicted of selling it [marijuana]?

A.    No.

Q.    What were you convicted of ?

A.    *It was a couple of pills.*

Q.    Pills?

A.     Mm-mm.

(Tr. 897-98) (emphasis added).

267.   On February 25, 1982, Garrett sold five white tablets to Trooper S.E. Todd of the Indiana State Police Department. (Exhibit 25). The five pills were determined to be Methaqualone. (*Id.*)

268.   On March 5, 1982, Peggy Garrett sold Trooper Todd six "small light blue tablets in an approximately one inch square piece of aluminum foil." (Exhibit 42). The tablets were later determined to be Lysergic Acid Diethylamide (LSD). (*Id.*)

269.   On June 29, 1983, Garrett pled guilty to a *couple* (two) counts of dealing in a controlled substance. (Exhibit 26).

270.   The Indiana trial court sentenced Garrett to two to ten years on each count, the sentences to be served concurrently. (*Id.*)

### 6.     Garrett lied about her son, Justin Horn's, whereabouts on the weekend Amber was kidnapped.

271.   Garrett testified that her son, Justin Horn, "was gone for the weekend" that Amber went missing. (Tr. 864). He left "[s]ometime in the afternoon on Friday" and did not return until "[p]robably around 3 o'clock or something like that" on Sunday. (Tr. 865).

272.   Justin Horn informed Special Agents Douglas Knight and Ronald Danielson that "on Saturday, November 23, 1991, he left [Garrett's apartment] at about twelve noon and went to the apartment of Chris Marshall." (Exhibit 14, p. 1). He returned to Garrett's apartment Saturday evening at "approximately 7 to 10 p.m., more likely around 8:30 to 9:00" to get something

116

to eat and left not long after because "there was very little to eat." (*Id.*) Justin claims that he returned to Marshall's apartment and stayed there until early Sunday morning when returned to his mother's apartment "at approximately 8:00 a.m." and woke her [Peggy] up and "said hi to her." (*Id.*) Justin added that his friend, Steve, was also with him at this time. (*Id.*)

273.  The discrepancy in Peggy Garrett's testimony concerning Justin Horn's whereabouts must also be considered in the context of the statements of three other individuals.

274.  Eric Horn told a member of the Harrison Police Department that Justin was at his mother's apartment near the time that Amber was alleged to have gone missing, "Justin came home about 4:45 a.m." on the morning Amber went missing. (Exhibit 27; *see also* Exhibit 81).

275.  Chris Marshall reported that it was extremely unlikely that Justin Horn spent the night at his apartment. (Exhibit 81).

276.  On November 29, 1991, Douglas Dalton and Robert Hess gave written statements in which they both reported that on October 3, 1991, they heard a young child screaming. (Exhibits 46 and 47).[4]  "A few seconds later" a young girl matching the physical description of Amber ran from an alley, screaming. (Exhibit 46). Hess and Dalton stopped her and asked her what was wrong, and she remained silent. (Exhibits 46 and 47).  She then ran down the

---

[4]  Douglas Dalton in his report states that the incident occurred on "3rd of October *1992*." (Exhibit 32) (emphasis added). The reported year was a misstatement given that he gave the written statement on November 29, 1991. (*Id.*).

117

street and two boys, matching the physical descriptions of Amber's brothers, chased her. (*Id.*)

**B.    The Prosecution Knowingly Adduced The Perjured Testimony Of Eric Horn to Obtain a Conviction for Capital Murder and Death Sentence.**

277.    Eric Horn, the victim's brother, provided critical testimony concerning the facts surrounding the kidnapping and murder of Amber and the involvement of Wogenstahl.

278.    On May 26, 1992, Cincinnati Police Officer Timothy T. Tighe administered a polygraph examination to Horn concerning the murder of his sister. (Exhibit 28). After completion of the testing, Officer Tighe concluded "[t]here were significant emotional and physiological disturbances indicative of deception in Eric Horn's polygraph" with respect to his sister's death. (*Id.*)

279.    Horn perjured himself in three portions of his testimony, and the prosecution had knowledge of that perjury.

**1.    Horn lied in his testimony as to his whereabouts when his sister was kidnapped.**

280.    On direct examination Horn testified, he: (a) did not leave his mother's apartment from eleven o'clock when his mother left until 3:00 a.m. (Tr. 953); (b) left the apartment with Wogenstahl at 3:00 a.m. (Tr. 953-57); (c) returned to the apartment at approximately 3:30 a.m. (Tr. 1007); and (d) remained in the apartment until 4:45 a.m., when he left to go to his grandfather's residence. (Tr. 1007-08).

281.    Contrary to Horn's testimony, Chris T. Brickner told Special Agent Mark Rogers that he saw Horn on Harrison Avenue at 2:30 a.m. (Exhibit 31).

118

Daniel Brock was with Brickner and also saw Horn as well. Brock stated that he did not see "the suspected [Wogenstahl's] vehicle." (*Id.*)

282. Ruth Ann Westenhoffer told the investigating officers that Horn "left @ 3/30 and left the door locked returned @ 500/ and the door was not locked Mom returned at @ 505/." (Exhibit 32).

**2.    Horn lied in testimony about trafficking in marijuana.**

283. At a pretrial deposition, Horn testified that he had never sold marijuana or narcotics. (Eric Horn pretrial videotaped deposition). On cross examination at trial, Horn repeated this testimony:

> Q:    And have you ever seen any marijuana around
>        your house?
>
> A:    No.
>
> Q:    None at all?
>
> A.    No.
>
> Q.    Did you ever sell it?
>
> A.    No.

(Trial Tr. at 986).

284. Prior to Wogenstahl's trial, law enforcement officers searched Horn's residence and found a "CUT tray" with approximately sixty-three grams of marijuana in two separate plastic baggies, and Horn's billfold that contained $769.00 in cash. (Exhibit 34).

**3.    Horn lied in his testimony about Wogenstahl's clothing.**

285. The investigating officers seized a brown leather jacket (State's Exhibit 9) from the Wogenstahl's apartment. (Tr. 1682-83).

286.   Eric Horn identified State's Exhibit 9 as the jacket that Wogenstahl was wearing when he gave Horn a ride to the Beard residence. (Tr. 954, 997, 999).

287.   Horn had previously told Patrolman Lowery that Wogenstahl was wearing "a wine colored windbreaker type jacket. (Exhibit 16).

288.   In a second report, Horn indicated, "What Wogenstahl wearing, Eric *Possibly* wht [sic] Sweater + jeans." (Exhibit 33).

289.   The jacket was a critical piece of evidence to the State's case. The prosecution claimed the Wogenstahl was wearing a brown jacket at the time of the murder/kidnapping and the rips in that jacket were caused by the thorns in the plants located in the vicinity where Amber's victim's body was found. (Tr. 849-50, 1360-63, 2454-55, 2584).

## C.  The Prosecution Knowingly Adduced The Perjured Testimony Of Bruce Wheeler, and Argument Concerning His Testimony, to Obtain a Conviction for Capital Murder and Death Sentence.

290.   Jail house informant Bruce Wheeler testified that Wogenstahl confessed to having killed Amber.

291.   Wheeler perjured himself in his testimony and the prosecution had knowledge of that perjury.

292.   The prosecution subsequently misrepresented facts not in the record when vouching for Wheeler's credibility.

**1.      Wheeler lied when he testified that he did not receive any consideration in exchange for his testimony.**

293.  Iin response to the prosecutor's questions, Wheeler denied that he had received or expected to receive favorable treatment because of his testimony:

> Q:    Has anyone ever made any promised or offered you any rewards or inducements in exchange for your testimony?
>
> A:    No.

(Tr. 2156).

> Q.    Bruce if you are endangering your life by testifying against Wogenstahl and if you are not getting anything from the State for testifying, will you tell the jurors why you're doing it and why you're here today?
>
> Mr. Schmidt:  You Honor, there is no showing he is in danger of his life.
>
> The Court: He may answer.
>
> Q.    Go ahead.
>
> A.    Because he told me he killed the girl and I have a daughter of my own, a 5 year old daughter, and I just could not go away not saying anything knowing he probably would get off.

(Tr. 2158).

294.  On cross examination, Wheeler continued to deny he received consideration in return for his testimony. (Tr. 2180-81).

295.  In closing argument, the prosecution emphasized the credibility of Wheeler's testimony: "*Bruce Wheeler got nothing for his appearance in this courtroom, He got nothing.* He pled guilty before Judge Winkler as charged.

121

*Nothing reduced, nothing dismissed.* Guilty as charged." (Tr. 2464) (emphasis added).

296. However, contrary to this testimony, Wheeler did receive consideration in exchange for his agreement to testify. In a sworn affidavit, Wheeler stated:

A.    The prosecution: "[i]mplied that [he] would do less time in prison if [he] testified" against Petitioner. (Exhibit 35).

B.    The prosecution promised Wheeler that if he testified the Office would write a letter on his behalf to the Parole Board. (*Id.*) The prosecution subsequently wrote a letter on to the Parole Board on Wheeler's behalf. (Exhibit 36).

C.    Wheeler requested that he be transferred to Ross Correctional Institution. (Exhibit 35). He was later transferred to Ross Correctional Institute. (*Id.*)

297.   The prosecution was aware that Wheeler's testimony was inaccurate, because it had given Wheeler the consideration in exchange for his testimony.

**2.    The prosecution misstated facts not contained in the record when it claimed that Wheeler had immediately accepted responsibility for the charge on which he was incarcerated.**

298.   At the time of Wogenstahl's trial, Wheeler was incarcerated for the offense of involuntary manslaughter. He pled guilty and received a sentence of five to ten years in prison.

299.   In its initial closing statement during the trial phase, the prosecution vouched for Wheeler's credibility claiming that Wheeler had readily admitted his guilt:

> I will tell you this. There is a difference between this defendant and Bruce Wheeler. The difference is that Bruce Wheeler did something stupid, he did a thoughtless, unthinking act, he accepted responsibility for it and actually feels some remorse.

(Tr. 2466).

300.   In the grand jury proceedings considering Wheeler's case, the same prosecutor provided a much different assessment of Wheeler's acceptance of responsibility:

> I don't understand how he [Wheeler] can back hand this child with this kind of force and not know how it happened. It stretches the bounds of credibility. Quite frankly, I just don't believe it.

(Exhibit 37, p. 3).

301.   Cincinnati Police Department Specialist William Davis told Wheeler's grand jury that Wheeler did not initially admit to hitting the child. Instead, Davis testified that Wheeler told the investigating officers that he (Wheeler) had awakened and found the child was vomiting. Davis testified that Wheeler did not admit to hitting the child until Wheeler failed a polygraph examination:

> We asked him to take a polygraph exam . . . It showed that he was not being totally truthful with us. We questioned him further, and he finally admitted that he had struck the infant at approximately 4:00 p.m. on the twenty-third.

(Exhibit 37, p. 8).

123

302. The prosecution was aware that its argument was inaccurate and misleading and did not correct it.

**D. The Prosecution Knowingly Adduced The Perjured Testimony Of Michelle Hunt to Obtain a Conviction for Capital Murder and Death Sentence.**

303. Michelle Hunt testified in the State's case in chief that:

A. She worked at the Waffle house and Peggy Garrett and Lynn Williams arrived at the Waffle House at approximately 2:30 to 3:00 a.m. on the night/early morning hours of Amber's disappearance. (Tr. 1083-84).

B. Shortly after Williams and Garrett arrived, a vehicle entered the parking lot and immediately left the lot without anyone exiting the vehicle. (Tr. 1086-87).

C. She believed that two persons were in the car, both of whom were in the front seat. (Tr. 1096, 1098).

D. FBI agents showed her a photograph, State's Exhibit 50, of the vehicle shortly after Amber's body was found.

E. She identified State's Exhibit 50 as a photograph of the vehicle that she saw entering and immediately leaving the parking lot (Tr. 1088, 1095).

304. State's Exhibit 50 was subsequently identified as a photograph of Wogenstahl's vehicle.

305. On November 25 1991, Hunt gave a statement to the Harrison Police Department (Exhibit 38) and on November 27, 1991, Hunt gave another statement to FBI Special Agent Woods. (Exhibit 39). Hunt made no mention in

either of these statements of having seen a car enter and leave the parking lot. (*Id.*) Further, her second statement makes no mention of Special Agent Woods having shown her photograph(s) of vehicle. (*Id.*)

306.  The prosecution was aware that Hunt's testimony was inaccurate and she had previously given contradictory statements, yet it did not correct her testimony.

### E. The Prosecution Knowingly Adduced The Perjured Testimony Of Brian Noel to Obtain a Conviction for Capital Murder and Death Sentence.

307.  Brian Noel testified that while driving on Jamison Road at approximately 3:40 a.m. on November 24, 1991, he saw Wogenstahl standing next to a car that was parked in the vicinity of where Amber's body was later found. (Tr. 1510-15, 1524-25).

308.  On cross examination, Noel stated earlier that, earlier that evening (from 9:00 p.m. until 2:30 a.m.) he had been at Hymie's, a tavern, and drank two beers. (Tr. 1529). On cross examination, trial counsel unsuccessfully attempted to develop the point that Noel had consumed more than two beers. (Tr. 1529-30).

309.  Noel had previously told a member of the Harrison Police Department that he drank "5 beers." (Exhibit 40).

310.  The prosecution was aware that his testimony was inaccurate and he had previously provided a contradictory statement but failed to correct his testimony.

**F.     The Prosecution Knowingly Adduced The Perjured Testimony Of Special Agent Douglas Deedrick to Obtain a Conviction for Capital Murder and Death Sentence.**

311.  Federal Bureau of Investigation Special Agent Douglas Deedrick testified inaccurately about the hair found in Amber's underwear.

312.  The prosecution was aware that his testimony was inaccurate and not supported by the applicable science, but did not correct it or advise defense counsel of the issue.

313.  On direct examination Deedrick testified that it was his opinion to a reasonable degree of scientific certainty that the hair found in the victim's underwear belonged to Wogenstahl. (Tr. 1286; Tr. 1290-91).

314.  Deedrick bolstered his opinion by testifying about the thousands of cases in which he had conducted hair analysis and the hundreds of samples he had reviewed. (Tr. 1297). He further bolstered the reliability of opinion by testifying to the hundreds of samples he was able to eliminate. (*Id.*)

315.  The prosecution made Deedricks' opinion a focus of its case.

316.  The prosecution used Deedrick's testimony to cross examine Wogenstahl:

> Q:     Do you want to tell the jury how your pubic hair got in her underwear?
>
> A:     It is not my pubic hair. That is all I can say.
>
> ***
>
> Q:     Another terrible coincidence or is this FBI agent lying also?

> A:   I believe that the FBI agent stated that it was similar to mine but he could not positively say it was mine.
>
> Q:   To the exclusion of everyone in the world.
>
> ***
>
> Q:   The FBI agent said to the exclusion of everyone in the world but exhibited every one of the characteristics of your pubic hair and you are telling the jury that was not your pubic hair?

(Trial Tr. 2373-74).

317.   In closing argument, the prosecutor personally vouched for the credibility of Deedrick and argued that his opinion eliminated all possibility that the hair belonged to another individual:

> In fact, during the time that he testified I had to admit I have never seen a witness with as much expertise in a particular area that is knowledgeable on his subject as Special Agent Deedrick. Here's a person who runs the most advanced crime lab . . . in the world and teaches forensic technicians how to make comparisons of trace evidence.
>
> ***
>
> He has examined four thousand hairs and he has told you that he has never found two known head hairs or two known pubic hairs that you could not distinguish and you could not say this goes to that person and that goes to that person. And he said that is Wogenstahl's hair.

(Trial Tr. 2456-2458).

318.   The Department of Justice has determined that that Deedrick's testimony was inaccurate and identified three specific errors therein. Deedrick:

127

A.      Stated or implied that the hair could be associated with a specific individual to the exclusion of all others. (Exhibit 87).

B.      Assigned to the positive association a statistical weight or probability or likelihood that the questioned hair originated from a particular source or an opinion as to the likelihood or rareness of the positive association that could lead the jury to believe that valid statistical weight can be assigned to a microscopic hair association. (*Id.*)

C.      Cited the number of cases of hair analysis conducted in the laboratory and the number of samples from different individuals that could not be distinguished from one another as a predictive value to bolster the conclusion that a hair belongs to a specific individual. (*Id.*)

319.   According to the Department of Justice, Deedrick's testimony exceeded the limits of science. (*Id.*)

**G.     Because Of The Nature And Quantity Of The Perjured Testimony, A Reasonable Probability Exists That It Could Have Affected The Jury's Verdicts In The Trial And/Or Sentencing Phases.**

320.   The prosecution adduced the testimony identified in this claim for relief knowing it to be false and failed to correct it or properly notified trial counsel.

321.   The prosecution engaged in argument and statements to the jury that they knew to be false and did not correct the same.

322.   The perjured testimony and inaccurate argument included: (a) direct evidence that linked Wogenstahl to the commission to the murder (including the eyewitnesses and jailhouse informant), (b) indirect evidence that

linked Wogenstahl to the crime (the clothing he was purportedly wearing and the forensic testimony of the FBI Agent) and (c) witnesses criminal records.

323.  The prosecution at no time corrected its misleading statements and argument and testimony of its witnesses, nor did it notify trial counsel.

324.  A strict standard of materiality applies when the prosecution fails to disclose testimony and argument that it knows to be false and neither corrects it or notifies trial counsel.  Reversal is required if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.

325.  A reasonable likelihood exists that the prosecution's knowing use of false testimony and argument affected the jury verdicts in the trial and sentencing phases.

**H.    Conclusion, Second Claim for Relief**

326.  The prosecution's reliance on false testimony and argument violated Wogenstahl's right to be free from cruel and unusual punishment and due process as guaranteed by the Eighth and Fourteenth Amendments.

327.  To the extent that the Ohio courts adjudicated the federal constitutional merits of this claim, their adjudications were contrary to, or were unreasonable applications of clearly established federal law, and/or were based on an unreasonable determination of the facts.

328.  This Court should issue the writ.

**Third Claim for Relief:** **Trial Counsel's Acts And Omissions Deprived Jeffrey Wogenstahl Of Effective Assistance Of Counsel During The Pretrial, Trial, And Mitigation Phases.**

329. Wogenstahl incorporates all of the allegations contained elsewhere in this petition as if fully restated herein.

330. Wogenstahl was entitled to effective assistance of counsel at all phases of his capital trial.

331. As a result of the lack of adequate pretrial preparation, skill and experience, trial counsel were not in a position to render, and did not render, Wogenstahl reasonably effective assistance in any of the phases of his capital trial.

332. A reasonable probability exists that the outcome of the proceedings at the trial and sentencing stages would have been different if defense counsel's performance met the prevailing standards of practice.

**A.      Counsel Performed Unreasonably And Deficiently In The Trial Phase.**

**1.      Counsel conducted an unreasonable trial phase investigation.**

333. Trial counsel were required to investigate all lines of defense or reasonably decide that a particular investigation was not necessary.

334. Trial counsel failed to conduct a reasonable investigation with respect to the trial phase.

335. Because trial counsel failed to conduct a reasonable investigation, they failed to learn the following with respect to issues that Peggy Garrett testified at trial: (a) the facts consistent with Garrett having been involved in the death of her daughter, (*see* First Claim for Relief, ¶¶103-09, *supra*)*;* (b)

Garrett's repeated physical and mental abuse of Amber, (*Id.* at ¶¶110-14, *supra*)*;* (c) Garrett's whereabouts at the time of the kidnapping, (*Id.* at ¶¶115-18, *supra*)*;* (d) the facts surrounding the kidnapping of Amber, (*Id.* at ¶¶119-22, *supra*)*;* (e) the clothing that Wogenstahl was wearing on the night of Amber's kidnapping, (*Id.* at ¶¶128-29, *supra*); (f) the full extent of Garret's criminal record, (*Id.* at ¶¶130-31, *supra*); (g) the whereabouts of Justin Horn when Amber was kidnapped, (*Id.* at ¶¶132-37, *supra*); and (h) Garrett's relationship with Wogenstahl, (*Id.* at ¶¶123-27, *supra*).

336. Because trial counsel failed to conduct a reasonable investigation, they failed to learn the following with respect to issues that Eric Horn testified at trial: (a) Horn's whereabouts in the early morning hours when Amber was kidnapped, (*Id.* at ¶¶144-47, *supra*); (b) Horn may have previously assaulted his sister, (*Id.* at ¶148, *supra*); (c) Horn failed a polygraph examination, (*Id.* at ¶¶149-51, *supra*); (d) Horn's trafficking in marijuana and subsequent adjudication, (*Id.* at ¶¶152-55, *supra*); (e) the clothing Wogenstahl was wearing during the time period when Amber was kidnapped, (*Id.* at ¶¶156-59, *supra*); and (f) the facts pointing to Horn's involvement in the killing of Amber, (*Id.* at ¶¶139-43, *supra*).

337. Because trial counsel failed to conduct a reasonable investigation, they failed to learn the following with respect to issues that Bruce Wheeler's testified at trial: (a) he received consideration in exchange for his testimony, (*Id.* at ¶¶178-80, *supra*), and (b) he failed to cooperate with authorities when

arrested for the involuntary manslaughter of his girlfriend's daughter, (*Id.* at ¶¶181-84, *supra*).

338. Because trial counsel failed to conduct a reasonable investigation, they failed to learn that eyewitnesses Michelle Hunt and Brian Noel had given statements prior to trial that contradicted portions of their trial testimony, (*Id.* at ¶¶185-92, *supra*).

339. Because trial counsel failed to conduct a reasonable investigation, they failed to learn that Amber had previously been the victim of several sexual assaults and other related offenses, (*Id.* at ¶¶167-75, *supra*).

340. Because trial counsel failed to conduct a reasonable investigation, they failed to learn the facts that impeached the prosecution's theory of the case concerning the: (a) manner in which Amber was kidnapped, (*Id.* at ¶¶204-09, *supra*)*;* (b) time and place of her murder, (*Id.* at ¶¶210-11, *supra*); and (c) blood found in Wogenstahl's apartment, (*Id.* at ¶¶212-19, *supra*).

**2.    Counsel failed to retain reasonable and necessary experts.**

341. Trial counsel's duty to conduct a reasonable investigation included the retention of all necessary experts. Counsel here failed to retain reasonable and necessary experts in this case.

342. Counsel unreasonably failed to retain a qualified forensic pathologist who would have testified to multiple inconsistencies with the prosecution's theory, including that Amber did not sustain her fatal injuries in a vehicle. (Exhibit 82).

343.   Counsel unreasonably failed to retain an expert in the area of crime scene analysis who could have testified to multiple inconsistencies with the prosecution's theory, including that: (a) the investigating officers conducted a deficient investigation of the area in Amber's body was found, (b) the cleaning of the interior of Wogenstahl's vehicle with bleach would not have likely precluded the detection of blood, and (c) Amber was killed in the immediate area where her body was found. (Exhibit 83).

344.   Counsel unreasonably failed to retain an expert in the area of eyewitness identification. A competent expert in this area could have provided testimony concerning multiple inconsistencies with the prosecution's theory, including the following: (a) the memory of a face of a stranger seen once for a few seconds is difficult under optimal conditions and when visibility is limited by poor lighting, viewing angle, and limited time it is extremely challenging to form durable, detailed memory, (b) the unreliability of  identifications based on a relative choice strategy, (c) chance encounters and or exposure to media accounts of a suspect may alter a witness's memory, and (d) photo lineup identifications are unreliable when the administrator provides encouragement or incentives. (Exhibit 80).

345.   Counsel unreasonably failed to retain a forensic expert in hair analysis. A competent expert in this area could have testified that Special Agent's Deedrick's testimony exceeded the limitations of science because he: (a) stated or implied that the hair found in the victim's underwear can be associated with a specific individual, Wogenstahl, to the exclusion of all others and (b)

assigned to the positive association a statistical weight or probability or likelihood that the questioned hair from Amber's underwear originated from a Wogenstahl or an opinion as to the likelihood or rareness of this positive association. (Exhibit 87).

### 3. Counsel performed unreasonably and deficiently in the prosecution's case in chief.

346. Counsel, to perform reasonably, must cross examine the State's witnesses as to any: (a) prior inconsistent statements, (b) conflicting evidence, and (c) those facts which support a finding of not guilty or guilty of a lesser offense. Counsel failed to meet this standard of reasonableness.

347. Trial counsel unreasonably cross examined Peggy Garrett concerning (a) her repeated physical and mental abuse of Amber, (*Id.* at ¶¶110-14, *supra*); (b) the facts surrounding the kidnapping of Amber, (*Id.* at ¶¶119-22, *supra*); (c) her prior statements concerning the jacket that Wogenstahl was wearing on the night of Amber's kidnapping, (*Id.* at ¶¶128-29, *supra*); (d) the full extent of her criminal record, (*Id.* at ¶¶130-31, *supra*); (d) the whereabouts of Justin Horn when Amber was kidnapped, (*Id.* at ¶¶132-37, *supra*); and (e) her relationship with Wogenstahl, (*Id.* at ¶¶123-27, *supra*).

348. Trial counsel unreasonably cross examined Eric Horn concerning: (a) his whereabouts in the early morning hours when Amber was kidnapped, (*Id.* at ¶¶144-47, *supra*); (b) whether he previously assaulted his sister, (*Id.* at ¶148, *supra*); (c) his trafficking in marijuana and subsequent adjudication, (*Id.* at ¶¶152-55, *supra*); and (d) his prior statements concerning the clothing

134

Wogenstahl was wearing during the time period was Amber was kidnapped, (*Id.* at ¶¶156-59, *supra*).

349. Trial counsel unreasonably cross examined Bruce Wheeler concerning the consideration he received in exchange for his testimony, (*Id.* at ¶¶178-80, *supra*).

350. Trial counsel unreasonably cross examined eyewitnesses Michelle Hunt and Brian Noel concerning their pretrial statements that contradicted their trial testimony, (*Id.* at ¶¶185-92, *supra*).

351. Trial counsel unreasonably failed to cross examine the investigating officers concerning the quality of their investigation including the evidence: (a) of the existence of other suspects (*Id.* at ¶¶161-75, *supra*); (b) that pointed to Peggy Garrett as a suspect in the murder of Amber including her prior abuse of Amber, (*Id.* at ¶¶103-14, *supra*); (c) that pointed to Eric Horn's involvement in the murder of Amber, including his prior abuse of her, (*Id.* at ¶¶139-43, 148, *supra*); (d) that conflicted with the state's theory as to manner in which Amber was kidnapped, (*Id.* at ¶¶204-09, *supra*); (e) regarding the time and place of Amber's murder, (*Id.* at ¶¶210-11, *supra*); and (f) concerning the source of the blood found in Wogenstahl's apartment, (*Id.* at ¶¶212-19, *supra*).

**4.    Counsel performed unreasonably and deficiently when making the Rule 29 motion.**

352. At the conclusion of the prosecution's case, counsel must make all objections to the prosecution's failure to produce sufficient evidence or face the prospect of the omitted objection(s) issues being waived for purposes of appeal.

Counsel failed to perform reasonably when moving for dismissal of the prosecution's case at the close of the evidence.

353.  Trial counsel realized the need for the prosecution to prove that the murder occurred in the State of Ohio. The Due Process Clause of the Fourteenth Amendment requires the State prove every element of a crime beyond a reasonable doubt.  They moved for judgment of acquittal at the end of the State's case based on the State's failure to produce sufficient evidence. (Tr. 2198).

354.  However, counsel premised the motion exclusively on the concept of venue, as opposed to jurisdiction: "we would ask and we would submit that the case is insufficient evidence [sic] to go forward and more specifically on the issue of venue." (*Id.*)

355.  Because defense counsel made the incorrect argument, the trial court overruled the motion, "[w]ith reference to venue, . . . Hamilton County is clearly the place where the case should be prosecuted." (Tr. 2200).

356.  Counsel is charged with knowing the applicable law. The statute in effect at the time of Wogenstahl's trial provided that in cases involving a homicide, common pleas courts only had had jurisdiction when "the act that causes death, or the physical contact that causes death, or the death itself" occurred in the State of Ohio. R.C. § 2901.11(B).  Defense counsel should have argued the prosecution's failure to adduce sufficient evidence as to subject matter jurisdiction, rather than challenging venue.

357.   Defense counsel should have also presented additional evidence to demonstrate the same.  (*See* Exhibits 82, 83, 94, and 95).

### 5.   Counsel performed unreasonably and deficiently in the defense case in chief.

358.   To perform reasonably in the defense case, trial counsel must present all relevant evidence (a) that calls into question the prosecution's case, and (b) supports a verdict of not guilty or guilty of a lesser offense. In the alternative, trial counsel must have a reasonable strategy for failing to present that relevant evidence.   Counsel failed to perform reasonably in the defense case in chief.

359.   Counsel unreasonably failed to present expert testimony that (a) Amber was killed in the immediate vicinity where her body was found, (*Id.* at ¶¶342, *supra*)*;* (b) the investigators failed to conduct an investigation of the crime scene that met the relevant professional standards, (*Id.* at ¶¶343, *supra*); (c) there were factors present in this case that caused the in court identification of the eyewitnesses to be suspect, (*Id.* at ¶¶344, *supra*)*;* and (d) the testimony of Special Agent Deedrick was not supported by the evidence, (*Id.* at ¶¶311-19, 345, *supra*).

360.   Counsel unreasonably failed to present evidence of Peggy Garrett's involvement in the death of her daughter including: (a) her physical and mental abuse of Amber (*Id.* at ¶¶110-14, *supra*); (b) her untruthful testimony as to her whereabouts at the time of Amber's kidnapping, (*Id.* at ¶¶115-18, *supra*); (c)

her addiction to controlled substances, (*Id.* at ¶¶103-09, *supra*); and (d) her statements to others that she had sold Amber, (*Id.* at ¶¶107-09, *supra*)*.*

361. Counsel unreasonably failed to present evidence of Eric Horn's involvement in the death of her sister including: (a) his prior abuse of Amber (*Id.* at ¶148, *supra*); (b) his statement that he wished she was dead, (*Id.* at ¶142, *supra*); and (c) that he lied in testimony concerning his whereabouts at the time of the kidnapping, (*Id.* at ¶¶144-47, *supra*).

362. Trial counsel unreasonably failed to present evidence of other suspects including (a) those individuals who had previously victimized Amber, (*Id.* at ¶¶167-75, *supra*); and (b) the bikers that frequented her mother's apartment that had inappropriately touched her, (*Id.* at ¶¶161-66, *supra*)*.*

### **6.  Counsel performed unreasonably and deficiently in the state's closing argument.**

363. To perform reasonably with respect to the State's closing argument, counsel must object to all impermissible and/or incorrect statements by the prosecution or the issue will be waived on appeal, absent plain error.

364. The prosecution called jail house informant Bruce Wheeler to testify that Wogenstahl had confessed to him. (Tr. 2156, 2158, 2180-81).

365. In closing argument, the prosecution vouched for Wheeler's credibility claiming that Wheeler had readily admitted his guilt:

> I will tell you this. There is a difference between this defendant and Bruce Wheeler. The difference is that Bruce Wheeler did something stupid, he did a

138

> thoughtless, unthinking act, he accepted responsibility
> for it and actually feels some remorse.

(Tr. 2466).

366.   The prosecution misled the jury concerning Wheeler's acceptance of responsibility. (*See,* ¶¶298-302, *supra*).

367.   Defense counsel performed deficiently when they failed to object to this argument. The argument (a) constituted improper vouching, (b) was based on misstatement of the facts, and (c) was not supported by evidence in the record.

### 7.   Counsel performed unreasonably and deficiently with respect to the court's trial phase instructions.

368.   Counsel must object to all errors in the trial court's instructions or the issue(s) will be waived for appellate purposes.

369.   Trial counsel acted unreasonably when they failed to object to the trial court's failure to instruct the jury as to subject matter jurisdiction.

370.   For a trial court to have jurisdiction in Wogenstahl's case, the killing itself must have occurred in the State of Ohio. (R.C. § 2901.11).

371.   The trial court instructed the jury on venue but failed to instruct the jury on subject matter jurisdiction. (Tr. 2611-12). This lack of instruction relieved the prosecution of its burden to prove jurisdiction was proper in Ohio, specifically in the Hamilton County Court of Common Pleas.

372.   An instruction (or lack thereof) which relieves the State of its burden to prove each essential element of a crime violates the Due Process Clause of the Fourteenth Amendment. Subject matter jurisdiction is an

element of the offense. The Due Process Clause of the Fourteenth Amendment requires the State prove every element of a crime beyond a reasonable doubt.

373. This improper instruction violated Wogenstahl's right to trial by jury as guaranteed by the Sixth and Fourteenth Amendments.

**B.  Counsel Performed Unreasonably And Deficiently At Sentencing Phase Hearing.**

374. Trial counsel had an obligation to conduct a thorough and independent investigation relating to the issue of punishment.

375. Counsel must present to the trier of fact all reasonably available evidence in mitigation unless there are *strong* strategic reasons to forego some portion of such evidence. Trial counsel did not meet that standard.

**1.  Trial counsel did not present important lay testimony.**

376. Trial counsel called Diana Linz to testify. However, because trial counsel failed to properly interview and prepare Linz to testify, they failed to adduce highly relevant testimony:

   a.   Wogenstahl's grandmother raised him because of the manner in which his mother was treating him. At one point his mother tied him to the back porch railing in his underwear in the cold, probably because he had wet his pants when he was around two to three years old. (Exhibit 89, ¶4).

   b.   Wogenstahl's biological father kicked his mother in the stomach when she was pregnant with Wogenstahl, in an attempt to cause a miscarriage. (*Id.* at ¶5).

140

      c.     When Wogenstahl lived with his parents, his room was in the unfinished basement. His siblings lived in the finished upstairs of the house. (*Id.* at ¶6).

      d.     A history of bipolar issues exist in the Wogenstahl family. His grandmother, Hazel Gordon, was believed to be bipolar and his mother probably suffered from bipolar disorder as well. (*Id.* at ¶8).

377.   Trial counsel did not call Tom Wilson and/or Edith Long to testify. If asked, they could have provided the following information:

      a.     Wogenstahl loved his dad, and it wasn't until he found out Allen was not his biological dad that he started acting out. (Exhibit 90, ¶5).

      b.     Wogenstahl seemed like his usual self the day of the crime. (Exhibits 90, 91). He had recently purchased a car and appeared happy. (*Id.* at ¶5).

378.   Trial counsel did not call Mabel Long to testify. If asked, she could have testified to the following information:

      a.     Wogenstahl's mother, Vera Wogenstahl, treated him very poorly. She did not want anything to do with him. She always referred to him as a "son of a bitch" and a "bastard". One time when Wogenstahl was probably eight or nine years of age and playing outside, his mother opened the door and yelled at him, "Come here you son of a bitch." (Exhibit 91 at ¶5).

      b.     Vera treated Wogenstahl's siblings very differently. She treated them like they were her life. (*Id.* at ¶6).

       c.     Wogenstahl slept in the unfinished basement of the house when he was a child. It contained only a mattress and bedframe. All of his siblings slept upstairs in bedrooms. Wogenstahl never said anything about the way his mother treated him, probably because he was accustomed to it. (*Id.* at ¶7).

       d.     When Wogenstahl was around thirteen years of age, Vera threw a Halloween party at her house. Wogenstahl, who slept with a knife under his pillow, badly cut his arm accidentally, during the night. The cut was so deep that his father thought that Wogenstahl should have sought medical treatment, but Vera did not to take him for treatment. (*Id.* at ¶8).

       e.     Wogenstahl was always kind to her. One time when Long was a high school freshman, she ran away from home. Wogenstahl suggested that Long go to a friend's house. Wogenstahl walked Long there to insure she was okay. (*Id.* at ¶9).

379.   Trial counsel called Wogenstahl's friend, Teresa Smith, to testify. Trial counsel did not prepare her to testify. She only met with them at the courthouse on the day that she testified. They just told her they would ask her some questions. She had no idea what the questions would be concerning. (Exhibit 76 at ¶8). She knew several persons who knew Wogenstahl that would have been willing to testify, including her father. (*Id.*)

380.   Trial counsel called Chris Oldendick to testify during the mitigation phase. Wogenstahl reached out to him to testify, not trial counsel. Oldendick provided the following information:

a.    Trial counsel never met with him prior to him testifying. Instead, Oldendick and his sister, Teresa Smith, approached them in the hallway and started a conversation about Wogenstahl. Counsel then asked him, "Are you going to be a character witness for Jeff?" Oldendick and his sister both agreed, and counsel told them to be seated and they would call their names when it was time to testify.  (Exhibit 92 at ¶4).

b.    Trial counsel did not review with him or his sister the content of their testimony. He did not know what they were going to ask him. He was surprised at how few questions they asked him. (*Id.* at ¶5).

c.    Had trial counsel asked Oldendick, he could have testified about Wogenstahl's background, including his family life. (*Id.* at ¶ 6).

381. Trial counsel did not call Phyllis Myers to testify. Myers lived around the corner from Wogenstahl's parents. (Exhibit 93, ¶1). Ironically, Myers had conducted most of the investigation for trial counsel in Wogenstahl's case. (*Id.* at ¶3).   If asked, she could have testified as to the following information:

a.    Wogenstahl was treated differently than his siblings by his parents when he was younger.  (*Id.* at ¶5).

b.    His parents punished him by shutting him in a closet. On one occasion, they tied him in his underwear to a chair outside in the cold. One Christmas he had to watch his siblings open Christmas presents but didn't get any himself.  (*Id.* at ¶6).

143

### 2. Trial counsel did not present critical expert testimony.

382. The prevailing standards of practice at the time of Wogenstahl's trial provided that counsel should retain a competent psychologist to identify for the jurors those environmental and biological factors that shaped the defendant's development and ultimately his involvement in the capital murder for which he was charged. Trial counsel did not meet this standard.

383. If so retained and provided a thorough social history, a competent expert could have provided the jury with the following information:

    a. Wogenstahl was abused as a child. This type of abuse has long term deleterious effects and increased the risk that Wogenstahl would experience drug and alcohol problems, develop mental illness, and engage in criminal and violent acts as he grew older. (Exhibit 88, pp.6-8).

    b. At the age of thirteen, Wogenstahl discovered that Allen, the man he believed was his father, was not his biological father. This news was "devastating" to Wogenstahl. (*Id.* at p.8).

    c. Wogenstahl was likely suffered from undiagnosed Mood and Anxiety Disorders. The records are strongly indicative that he suffered from Bipolar Disorder. (*Id.* at pp.8-9).

    d. For many years, Wogenstahl had been prescribed psychotropic medications, including anti-anxiety agents, anti-depressants, and mood stabilizers. (*Id.* at p. 8).

384. With respect to expert testimony, the mitigation presentation was deficient in the following respects:

a.      Wogenstahl's substance abuse problems were not fully developed and presented.  (*Id.* at pp. 9-10).

b.      Substantial mitigating factors existed that were not presented to the jury. (*Id.* at p. 11).

c.      There was a complete absence of references to the empirical evidence in the field of psychology and related disciplines that would have been of mitigating value.  (*Id.* at p.11).

d.      Because of the lack of evidence in the sentencing phase, the jury was not able to fully consider the history, character, and background of Wogenstahl. (*Id.*)

## C.      Wogenstahl Was Prejudiced By Counsel's Deficient Performance In Both The Trial And Sentencing Phases.

385.  A defendant is prejudiced by counsel's deficient performance when a reasonable likelihood exists at least one juror would have reached a different result had counsel performed competently. In making this assessment a court must weigh *in toto* the evidence presented at trial and the evidence developed since trial.

386.  In this case, when the evidence is viewed *in toto*, a reasonable probability exists that one or more jurors would have reached a different result in either the trial or sentencing phase if counsel had not performed deficiently and instead performed reasonably as defined in the prevailing standards of practice and applicable case law.

387.   Counsel's failure to perform reasonably was not the result of any tactical or strategic choice within the range of reasonable competence but was the result of counsel's lack of preparation, experience, knowledge and skill.

**D.      Conclusion, Third Claim For Relief**

388.   Counsel's deficient performance denied Wogenstahl his right to effective assistance of counsel guaranteed by the Sixth, Eighth, and Fourteenth Amendments as to all phases of his case at the trial level.

389.   To the extent that the Ohio courts adjudicated the federal constitutional merits of this claim, their adjudications were contrary to, or were unreasonable applications of clearly established federal law, and/or were based on an unreasonable determination of the facts.

390.   This Court should issue the writ.

**Fourth Claim for Relief: The Cumulative Effect of the Federal Constitutional Errors Denied Wogenstahl Due Process Under the Fifth, Sixth, Eighth and Fourteenth Amendments**

391.   Wogenstahl incorporates each and every factual allegation contained in this petition as if fully set forth herein.

392.   Each of the claims for relief raised in this petition requires vacation of Wogenstahl's convictions and sentences.

393.   In the alternative, even if none of the individual grounds for relief warrants the granting of habeas relief, then the cumulative effect of those errors requires the vacation of Wogenstahl's convictions or sentences.

394.   Constitutional claims of error are to be considered cumulatively as well as individually. Cumulative error or the cumulative effect of prejudice from

a range of claims may collectively provide a basis for relief whether or not the effect of the individual errors warrants relief.

395. Because of the unparalleled severity and irreversibility of the death penalty, the Eighth Amendment imposes a heightened standard for reliability in the determination that death is the appropriate penalty.

396. The cumulative effect of the errors and omissions presented in the preceding claims for relief prejudiced Wogenstahl and deprived him of his rights as guaranteed by the Fifth, Sixth, and Fourteenth Amendments. The result is constitutionally unreliable convictions and sentences.

397. To the extent that the Ohio courts adjudicated the federal constitutional merits of these claims, their adjudications were contrary to, or were unreasonable applications of, clearly established federal law, and/or were based on unreasonable determinations of the facts.

398. This Court should issue the writ.

## **PRAYER FOR RELIEF**

Petitioner Jeffrey A. Wogenstahl respectfully requests this Court to grant him the following:

A. Leave to conduct discovery pursuant to Rule 6 of the Rules governing Section 2254 cases;

B Upon completion of discovery, leave of court to amend his habeas petition;

C. After amendment of his petition, an evidentiary hearing on the issues contained in his amended habeas petition;

D. A new trial as to his conviction for capital murder and kidnapping;

E.    In the alternative, to the relief requested in the preceding paragraph, a new sentencing hearing as to his death sentence;

F.    In the alternative to the relief requested in the preceding paragraph, an unconditional writ of habeas corpus with respect to Petitioner's death sentence;

G.    Such further relief as this Court may deem just and proper.

Respectfully submitted,

Office of the Ohio Public Defender

/s/ KIMBERLY S. RIGBY
KIMBERLY S. RIGBY (0078245)
Kimberly.Rigby@opd.ohio.gov
Supervising Attorney, Death Penalty Dept.

ELIZABETH ARRICK (0085151)
Elizabeth.Arrick@opd.ohio.gov
Assistant State Public Defender

250 East Broad St., Suite 1400
Columbus, Ohio 43215
614-466-5394 (Phone)
614-644-0708 (Fax)

And

ANDREW P. AVELLANO - 0062907
Attorney At Law
4181 East Main Street
Columbus, Ohio 43213
(614) 237-8050; (614) 237-3505 - Fax
Email: drewavo@wowway.com

Counsel For Jeffrey A. Wogenstahl

148

**CERTIFICATE OF SERVICE**

I hereby certify that on May 3, 2017, a copy of *Jeffery A. Wogenstahl's Petition For Writ Of Habeas Corpus Pursuant To 28 U.S.C § 2254* was forwarded to all parties via the courts electronic system.

/s/ KIMBERLY S. RIGBY
KIMBERLY S. RIGBY (0078245)
Supervising Attorney, Death Penalty Dept.
Kimberly.Rigby@opd.ohio.gov

COUNSEL FOR APPELLANT
